In The

# United States Court of Appeals

### For The Federal Circuit

## BASEBALL QUICK, LLC, a New York corporation,

*Plaintiff – Appellant,*

v.

## MLB ADVANCED MEDIA, L.P., a Delaware corporation,

*Defendant – Appellee,*

## DOES, 1 through 5, inclusive,

*Defendant.*

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK
### IN CASE NO. 1:11-cv-01735-KBF, JUDGE KATHERINE B. FORREST.

―――――――――

## NON-CONFIDENTIAL BRIEF OF APPELLANT

―――――――――

James M. Bollinger
Joshua A. Berman
Timothy P. Heaton
Phoenix S. Pak
TROUTMAN SANDERS LLP
875 Third Avenue
New York, New York  10022
(212) 704-6000

*Counsel for Appellant*

Paul E. McGowan
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia  30308
(404) 885-3270

*Counsel for Appellant*

Matthew D. Murphey
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, California  92614
(949) 622-2756

*Counsel for Appellant*

Eric M. Jaegers
TROUTMAN SANDERS LLP
11682 El Camino Real
San Diego, California  92130
(858) 509-6000

*Counsel for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant certifies the following:

1.  The full name of every party or amicus represented by me is:

    Baseball Quick, LLC

2.  The name of the real party in interest represented by me is:

    N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party of amicus curiae represented by me are:

    N/A

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    James M. Bollinger, Matthew D. Murphey, Paul E. McGowan, Eric M. Jaegers, Timothy P. Heaton, Phoenix S. Pak, Joshua A. Berman, Douglas D. Salyers; Troutman Sanders LLP

    Gregg I. Anderson, Kimberly D. Howatt; Gordon & Rees, LLP

<u>May 1, 2015</u>
Date

<u>/s/ James M. Bollinger</u>
Signature of Counsel

<u>James M. Bollinger</u>
Printed name of Counsel

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTEREST...............................................................................i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES .................................................................. vii

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE AND FACTUAL BACKGROUND.........................2

I.      THE '716 PATENTED INVENTION ....................................................4

        A.      An Analytical View Of Baseball ................................................5

        B.      The Innovative Video Editing Protocol Of The '716
                Patent................................................................................6

        C.      '716 Patent Prosecution History .................................................8

                1.      The '716 Invention Includes Essentially All
                        "Game Action That Contributes To The Final
                        Score" ........................................................................9

II.     MLBAM REJECTED THE INVENTOR'S LICENSING
        OFFER AND LAUNCHED ITS OWN CONDENSED GAME
        PRODUCT ...................................................................................9

        A.      From 2003 To 2009 All MLBAM Condensed Games
                Were Edited Following The Precise Rules (and Pending
                Claims) Of The '716 Patent .....................................................11

B.    Starting In 2010, MLBAM Implemented New Editing Rules—Rules That Continue To Capture The "Narrative Of The Game" And Infringe The '716 Patent ..........................12

C.    The Evidence Demonstrates That Removing Additional "Final Pitches" Results In An Insubstantial Change In The CG Editing Process...........................................................16

D.    MLBAM's Editing Process Infringes The '716 Patent ...........17

    1.    MLBAM Employs An Editing Step That Operates By "Deleting" [Excluding] All Game Action From The Full Game Recording Other Than Final Pitches And Base Running ...............................................17

    2.    MLBAM Performs The "Playing or Broadcasting" Step ............................................................................17

III.    DISTRICT COURT PROCEEDINGS.................................................19

A.    MLBAM's First Motion For Summary Judgment Of Non-Infringement And No Provisional Rights.........................19

B.    *Inter Partes* Reexamination And MLBAM's Motions To Stay Proceedings In The District Court ...................................20

C.    Second Round Of Claim Construction Briefing And MLBAM's Renewed Motions For Summary Judgment ..........21

    1.    MLBAM's Second Motion For Summary Judgment On Provisional Rights ....................................22

D.    The District Court Grant Of MLBAM's Second Motion For Summary Judgment Of Non-Infringement ........................24

    1.    Subjective v. Objective Selection Of Game Content For Inclusion In An Edited Recording..............25

    2.    The District Court's Newly Defined Non-Destructive "Deleting" Process .......................................26

3.    The Doctrine Of Equivalents And Amendment-
Based Estoppel.................................................................27

E.    BQ's Motion For Reconsideration............................................29

SUMMARY OF THE ARGUMENT ...............................................29

ARGUMENT ....................................................................................31

IV.    STANDARD OF REVIEW ...................................................31

V.    THE DISTRICT COURT'S SUMMARY JUDGMENT OF NO
PROVISIONAL RIGHTS WAS PREDICATED ON AN
ANALYSIS OF THE WRONG TWO CLAIMS AND A
FLAWED CLAIM CONSTRUCTION ..............................32

A.    Provisional Rights Law.....................................................32

1.    Clarifying Claim Amendments Fall Within The
"Substantially Identical" Test And Typically
Support The Recovery Of Provisional Rights................33

2.    Assessing Any Change In Claim Scope Requires
Application Of Claim Construction Principles To
Both The Published Claim And The Issued Claim ........35

B.    The District Court Failed To Construe Published Claim 8
And The Impact Of The Added Term "Substantially".............36

1.    The Addition Of "Substantially" To Claims 1 And
3 Of The '716 Patent Not Only Parallels The Exact
Language Of The Statute But Conforms To The
Policy Of The Act.........................................................38

C.    The "Obtaining Subscribers" Requirement Of Issued
Claim 3 Parallels This Precise Requirement Of Published
Claim 4/8 And Thus Is Substantially Identical To Claim
4/8.............................................................................40

D.    The Change From "Presenting" To "Playing Or Broadcasting" Was A Clarification That Did Not Change The Scope Of The Claims—And Thus Provisional Rights Were Preserved ........................................................42

VI.    THE DISTRICT COURT IMPROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT ON THEORIES NEITHER PARTY SPONSORED .................................43

A.    District Court's *Sua Sponte* Claim Construction Of The '716 Editing Process As Strictly Objective To The Exclusion of Subjective Content Cannot Survive Scrutiny ......44

1.    District Court Improperly Resolved Disputed Material Facts And Resolved All Inferences In Favor Of MLBAM—The Moving Party ........................47

2.    The Record Is Nearly Silent On Evidence Supporting The Novel Basis For Judgment Rendered By The Court ...................................................50

B.    District Court's *Sua Sponte* Construction Of "Editing By Deleting" Has No Basis In Intrinsic Evidence And Conflicts With The Proper and Accepted Construction Of This Term ...................................................................53

1.    The Proper Construction Of "Editing By Deleting" Is Editing That Excludes Content From The Final Condensed Game By Any Accepted Editing Methods Commonly Used ..............................................54

C.    The District Court Committed Legal Error By Dismissing BQ's Infringement Claim As A Matter of Law ........................56

D.    The Relevant Law On Doctrine Of Equivalents Provides A Compelling Foundation Supporting BQ's Infringement Claim .........................................................................58

1.    BQ's Evidence Of Doctrine Of Equivalents Is Compelling ...................................................59

VII.    CONCLUSION ...................................................................................61

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................31

*AT&T v. City of Portland*,
    216 F.3d 871 (9th Cir. 2000) ........................................................18

*Bloom Eng'g Co. v. North Am. Mfg. Co.*,
    129 F.3d 1247 (Fed. Cir. 1997) ...............................................34, 36

*Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*,
    559 F.3d 1308 (Fed. Cir. 2009) .....................................................58

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
    697 F.3d 1342 (Fed. Cir. 2012) .....................................................59

*Eon-Net LP v. Flagstar Bancorp*,
    249 Fed. App'x. 189 (Fed. Cir. 2007)......................................30, 45

*EPOS Techs Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2015) .................................................31-32

*Felix v. Am. Honda Motor Co.*,
    562 F.3d 1167 (Fed. Cir. 2009) .....................................................32

*Fenner Invs v. Cellco*,
    778 F.3d 1320 (Fed. Cir. 2015) .....................................................32

*Graver Tank & Mfg. Co. v. Linde Air Products Co.*,
    339 U.S. 605 (1950)........................................................................58

*ICU Med., Inc. v. Alaris Med. Sys. Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) .....................................................31

*Kaufman Co. v. Lantech, Inc.*,
    807 F.2d 970 (Fed. Cir. 1986) ...................................................................34

*Klimas v. Comcast Cable Commn's*,
    465 F.3d 271 (6th Cir. 2006) .....................................................................18

*K-TEC, Inc. v. Vita-Mix Corp.*,
    2010 U.S. Dist. LEXIS 51858 (D. Utah May 24, 2010) ..............................34

*Laitram Corp. v. NEC Corp.*,
    952 F.2d 1357 (Fed. Cir. 1991) .................................................................34

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998) ............................................................32, 35

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ...................................................................38

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)...................................................................................51

*Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*,
    541 Fed. App'x. 964 (Fed. Cir. 2013)....................................................31, 45

*Minco, Inc. v. Combustion Eng'g, Inc.*,
    95 F.3d 1109 (Fed. Cir. 1996) ...................................................................33

*Predicate Logic, Inc. v. Distributive Software, Inc.*,
    544 F.3d 1298 (Fed. Cir. 2008) .................................................................35

*Seattle Box Co. v. Industrial Crating & Packing, Inc.*,
    731 F.2d 818 (Fed. Cir. 1984) ..............................................................33, 39

*Slimfold Mfg. v. Kinkead Indus.*,
    810 F.2d 1113 (Fed. Cir. 1987) .......................................................33, 36, 42

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987) .................................................................35

*Telecomms. Sys., Inc. v. Mobile 365, Inc.*,
    No. 3:06CV485, 2008 U.S. Dist. LEXIS 112753
    (E.D. Va. Sept. 24, 2008) ....................................................................... 34-35

*Tennant Co. v. Hako Minuteman, Inc.*,
    878 F.2d 1413 (Fed. Cir. 1989) ...................................................................34

*Teva v. Sandoz*,
    135 S. Ct. 831 (2015)...................................................................................32

*Toys v. Mga Entm't*,
    2015 U.S. App. LEXIS 7085 (Fed. Cir. 2015) .......................................32, 36

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)..................................................................................50, 59

*Winans v. Adam*,
    56 U.S. 330 (1854)......................................................................................58

## <u>STATUTES</u>

28 U.S.C. § 1295(a)(1)..........................................................................................1

28 U.S.C. § 1331 ...................................................................................................1

28 U.S.C. § 1338(a) ..............................................................................................1

35 U.S.C. § 103 .....................................................................................................8

35 U.S.C. § 112 ...................................................................................................34

35 U.S.C. § 154 .....................................................................................................1

35 U.S.C. § 154(d) ........................................................................................32, 33

35 U.S.C. § 252 ...................................................................................................33

35 U.S.C. § 271 .....................................................................................................1

35 U.S.C. § 307 ...................................................................................................33

**RULE**

Fed. R. Civ. P. 56(c) ................................................................................31

**OTHER AUTHORITIES**

H.R. 400, the "21st Century Patent System Improvement Act," Mar. 20, 1997 .....33

H.R. Rep. 105-39 ............................................................................33, 39

## STATEMENT REGARDING CONFIDENTIAL MATERIAL OMITTED

Information designated as confidential by MLB Advanced Media, L.P. pursuant to the Stipulated Protective Order in this matter, regarding its editing process, has been redacted on pages 13, 15, 16, 17, 18, and 49.

## STATEMENT OF RELATED CASES

There are no cases related to the present case.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). This matter is on appeal in a patent infringement dispute. Subject matter jurisdiction in the district court arose under 35 U.S.C. § 271 and under 28 U.S.C. §§ 1331 and 1338(a). The decision below was final, all claims having been addressed either by way of summary judgment or stipulation of dismissal. The Notice of Appeal was timely filed.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred in granting summary judgment precluding Plaintiff Baseball Quick, LLC's ("BQ") provisional rights based on a mistaken comparison of issued claim 1 of U.S. Patent 7,628,716 (the "'716 patent") with pending claim 4 of U.S. Publication 2003/0060311 (the "'311 publication"), where the proper comparison should have been between issued claim 3 and pending claim 8; and the intrinsic record conclusively demonstrates that these two claims are "substantially identical" under 35 U.S.C. § 154.

2.    Whether the District Court erred in its December 4, 2014 Order granting summary judgment of non-infringement of 'the '716 patent:

a. by adopting a late construction of the claimed "editing" step long after *Markman* that required <u>strictly</u> "objective" editing rules where neither party sponsored such a limitation, the claims include no such limitation and the intrinsic record cannot support such a limitation;

b. by adopting a late construction of "deleting" long after *Markman* that neither party requested nor sponsored that conflicts with the intrinsic record and prior arguments by Defendant; and

c. by applying its flawed claim construction to literal and doctrine of equivalents infringement, and failing to consider probative evidence of infringement that presented a genuine issue of material fact that foreclosed summary adjudication.

## <u>STATEMENT OF THE CASE AND FACTUAL BACKGROUND</u>

On August 23, 2010, BQ filed this action in the Southern District of California against MLBAM for infringement of its '716 patent by MLBAM's "Condensed Games" ("CGs") edited baseball game recording product; and for Provisional Rights for practicing the claims before patent issuance. (A150-162). On March 11, 2011, the District Court transferred venue to the Southern District of New York. (A126).

In early 2012, the District Court denied MLBAM's motion for summary judgment of non-infringement, except as to baseball games that were recorded

2

prior to patent issuance. (A22). The District Court also denied MLBAM's motion for summary judgment as to provisional rights and, in fact, considered ruling for BQ on the issue as a matter of law. (A23-24; A1691).

MLBAM then filed a Request for *Inter Partes* Reexamination on September 14, 2012, which the PTO granted. On May 23, 2013, while in the midst of discovery and *Markman* briefing, the District Court (Judge Griesa) denied MLBAM's motion to stay all proceedings pending reexamination.

On June 6, 2013, this case was reassigned to Judge Katherine B. Forrest, who granted MLBAM's renewed motion for a stay on October 9, 2013, in view of the pending reexamination. (A2704).

On January 17, 2014, the USPTO withdrew all rejections in the *inter partes* reexamination and confirmed the validity of all claims of the '716 patent. (A2943). The District Court then lifted the stay and ordered supplemental claim construction briefing. (A138). Concurrently, MLBAM renewed its summary judgment motion on Provisional Rights. On July 25, 2014, the Court construed the eight disputed terms and granted summary judgment precluding provisional rights. (A26-72).

On December 4, 2014, the District Court construed two claim terms that were never previously disputed, rejected the grounds of MLBAM's renewed motion for summary judgment of non-infringement but granted the motion based on its new claim constructions. The Court then denied BQ's motion for

3

reconsideration; and entered the parties' joint stipulation dismissing MLBAM's invalidity counterclaim. (A109-11; A79, n.8).

## I.    THE '716 PATENTED INVENTION

While a "sport," professional baseball is more aptly described as a highly profitable entertainment business dominated by Major League Baseball (MLB).[1] For years before the '716 patent, baseball could be enjoyed by fans either at a ballpark or by watching the game on TV. In both instances, a typical professional ballgame would last well over three hours. This lengthy exhibition became a recognized problem, particularly for viewing video playback.

In late 1999, inventors George and Gregory Mockry were both avid baseball fans who understood the problems of lengthy game recordings. (A1090). They conceived of an editing protocol for reducing a full-length three hour baseball game video to a condensed version that ran about 10-15 minutes in length. (A114). Critically, this dramatic reduction was accomplished while preserving the essence of the game—what is referred to as capturing the "narrative [or story] of a full game." (A4100; A4104; A4580-81; A3965; A3974; A3975). The '716 patent characterizes this editing process as resulting in the video content of the specific plays (or game action) that are "outcome determinative." (A114, col. 1:15-20,

---

[1] MLBAM is an affiliate supplied and controlled by MLB.

2:28-30, 61-65). Conversely, nearly all of the less interesting "game action" was systematically removed.

## A.    An Analytical View Of Baseball

In its basic form, a baseball game is a contest played by two teams comprised of nine players each that compete to score the most runs. There is no clock and the game is only completed when both teams exhaust their allotted outs. A game is divided into nine innings of play where each team takes a turn to score runs before causing the three outs that end that inning.

Drilling down further, a baseball game is actually a series of mini contests between a batter (or hitter) and a pitcher on the opposing team. Action is triggered by the pitcher throwing a baseball towards a target—home plate—and the batter, positioned at home plate, given the chance to hit the pitched ball into the field of other opposing players—the fielders. Each pitch can be classified as either non-final or final. Importantly, the pitcher-batter contest (an "at-bat") may go on for many pitches—there is no limit—and the final pitch that ends a hitter's at-bat results in either an out or a safe passage to one of the bases in the field that form the path to scoring a run, and associated action in the field. This process continues for each inning through the team's "line-up" i.e. the ordered progression of hitters for all batters until three outs are made—and all runs recorded for that inning.

After nine innings of play (normally 54 outs total), the team with the most runs is declared the winner. (A1698-1702; A1705; A1715).

An entire game can last for hours as each game is comprised of nearly 100 of these mini contests and perhaps as many as 400 pitches in total.[2]

## B.    The Innovative Video Editing Protocol Of The '716 Patent

There were a number of creative and innovative developments underlying the condensed game video editing protocol. To begin, it wasn't merely limiting the content of the condensed game video to only game action resulting from "final pitches" (and base running). It was the surprising discovery that <u>exclusion</u> of all "non-final" pitches offered a simple, objectively driven editing step that largely eliminated the least entertaining ballgame portions while preserving the game action and "story," but now presentable in 10-15 minutes of action. While defining an editing protocol by what's excluded versus what's included may seem largely semantics, the distinction highlights a core value in that exclusion of all non-final pitches removes most of the slow moving action while preserving the narrative of the game and capturing the most interesting plays. It was the exclusion process—simple and without subjective evaluation—of all non-final pitches that allowed for the swift video editing that made CGs a commercial success.

---

[2] Modern video processing allows for simplified parsing into numerous short segments of all of these plays so that, for example, highlights of the game can be presented on the evening news.

There is a clear benefit in the patented editing process that rapidly excludes nearly 90 percent of video content while preserving the 10 percent that is of principal interest to fans—a benefit recognized by the USPTO when it twice allowed the claims of the '716 patent and MLBAM when it copied this protocol.

The invention was also directed to a simple video editing protocol that seamlessly created CGs, and a method for distributing them to subscribing fans for viewing via the Internet or otherwise. (A115, claims 1 & 3). Starting with the full game recording, a CG was created by excluding all game action—except for (i) game action that resulted from a <u>final pitch</u> to a batter, and (ii) base running attempts (i.e., stolen bases and attempts to steal a base). Using this approach, key attributes of the game were preserved such as the ordered progression of hitters that captured the ebbs and flows of the game through to the end.

These editing steps were easy to implement, offered a consistent presentation and resulted in a uniquely compact, and popular product. Moreover, because some "boring" plays remained, watching the condensed version retained the desirable "narrative" of the game giving it an authenticity that was considered essential for enjoyment.

The inventors retained a professional video editor who implemented the editing protocol on a video for a local minor league team. (A4089-90, ¶¶6-7; A4102, ¶¶26-27). All non-final pitches were removed forming a shortened and

very compact version of the full length game—but a version that retained the game "story."

### C.     '716 Patent Prosecution History

The inventors filed a provisional application on June 13, 2000, followed by a non-provisional application on June 9, 2001. (A3314-18; A362-66; A1091, ¶4). The application published on March 27, 2003 as the '311 publication with ten claims ("the published claims") (A116-18), which form the basis for BQ's provisional rights claim. These claims were initially rejected as *inter alia*, "indefinite" and cancelled.

The examiner issued a Notice of Allowance on February 24, 2004 (A539-44), but on March 14, 2005, withdrew the application from issue (A601) and rejected all application claims under 35 U.S.C. § 103 over two new prior art references (A602-10).

The applicants appealed the rejection and the BPAI reversed the rejection of Claim 24. (A856-73). The BPAI subsequently reversed the rejections of application claims 30 and 32-34 by virtue of their dependency on application claim 24. (A889-91).

The claims found patentable were all directed to editing defined by the content excluded—"deleting substantially all game action other than"—that now

resides in claim 1 of the '716 patent. These application claims issued as '716 patent

claims 1-5, respectively.

### 1. The '716 Invention Includes Essentially All "Game Action That Contributes To The Final Score"

During prosecution, the applicants described their invention as an editing

procedure for selecting "essentially all" outcome determinative plays using an

approach not found in the prior art:

> There is no suggestion…that ProQuest [prior art] suggests any means by which <u>essentially all</u> of the <u>outcome-determinative action</u> of a game is condensed into a time frame such as that described for the present invention…The present invention, in contrast, establishes an objective, pre-selection of the game action to be included, selecting <u>essentially all</u> of the game action that contributes to the box score of the game

(A792-6 (emphasis added); *see also* A696-98; A621-22; A660-61).

Notably, none of the prior art cited during prosecution disclosed an editing

protocol based on excluding all non-final pitches leaving essentially all final

pitches in the CG.

## II. MLBAM REJECTED THE INVENTOR'S LICENSING OFFER AND LAUNCHED ITS OWN CONDENSED GAME PRODUCT

Prior to the '716 patent, nobody had developed a technique to substantially

and simply reduce baseball game content by excluding non-final pitches and thus

preserving the "narrative" of the game. (A2943). MLB well recognized an issue

with the length of their full game product and were investing substantial resources

in developing new media platforms for MLB game content in 2000—particularly

targeting the internet and forming Defendant MLBAM. (A3937-3938, ¶¶7-11;

A3945-3947).

Once armed with a pending patent application, the inventors reached out to

MLB to explore licensing opportunities. (A1112-13). MLB rejected working with

the inventors, but "borrowed" their concept and began developing the exact CG

that is the foundation of the '716 patent. (A1115). MLBAM then announced the

development (in 2001) and then launch (in 2002) of its "revolutionary"

"Condensed Games" product. (A1119-20; A1122; A1137-38).

According to MLBAM, CGs are "a shortened version of [a baseball] game,

which <u>includes specific plays to tell the story</u>." (A3966, ¶12) (emphasis added).

MLBAM CGs originally included game action following the final pitch thrown to

each batter and base running (stolen base) attempts. Each CG provided the ordered

progression of hitters that forms the core of the game action – but now in a

condensed format. These shortened game videos are published to MLBAM's

website, MLB.com. (A4566-67; A913, ¶8). MLBAM has also offered CGs as a

core feature in its MLB.tv product line (A4183) and through its smartphone

application, "MLB.com At Bat." (A1095, ¶26; A1334, ¶4(d); A1342-3).

Soon after launch, the '716 inventors notified MLBAM of their pending

patent application and that its new CG product was covered by the pending claims.

(A1092, ¶12; A1124-25). The inventors also renewed their offer for licensing or purchase, and MLBAM again declined. (A1093, ¶15; A1132-33; A1135; A1137-38).

### A.    From 2003 To 2009 All MLBAM Condensed Games Were Edited Following The Precise Rules (and Pending Claims) Of The '716 Patent

From the 2002 launch until the '716 patent issuance, MLBAM distributed CGs that practiced the invention with precision to subscribers over the internet. Specifically, MLBAM excluded all "non-final" pitches and thus automatically removed those less valuable elements while preserving the game narrative. (A4573-74; A4580-81). MLBAM distributed these CGs to its subscribers with content made up of (i) final pitches and (ii) base running. (*Id.*)

MLBAM followed a "heavily automated" process to produce its CGs. (A4193) (testimony of Joe Inzerillo, MLBAM Executive VP and CTO). The process applied a protocol to select the content to be included and excluded in a CG. (A4190; A4602). The MLBAM CGs were prepared from full game recordings, deleting all game action except that resulting from "every final pitch." (A4576). As late as 2009, the essential guideline was to include "every payoff [i.e., final] pitch." (A4573). These original editing protocols also captured all base running plays. (A1335, ¶8).

MLBAM leveraged the new format CGs in creating its new Internet platform—and portal: MLB.com—that quickly became a strong commercial success. (A1096, ¶¶27-29; A1207-8; A1216-18). Importantly, CGs were part of the very first video offerings on the web portal and has been consistently offered for over a decade.

### B.    Starting In 2010, MLBAM Implemented New Editing Rules—Rules That Continue To Capture The "Narrative Of The Game" And Infringe The '716 Patent

Confronted with an issued '716 patent in late 2009 and a clearly infringing editing process, MLBAM started the 2010 baseball season with revamped editing <u>instructions</u> for building CGs. (A3973-78). MLBAM's new editing <u>instructions</u>, however, failed to modify the editing <u>process</u> in a manner that significantly altered the resulting CGs. In practice, these new editing instructions created CGs that nevertheless captured the "narrative of the game"; presented a near complete, ordered progression of game action; excluded all non-final pitches and reduced a full game video to about 10-12 minutes. The "new" CG remained comprised of only final pitches—and the District Court found these CGs were "substantially similar in some respects" to those resulting from the claimed methods. (A88).

MLBAM's new instructions were carefully crafted—with all the earmarks of patent counsel—to continue to provide nearly the same CGs, but seeking to avoid

**CONFIDENTIAL MATERIAL OMITTED**

the '716 patent. While a masterful reconfiguration, these new <u>instructions</u> reflected

in practice the same editing <u>process</u> as found in the '716 patent.

Specifically, the instructions were rephrased and expanded. For example, the

primary instruction sought: "any action that results in a hitter reaching base and

what happens after they reach" and "all runs scored." (A3973, ¶46; A4010). This

was merely a restated requirement to capture all game action from "<u>final pitches</u>"

and <u>all base running—as in the '716 patent</u>. Additional criteria all falls squarely

into the '716 protocol, including: "great defensive plays," "any costly errors"

███████████████████████████████████████████████ "all

K's [strike-outs]," "all double plays [a single play resulting in two outs]," "historic

plays" and "[██████████████].". (A3973, ¶46; A4010). All of these instructions

exclude all non-final pitches. (*See* A4957).

In sum, MLBAM's new editing rules merely divide its old rules into

multiple parts, but collectively provide nearly the same editing outcome. These

new editing rules however, supposedly provide a new twist: "subjective"

evaluation by the editors as to "historic plays" and "great defensive plays."

However, there is no evidence that any editor performed any subjective review of

any play, and MLBAM provided no guidance on these new allegedly subjective

evaluations—likely because no one really intended such "subjective" reviews.[3]

There is no explanation what qualifies as "historic" or "great" and considering the

time constraints on the editors,[4] this is not surprising.

Critically, the '716 step of excluding all non-final pitches has been faithfully

followed by MLBAM. Not a single instance of a <u>non-final pitch</u> surviving the

editing process has been shown both before and after patent issuance.

While hidden, the only meaningful change was the instruction to <u>exclude</u>

"routine outs" (routine fly balls, pop-ups and ground balls). To the extent the '716

patent requires all final pitches, the new "routine out" instruction, if followed,

would literally avoid this requirement. This instruction, however, does not avoid

<u>practicing</u> the invention as it is a simple, objectively applied rule that still leaves

nearly all "final pitches"—and a CG that retains all its core patented features; and

remains indistinguishable from one that includes all routine outs.

Moreover, the "avoid routine outs" instruction is one that MLBAM—and its

editors—does not consistently follow. A quick review of the MLBAM CGs reveals

that "routine outs" are frequently included in published CGs. (A4098-100, ¶¶13,

15, 18). BQ's statistical expert sampled 11,080 published CGs for the 2010-14

baseball seasons and found a widespread disparity regarding CG content—with a

---

[3] In practice, game editing would simply default to the old rules: exclude all non-final pitches—to achieve the same result much faster.

[4] *See infra* note 21.

CONFIDENTIAL MATERIAL OMITTED

sizable "outlier" fraction with a very low number of final outs removed. (A4262). These values undermine any credible reliance on MLBAM's new instructions as a basis for determining non-infringement as the expectation of "routine" outs in a games is dramatically more than the statistically measured amount and thus the CGs after patent issuance nearly matched pre-issuance CGs that included all final pitches.

MLBAM moved for summary judgment arguing that no current CGs included all "final pitches" and resulting game action and thus did not infringe the '716 patent. (A220-21). MLBAM relied upon a declaration in which Dinn Mann, Executive VP of Content at MLBAM, swore under oath that no CGs include all final pitches. (A913, ¶6).

He was wrong. Fifteen post-issuance CGs were quickly uncovered that included all final pitches and all "routine outs" (A1424-25, ¶10); reflecting a clear disparity between MLBAM's written editing instructions and its actual editing process. Indeed, the discrepancy resulted in MLBAM instituting a "final pitch" quality control procedure—e.g., a second editing step—whereby its editors review all pre-publication CGs to insure at least one final pitch had been removed. (A4546, ¶21; A4587-89; A3909, ¶45; A3972, ¶38).

[██████████████████████████████████████████████

████████████████████████████████████████████████

CONFIDENTIAL MATERIAL OMITTED

██████████████████████████████████████████████

███████████████] (A4027 (emphasis added)). The intent of this instruction

is clear. The removal of "at least one out" —i.e., final pitch—was a transparent

attempt to narrowly avoid (and practice a fraud) on the '716 patent. There is no

evidence that this special editing step was done for any other reason.

## C.    The Evidence Demonstrates That Removing Additional "Final Pitches" Results In An Insubstantial Change In The CG Editing Process

Despite the superficial changes to MLBAM's editing procedure, the

resulting CGs were substantially identical to the earlier published CGs in content

and duration. There is no discernible difference between CGs that contain all final

pitches as opposed to those that skip a few, as acknowledged by the District Court.

(A83; *see also* A4100, ¶18). That is, the narrative of the full game is preserved;

CGs present a faithful and ordered progression of game action consistent with the

patented approach. MLBAM did not tell their subscribers that there was a change

and continued to advertise and market CG as if nothing had changed, and they held

the games at the same time span for the next two years. (A4581-83; A4546, ¶22).

CGs with a handful of "routine outs" removed are nearly the same as and

equivalent to CGs having every last final pitch included. (A4100, ¶18).

The editing step provides substantially the same <u>function</u> whether some final

pitches ("routine outs") are excluded, as the CG is created by editing from the

CONFIDENTIAL MATERIAL OMITTED

complete game reduced to a substantially shorter time span, using a pre-determined rules based editing protocol. The <u>way</u> this is accomplished is the same, as the core editing protocol provides that all non-final pitches are excluded, removing a significant portion of the total content while preserving the "outcome determinative" plays. (*Id.*) The <u>result</u> is the same: the CG provides a highly condensed and chronological video presentation of a full game that captures the "narrative of the game." (*Id.*)

### D.   MLBAM's Editing Process Infringes The '716 Patent

#### 1.   MLBAM Employs An Editing Step That Operates By "Deleting" [Excluding][5] All Game Action From The Full Game Recording Other Than Final Pitches And Base Running

For CGs prepared during the provisional rights period, all non-final pitches were excluded and all final pitches retained. (A1335, ¶8). After the '716 patent issued, MLBAM continued to exclude all non-final pitches in order to end up with final pitches as claimed but also began excluding a few "routine outs."

#### 2.   MLBAM Performs The "Playing or Broadcasting" Step

[ ████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] As noted *infra* at Part VI.B.1, "editing by deleting" is properly construed as <u>excluding select content</u>.



[REDACTED][6] (A4547-48, ¶28-29; A4578-79). [REDACTED] (A4548, ¶30; A4563; A4199). [REDACTED] (A4548, ¶31; A4566; A4585).

[REDACTED]

(A4548-50, ¶¶33, 34, 38, 39; A4604-40 (CDN agreements); *see also* A4279-84; A4224-25, col. 2:4-5 & 3:14-16).

[REDACTED][7] In conjunction with its CDNs, MLBAM "plays and broadcasts" its CGs in this manner. For streaming video, this is how concurrent delivery of multiple one-way streams is accomplished. (A4102, ¶24); *see Klimas v. Comcast Cable Commn's*, 465 F.3d 271, 279 (6th Cir. 2006) (citing *AT&T v. City of Portland*, 216 F.3d 871, 876-77 (9th Cir. 2000)) (over'd on other grounds, citation omitted)).

---

[6] (*See* A3909, 14, ¶¶45 & 74 [REDACTED]); *see also* A3972, 3976-77, ¶¶38-39 & 67-8).
[7] (A3917-3920, ¶¶96-107).

## III.   DISTRICT COURT PROCEEDINGS

### A.   MLBAM's First Motion For Summary Judgment Of Non-Infringement And No Provisional Rights

Shortly after this case was transferred to the Southern District of New York and before any discovery was conducted, MLBAM moved for summary judgment on both the infringement issue and issue of provisional rights.

With respect to infringement, MLBAM argued that the '716 patent claim 1 required a claim construction of the editing step that produced CGs with game action from all final pitches, and that pursuant to its newly instituted editing protocol, MLBAM argued that CGs dropped at least one "final pitch" per game. As noted above, the Mann Declaration—asserting that since 2010, no CGs were distributed that included all final pitches—was wrong. The District Court also denied MLBAM's claim construction requiring all final pitches in the CG.

As for provisional rights, MLBAM argued that the published application was not "substantially identical" to the '716 patent because the "obtaining subscribers" step was not explicitly recited in the published claims. (A206, 228-229).

Judge Griesa rejected this argument:

> MR. WANG [MLBAM's counsel]: …Under the cases of *Latram* [sic] and the other cases, once they [amended the claim to add the "obtaining subscribers" step], Judge, they can seek no possible provisional relief with respect to what happened earlier.

19

> THE COURT: …I don't quite understand. The claim eight in the application speaks of <u>delivering and recording the game to subscribers</u>, and claim four of the actual patent talks about <u>playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers. How do you get subscribers if you don't obtain them?</u>
>
> MR. WANG: [T]here is a big change between having subscribers and obtaining subscribers….So the action of obtaining the subscribers, if your Honor please, makes all the difference in the world.
>
> THE COURT: <u>If you don't obtain them, you don't have them</u>.

(A1646 (emphasis added)). The Court denied MLBAM's motion, finding that

"[t]he language about "obtaining" does not involve anything approaching a

difference of substance from the application." (A23-24).

## B. *Inter Partes* Reexamination And MLBAM's Motions To Stay Proceedings In The District Court

MLBAM petitioned for *inter partes* reexamination proceedings against the

'716 patent, which the USPTO later instituted.

MLBAM's motion to stay pending reexamination was first denied because a

"major consideration weighing against a stay is the prejudice that such a lengthy

delay would cause the plaintiff." (A2659-60).

After reassignment to Judge Forrest, the District Court granted MLBAM's

"renewed" motion to stay, stating that the USPTO's second rejection of the '716

patent claims was a "clear message from the USPTO at this stage of the

reexamination proceedings that the '716 patent will not survive the reexamination process." (A2703-5).

To the contrary, the examiner on reexamination confirmed the patentability of all claims without amendment. (A2925, 2928-9, 2943). BQ again stressed during the reexamination proceedings that the claimed editing algorithm does not require every final pitch:

> [B]y consistently including the 'substantially all' language in the claims and in arguments during the original prosecution, the Patent Owner made clear the condensed game, while consisting of nearly every single 'final pitch' did not mandate exactly every final pitch.

(A2880-81 (emphasis added); A2886-87).

### C.    Second Round Of Claim Construction Briefing And MLBAM's Renewed Motions For Summary Judgment

The District Court lifted the stay and ordered a second round of claim construction briefing. (A2733-34). The parties conferred and identified seven claim terms in dispute. (A2735-39). The disputed terms did not form the basis of the District Court's summary judgment rulings and thus are not addressed in this Appeal.

The dispute on claim construction raised in this appeal involves terms that were construed long after the *Markman* process was complete. MLBAM never argued during *Markman* briefing that the editing step, or any other aspect of the claimed invention was confined or limited to a strictly objective process. Indeed, as

discussed below, the District Court's grant of summary judgment on non-infringement is entirely premised on its own claim construction of the term "deleting" (which differed from the near "frivolous" construction proposed by MLBAM) and the alleged requirement that video editing as claimed in the '716 patent was required to be "strictly objective" in nature. These terms were not part of the *Markman* process.[8]

### 1. MLBAM's Second Motion For Summary Judgment On Provisional Rights

MLBAM's "renewed" Motion for Summary Judgment on Provisional Rights largely duplicated its original and rejected summary judgment motion. Notwithstanding the "law of the case" doctrine, MLBAM was permitted to take a second pass at challenging provisional rights based on three alleged changes to claim 1 in the '716 patent: (i) the term "substantially"; (ii) the term "obtaining subscribers"; and (iii) the phrase "play or broadcast."

The District Court compared issued claim 1 with published claim 4—and ultimately ruled that each of the above represented a substantial difference in claim scope. (A60-70). The District Court, however, did not assess or compare issued claim 3 with published claim 8 as argued by BQ. Moreover, the District Court did

---

[8] MLBAM tactically avoided offering a construction of the claim term "deleting" in claim 1 during *Markman* proceedings– and only much later presented its novel definition of "deleting." (*See id*; A3883-84, 3893-95).

not determine the scope of published claim 8 in accordance with the intrinsic record. (*See id*.).

With respect to the "obtaining subscribers" claim language, the District Court reviewed the wrong two claims and found that "[t]here is simply no way to read [Published] Claim 4 against Patent Claim 1 so that the two claims have substantially identical scope. [Published] <u>Claim 4 does not require that any subscribers be obtained at all</u>; thus, it would permit a claim of infringement in the absence of any subscribers." (A68).

While published claim 4 does not discuss "subscribers," claim 8 provides subscribers precisely as defined by the District Court in its concurrent *Markman* ruling: subscribers are viewers. (A117-8). Published claim 8 provides for "delivering the recorded game to subscribers," thus corresponding to the "obtaining" viewers for the CGs and substantially identical in scope to claim 3 as issued.

With respect to the final term—"playing and broadcasting"—the District Court found that "[t]here is a good argument that 'playing or broadcasting' simply clarifies the word 'presenting.'" Only by mistakenly comparing the wrong two claims and appearing to misapply the claim differentiation doctrine did the District Court conclude that "playing" was not "equivalent" to "presenting." (A69).

### D.    The District Court Grant Of MLBAM's Second Motion For Summary Judgment Of Non-Infringement

MLBAM also moved for summary judgment of non-infringement, raising four arguments: (i) MLBAM's CG product are not created by <u>deletion</u>; (ii) MLBAM's editing instructions and resulting CGs do not include "all <u>final pitches</u>"; (iii) MLBAM's accused CGs include <u>additional non-game content</u>; and (iv) MLBAM does not practice the claimed <u>playing or broadcasting</u> step. (A3875).

The District Court rejected three of the four grounds explicitly. It stated that MLBAM's newly presented claim construction of "<u>deleting</u>," was "borderline frivolous." The District Court ignored MLBAM's <u>final pitch</u> argument, rejected MLBAM's <u>additional non-game content</u> argument, and ruled that disputed issues of fact precluded summary judgment on MLBAM's <u>playing and broadcasting</u> argument. (A81-86). The District Court also <u>denied</u> MLBAM's motion for summary judgment precluding doctrine of equivalents based on argument-based estoppel. (A92).

The District Court however granted summary judgment, *sua sponte*, on three grounds not presented by either party: (i) MLBAM's editing instructions are primarily "subjective" and the '716 patent is limited to an "objective" editing process; (ii) the '716 patent claims an editing process based on non-destructive deletion requiring the <u>erasing</u> of excluded content and "time gaps"—not performed

24

by MLBAM; and (iii) amendment-based estoppel on the term "deleting" precludes the application of the doctrine of equivalents. (A81-84, 93-94).

### 1.    Subjective v. Objective Selection Of Game Content For Inclusion In An Edited Recording

The District Court found that the '716 patent claims a strictly objective editing step because BQ described the invention as "a set of objective criteria" and "an objective algorithm." (A82). On the other hand, the District Court found that, based on MLBAM's written instructions, the CG editing procedure was a "generally subjective process" that "substantially differs" from the '716 patent. (A82-83).

Even though the District Court recognized that MLBAM's written instructions include unquestionably objective content such as "'any action that results in a hitter reaching base and what happens after they reach,' 'all runs scored,' and 'all [strikeout]s,' they also require [its] editors to make value judgments, specifically regarding which defensive plays are 'great' enough, which errors are 'costly' enough, and which game events are 'historic' enough to merit inclusion in a Condensed Game." (*Id.*).

The District Court was persuaded that what it characterized as subjective language in MLBAM's written instructions played a significant role in the content found in CGs. It did not recognize that the first three objective rules account for the vast majority of the content selected for nearly every CG produced, and correspond

25

precisely to the claimed criteria at the '716 patent. Even the ostensibly subjective content, which the Court described as requiring "value judgment," would be captured by the criteria of claim 1 as well as the above objective criteria used by MLBAM.[9] Moreover, the number of actual plays that would fall into the allegedly subjective categories and subject to an editor's "value judgments" (i.e., "historical" and "great plays") is by their nature miniscule. The District Court also acknowledged that MLBAM's editing instructions were not consistently followed by its editors in practice–MLBAM admitted that a number of CGs were produced in contravention to its instructions to make value judgments as to what content to include and BQ presented evidence that MLBAM's editors could not have followed the instructions to exclude "routine outs"[10]–but nevertheless took the instructions as "evidence[]" that MLBAM's method "does not incorporate and build on BQ's" method. (A83).

## 2.    The District Court's Newly Defined Non-Destructive "Deleting" Process

The Court determined that the patented method was rooted in editing processes involving "deletion" of content. (A84). This was "fundamentally different" from MLBAM's process, which the Court described as a "subjective

---

[9] To illustrate this point, BQ produced a chart of all MLBAM instructions, which indicated whether they require an editorial value judgment, and whether they would nonetheless be captured by the '716 patent editing criteria. (A4956-57).

[10] *See* discussion *supra*, Part II.B (findings of Salzberg report).

accretive" process. (*Id*.). The Court further reasoned that the '716 patent claims a method whereby a full game recording is reduced "to an edited recording or a Condensed Game…by deleting material from a copy of the full-game recording and then eliminating the time gaps," in contrast to MLBAM's process whereby the reduction is accomplished "by copying portions of the full-game recording into a new recording." (*Id*.).

The District Court mistakenly believed that the above non-destructive deletion process was a construction sponsored by MLBAM. It was not. In fact, the actual claim construction presented and argued by MLBAM involved the classically practiced editing technique of "destructive deleting" whereby film/video clips are cut and spliced from the original material.[11] The District Court characterized this construction as "borderline frivolous"—but labeled it a "strawman" argument proffered by BQ —revealing its own misunderstanding of MLBAM's argument.[12] (A85).

### 3. The Doctrine Of Equivalents And Amendment-Based Estoppel

Applying its "deletion" definition, the District Court ruled against BQ on the doctrine of equivalents, as it found that BQ's method was "fundamentally

---

[11] "Destructive" video editing results in the physical destruction of original source material. (A3959, ¶16; A4090-91, ¶¶8, 15-16).

[12] It's clearly the argument made by MLBAM. (*See* A3884-85, 3895; *see also* A3959, ¶¶16-18).

different" from MLBAM's accused method, which was "both subjective and based on accretion." (A88). This was not, however, BQ's infringement theory. In fact, BQ contended that "editing by deletion" is literally satisfied by the allegedly "accretion" method of MLBAM, as it clearly "excludes" the "non-final" pitch content as claimed.

BQ's doctrine of equivalents theory and matching evidence all focused on a minor distinction between the claimed editing step and resulting CG, and that now practiced by MLBAM. This simply amounts to removal of a handful of "final pitches" from the CG as a last step edit, most likely performed by its QC staff. In support, BQ submitted substantial evidence (A4093-106 (Dec. of Gregory Mockry); A4257-75 (Expert Rep. Alan J. Salzberg, PhD)), much of which the District Court ignored.

The District Court, however, made several important findings that support BQ's infringement theory. First, the District Court rejected MLBAM's contention that statements made during patent prosecution amounted to "argument-based" estoppel on the final pitch issue. (A92). In addition, the District Court found Mr. Mockry qualified to provide testimony—and accepted his testimony—on the issue of whether persons skilled in the art would find MLBAM's editing and excluding of some final pitches an "insubstantial" change. (A89). Notwithstanding these findings, the District Court ruled that it was irrelevant whether "there is no

discernable [sic] difference between [Condensed Games] that contain all final pitches as opposed to those that do not." (A83).

### E.    BQ's Motion For Reconsideration

BQ filed a Motion for Reconsideration urging the Court to avoid manifest injustice by reevaluating its order granting MLBAM's Motion for Summary Judgment of Non-Infringement. (A4929-31; A4937-55). BQ identified three primary legal errors[13] committed in the Court's summary judgment ruling (A4940-41, A4943-53). Shortly after the parties completed their respective briefing, the Court summarily denied BQ's motion without opinion. (A96-108).

## SUMMARY OF THE ARGUMENT

The District Court mistakenly compared the wrong two claims (published claim 4 vs. issued claim 1) in analyzing BQ's provisional rights claim. In addition, the District Court construed the individual claim terms "substantially" and "obtaining subscribers" in the abstract—independent of their use in the claims and patent. These errors led to the mistaken conclusion that no issued claim was substantially identical to a published claim—an error that deserves correction by this Court. Specifically, once focused on the proper two claims (published claim 8

---

[13] BQ also identified several factual errors committed by the Court in its summary judgment ruling. However, these largely stem from the identified erroneous conclusions of law.

vs. issued claim 3), the application of the appropriate claim construction protocol reveals that these two claims are substantially identical.

The District Court's non-infringement ruling suffers two fatal defects in claim construction. First, the District Court's requirement that the claimed editing is accomplished using "strictly objective" instructions finds no support in the actual language of the claims and stands in stark contrast with the intrinsic record. The District Court compounded this error by construing the editing step to require non-destructive deletion of content by erasure followed by "time-gap" removal. Not only does this definition of "editing by deleting" lack any support in the intrinsic record, it's not clear whether it's even possible.

This defective ruling and flawed claim construction is based on reasoning that was not sponsored by either party and arrived at by the District Court *sua sponte*; only to be revealed for the first time in its summary judgment opinion. (A73-95). Thus, the District Court improperly grounded its non-infringement rulings on a novel theory without prior notice and without providing an opportunity for the parties to respond. *See Eon-Net LP v. Flagstar Bancorp*, 249 Fed. App'x. 189, 193 (Fed. Cir. 2007) ("In this circuit as in other circuits, a court may not *sua sponte* grant summary judgment on a particular ground without giving the non-moving party notice and an opportunity to present evidence and argument

in opposition."); *cf. Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*, 541 Fed.

App'x. 964, 973 (Fed. Cir. 2013).

The flawed analysis further led to the District Court's wrongful dismissal of

BQ's doctrine of equivalents infringement claim, where the dismissal relies on the

improper claim requirements that editing is an "objective only" process and uses a

"non-destructive deletion" approach. Once these phantom claim limitations are

removed from the analysis, BQ's infringement claims—both literal and doctrine of

equivalents based—become clear, well supported by the record and the proper

subject of jury consideration in assessing liability of MLBAM.

## **ARGUMENT**

## IV.    STANDARD OF REVIEW

This Court reviews this district court's grant of summary judgment *de novo*.

*ICU Med., Inc. v. Alaris Med. Sys. Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009).

Summary judgment is appropriate only when, drawing all justifiable inferences in

the nonmovant's favor, there exists no genuine issue of material fact and the

movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On appeal of summary judgment of noninfringement, this Court must

determine whether no reasonable jury could find no infringement, resolving all

factual inferences in the patentee's favor. *EPOS Techs Ltd. v. Pegasus Techs. Ltd.*,

766 F.3d 1338, 1341 (Fed. Cir. 2015). A finding of prosecution history estoppel is subject to de novo review. *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1181 (Fed. Cir. 2009).

Claim construction not grounded upon extrinsic evidence is reviewed *de novo*. *Teva v. Sandoz*, 135 S. Ct. 831, 841 (2015); *Fenner Invs v. Cellco*, 778 F.3d 1320, 1322 (Fed. Cir. 2015).

With regard to provisional rights, this Court reviews "de novo the ultimate legal conclusion that claims are identical in scope." *Toys v. Mga Entm't*, 2015 U.S. App. LEXIS 7085, 13-14 (Fed. Cir. 2015) (citing *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998)).

## V.   THE DISTRICT COURT'S SUMMARY JUDGMENT OF NO PROVISIONAL RIGHTS WAS PREDICATED ON AN ANALYSIS OF THE WRONG TWO CLAIMS AND A FLAWED CLAIM CONSTRUCTION

The District Court granted summary judgment after incorrectly evaluating the wrong two claims. Combined with a flawed claim construction, the District Court ruled that three minor differences between the issued claim 1 and Published claim 4 were "substantial" precluding provisional rights. This was error.

### A.   Provisional Rights Law

BQ is entitled to a reasonable royalty from MLBAM for its use of the claimed invention before issuance. 35 U.S.C. § 154(d). Congress added "provisional rights" through the American Inventor Protection Act of 1999, to

32

protect against those with actual knowledge, like MLB, from practicing a published invention prior to the issuance of the patent. *See* H.R. Rep. 105-39 accompanying H.R. 400, the "21st Century Patent System Improvement Act," March 20, 1997.

### 1. Clarifying Claim Amendments Fall Within The "Substantially Identical" Test And Typically Support The Recovery Of Provisional Rights

To recover provisional rights damages, a patentee needs to demonstrate that the "invention as claimed in the patent is *substantially identical* to the invention as claimed in the patent application." 35 U.S.C. § 154(d). This test is borrowed in part from reissue/reexamination provisions, 35 U.S.C. §§ 252 and 307. *Slimfold Mfg. v. Kinkead Indus.*, 810 F.2d 1113 (Fed. Cir. 1987). *See* H.R. Rep. 105-39, *supra*.  The substantially identical inquiry is directed to changes made to the scope of the claim—not the actual words used. *Slimfold*, 810 F.2d at 1115-16; *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1115 (Fed. Cir. 1996).[14]

The flexible application of this test is required because patent claims are frequently amended during prosecution. These amendments either substantively alter the scope of the claims (broaden or narrow) or clarify claim language that is

---

[14] Notwithstanding the original statutory language that lacked the "substantially" modifier to "identical" the Court construed the test to include this language. *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 827-28 (Fed. Cir. 1984). The 1999 statute conformed this test to the actual language.

otherwise less precise and thus potentially indefinite pursuant to 35 U.S.C. § 112. Amendments or changed claim language that clarifies a claim limitation without a substantive change in claim scope qualifies for a provisional rights recovery. *K-TEC, Inc. v. Vita-Mix Corp.*, 2010 U.S. Dist. LEXIS 51858 (D. Utah May 24, 2010).

Indeed, amendments that "make specific what was always implicit or inherent" result in claims that are considered substantially identical under the statute. *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1361 (Fed. Cir. 1991) ("*Laitram I*"); *Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997).

In *Tennant*, 878 F.2d at 1417, the patentee amended claims during reexamination to add the word "bottom," present in the original specification, before "wall." *Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989). This seemingly more narrow statement however did not substantively affect scope for this patent because the original claim language "movable first wall" was construed to cover a "bottom" wall. *Id.* Similarly, in *Kaufman*, 807 F.2d at 977, the Federal Circuit affirmed the holding that the claim amendments, adding language from the original specification and claims, merely clarified the original claims. *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 977 (Fed. Cir. 1986); *see also K-TEC*, 2010 U.S. Dist. LEXIS 51858, at *25; *Telecomms. Sys., Inc. v. Mobile*

*365, Inc.*, No. 3:06CV485, 2008 U.S. Dist. LEXIS 112753, at *25-26 (E.D. Va. Sept. 24, 2008) (replacing "phone number" with "MIN number" in the claim did not substantively alter the scope).

Claims can be amended during prosecution and retain substantial identity. Even a claim that is amended to overcome prior art can be "substantially identical" to the issued patent. *See*, *e.g.*, *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("*Laitram IV*"); *Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1305-06 (Fed. Cir. 2008) (reversing district court finding that an amendment replacing the step of "instantiating" with "first instantiating" and "second instantiating" steps substantively changed the scope of the claim; the Federal Circuit concluded the amendment did not result in a substantive change, noting that its conclusion was "entirely consistent with the specification's description…").

### 2. Assessing Any Change In Claim Scope Requires Application Of Claim Construction Principles To Both The Published Claim And The Issued Claim

Contrary to MLBAM's assertion and the reasoning of the District Court, a minor difference in claim language—in the abstract—does not demonstrate a substantive change in scope of the claims. In particular, "two claims which read differently can cover the same subject matter." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). Resolution of this requires the

assessment of the intrinsic record. In other words, claim scope cannot be evaluated in a vacuum, but rather, must be considered in view of the patent specification and applicable prosecution history. *See Bloom Eng'g*, 129 F.3d at 1250; *Slimfold*, 810 F.2d at 1116.

Provisional rights are not limited to independent claims and can be based on any two claims, one taken from the published application for comparison to an issued claim. *See e.g.*, *Toys v. Mga Entm't*, 2015 U.S. App. LEXIS 7085, at 14-15. Thus, the District Court's first error was its focus on independent claims—published claim 4 compared to issued claim 1. Yet the proper comparison is between published dependent claim 8; and issued claim 3 below. MLBAM has never challenged that this is the proper comparison.[15]

## B. The District Court Failed To Construe Published Claim 8 And The Impact Of The Added Term "Substantially"

The District Court was required to assess the question of "substantially identical" claims by reviewing the patent specification, other pending claims and the file history—and based thereon, determine whether the minor changes in claim language in the '716 patent provided a substantive change in scope. This, it did not do. To the contrary, the District Court only analyzed the added word "substantially" in the abstract and found that this was a substantial change. The

---

[15] MLBAM offers no argument that it did not use (infringe) the claimed invention before issuance or that it did not receive proper notice by BQ of its patent rights.

requisite review of the intrinsic record demonstrates conclusively that this change was in fact insubstantial.

In particular, the *specification*, other claims and the file history reveals that the addition of the term "substantially" merely clarified the editing step—making clear that a small amount of additional video content could be included in the final edited CG beyond that explicitly listed in issued claim 1/3. Because original published claim 4/8 was potentially ambiguous on this point, the addition of the term "substantially" only clarified the claim.

Specifically, in the very first Office Action, the Examiner immediately challenged published claim 4/8 as "indefinite" (A1261-62) reflecting a claim that may require clarification. The Examiner's indefiniteness objection challenged various terms in the claims as vague. (*Id.*). The existence of dependent published claims 5 and 10—both depending on published claim 4—further demonstrated the possible ambiguity in what claim 4 excluded by editing; and what was included or remained after the editing step was completed. (A117-18).

In particular, while MLBAM argued that published claim 4 excluded everything from a final edited CG but "final pitches" and running plays, published claim 5 restates this same result, but explicitly and potentially identical in scope with claim 4—that is unless claim 4 allows for additional content. By convention, published claim 5 must be narrower than published claim 4—and therefore claim 4

could be construed to embrace additional subject matter excluded by claim 5. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004).

The same conclusion is reached by considering published claim 10. This claim embraced additional content in the CG beyond "final pitches" and running plays—and, again, resulted in a dependent claim (claim 10) that by convention must specify the final CG content that is also embraced by published claim 4—its base independent claim.

In response, applicants *clarified* published claim 4/8 by replacing the claim. A new claim was similarly worded to provide that the video content removed during the editing step to form the CG was "s*ubstantially*" everything except "final pitches" and running plays. (A503-38). By this amendment, the issued claims were substantially identical to those filed, but now clarified in that the scope explicitly allowed some minor additional material—such as that recited by claim 10—for inclusion in the CG.

### 1. The Addition Of "Substantially" To Claims 1 And 3 Of The '716 Patent Not Only Parallels The Exact Language Of The Statute But Conforms To The Policy Of The Act

The fact that the governing statute uses the same language as the claim amendment in this dispute, the word "substantially," is a powerful indication that this change maintained "substantially identical" scope with the published claim. It defies logic to believe Congress expressed a different meaning for its use of the

term "substantially" in the statute—a meaning that is fundamentally different than that used in the patent claims here.[16]

Moreover, allowing provisional rights to BQ conforms completely to the intended purpose and policy of the Act. BQ gave notice to MLBAM of what claims it was pursuing—and these claims did not change in any manner that was meaningful in terms of either infringement or validity. MLBAM continued to infringe and only made minor changes to its CG editing process *after* the '716 patent issued. Indeed, by its actions, MLBAM built its market for CGs using the clearly infringing editing process—and now seeks to leverage this market to support the post issuance product with its slight modifications. This is what the statute was clearly intended to prevent. *See* H.R. Rep. 105-39 (in return for disclosure, patentees are given the right to obtain compensation between publication and grant).

---

[16] Reliance on *Seattle Box* by the District Court was misplaced. While similar, the issues in *Seattle Box* were distinct in important ways. In that case, the term "substantially" was embedded into a longer claim amendment that was added specifically to capture a design that, before the amendment, did not infringe. *Id* at 731 F.2d at 828. There is nothing remotely analogous in this case.

### C.   The "Obtaining Subscribers" Requirement Of Issued Claim 3 Parallels This Precise Requirement Of Published Claim 4/8 And Thus Is Substantially Identical To Claim 4/8

The District Court's mistaken ruling on "obtaining subscribers" was a direct result of its failure to review the relevant claims;[17] that is, issued claim 3 and published claim 8. Had the District Court compared these two claims, as Judge Griesa had done previously, it would have reached the same sound conclusion that the District Court under Judge Griesa had previously reached:

> The patent application also provided for delivering the game to subscribers over the Internet. The patent itself provided for playing or broadcasting the recorded game for viewing by subscribers. These two passages regarding subscribers are essentially synonymous. However, MLB alleges that there is a difference between the patent application and the actual patent because the actual patent describes "obtaining subscribers," and this precise language is not contained in the application. The language about "obtaining" does not involve anything approaching a difference of substance from the application.

(A23 (emphasis added)).[18]

_____

[17] The District Court noted that "Application Claim 4 does not require that any subscribers be obtained at all…" (A68)

[18] At the hearing, Judge Griesa stated: "How do you get subscribers if you don't obtain them? I don't see that it is a substantial change at all…..If you don't obtain them, you don't have them." (A1645-7); and found the issued claim "virtually identical" to the published application, and even indicated he would have been inclined to grant summary judgment for BQ on provisional rights, had BQ filed such a motion. (A1690-91).

Moreover, the entire premise of MLBAM's "obtaining subscribers" argument stems from its proposed but flawed and rejected claim construction on this term. Specifically, MLBAM initially argued that "obtaining subscribers" was directed to a specific "sign up" process. (A206, 228-29). This construction however lacked any intrinsic support whatsoever. The specification of the '716 patent included no such disclosure and the file history was utterly silent on this construction.

However, during *Markman*, MLBAM offered an entirely different construction for this term—one that said nothing about new subscribers in any way. In fact, MLBAM insisted that the term "subscribers" as used in the '716 patent reflected their role as viewers *per se*. (A3205-06). The District Court agreed, but never applied this construction to the provisional rights question.

Given this construction, there is no doubt that the "obtaining subscribers" of issued claim 3 existed in *substantially identical* form in published claim 8. The language of published claim 8 sets forth that the "step of presenting the edited game as a condensed recorded game includes *delivering the recorded game to subscribers over the Internet*." This language is comparable to the relevant portion of issued claim 3, which incorporates language from issued claim 1 to read "[] *obtaining subscribers for viewing the edited recording* and [] *playing or broadcasting the edited recording* as a condensed recorded game *for viewing by*

*the subscribers*…wherein the step of playing or broadcasting the edited recording for viewing is conducted *over the Internet*."

This is indistinguishable in scope from published claim 8, a conclusion reinforced by the District Court determination that "[t]he only role for the subscribers is to view." (A68). If published claim 8 is also interpreted to mean "delivering the recorded game to [viewers that either agreed or requested to view the edited recording—i.e., subscribers] over the Internet", then it becomes clear that "obtaining subscribers [i.e., viewers]" is implicit in the ability to deliver the recording to said viewers. *See Slimfold Mfg.*, 810 F.2d at 1117 (concluding that the addition of an antecedent basis that is already there by implication does not change scope of the claims).

### D.    The Change From "Presenting" To "Playing Or Broadcasting" Was A Clarification That Did Not Change The Scope Of The Claims—And Thus Provisional Rights Were Preserved

The District Court actually acknowledged that the amendment was a clarification and that these two terms were essentially identical: "using the words 'playing' and 'broadcasting' clarifies the term 'presenting'" and that "[t]here is a good argument that 'playing or broadcasting' simply clarifies the word 'presenting'…" (A69). This logic was compelling and lacked meaningful challenge by MLBAM—and had the District Court simply adopted this, the issue would have been correctly resolved.

Instead, the District Court embarked on a flawed *claim differentiation* argument focusing on issued claims 1 and 3, noting that if issued claim 3 contained the word "presenting" the scope would be identical to issued claim 1. (A69-70). This is neither accurate nor even a relevant assessment.

To the contrary, issued claim 3 specifically repeats claim 1's recitation of "playing or broadcasting" but modifies it by requiring this to occur "over the Internet." This clarifying amendment is consistent with the original claims, a conclusion amply supported by the intrinsic record. The proper comparison between issued claim 3 and published claim 8 results in no redundancy in scope or any claim differentiation issues. Based on this record, provisional rights should have been granted as a matter of law.

## VI.   THE DISTRICT COURT IMPROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT ON THEORIES NEITHER PARTY SPONSORED

In seeking summary judgment of non-infringement, MLBAM postulated four theories. (A3875). Three of these were explicitly rejected by the District Court and the fourth was largely ignored. (A81-86, 92). The District Court, however, granted summary judgment, but on grounds of its own making. In particular, the District Court injected two new claim constructions—constructions that formed no part of its *Markman* hearing process that was completed months earlier. Specifically, the District Court construed the patent claims as requiring "strictly

objective" editing accomplished by using a "non-destructive deletion" process. There is no intrinsic record support for either of these newly crafted claim constructions.

Compounding this error, the District Court improperly inferred numerous facts in favor of MLBAM, including its contention that MLBAM's actual video editing faithfully followed printed editing instructions where the facts clearly demonstrated otherwise. Once these errors are corrected, it is clear that MLBAM infringes the '716 patent—or at least the issue remains one of reasonably disputed material facts.  (*See*  A1086-9;A4543-54).

## A.    District Court's *Sua Sponte* Claim Construction Of The '716 Editing Process As Strictly Objective To The Exclusion of Subjective Content Cannot Survive Scrutiny

The District Court determined that there was no literal infringement premised on its contention that: "BQ's claimed method is objective and allows little room for editorial discretion, whereas MLBAM's accused method is subjective and is premised on its editors exercising a great degree of discretion."

(A81-82). Implicit in this ruling is a new claim construction by the District Court, requiring "strictly objective" editing to infringe the claims of the '716 patent.[19]

MLBAM never argued for a claim construction requiring "strictly objective" editing; and for good reason—there is absolutely no support for such an argument. And, while MLBAM has stressed aspects of its editing process that it claims are "subjective," it also acknowledges that this alone does not resolve the infringement question. (A3882-86).

The District Court's new claim construction is critically flawed. Nothing in the '716 patent claims can remotely support a "strictly objective" limitation to the editing process. Moreover, nothing in the specification mandates such a requirement; and certainly the file history—while stressing the value of objective editing—never disclaimed the inclusion of subjective content resulting from the video editing operation as long as the claimed editing process was employed.

---

[19] Since this was not a construction proposed by either party nor part of the *Markman* order, the District Court gave no notice of this *sua sponte* construction until its summary judgment opinion. (A73-95). Thus, the District Court improperly denied BQ—the non-moving party—an opportunity to respond. *See Eon-Net LP*, 249 Fed. App'x. 189, 193 (Fed. Cir. 2007) ("In this circuit as in other circuits, a court may not *sua sponte* grant summary judgment on a particular ground without giving the non-moving party notice and an opportunity to present evidence and argument in opposition."); *cf. Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*, 541 Fed. App'x. 964, 973 (Fed. Cir. 2013).

To the contrary, the inclusion of selected subjective video content was always integral to the CG editing process outlined in the '716 patent. This was clearly confirmed by the examiner on reexamination of the '716 patent:

> Accordingly, the examiner agrees with patent owner that the claimed editing step involves an objective step of deleting certain game action. However, it is the examiner's position that <u>claim 1, as a whole, cannot be characterized as being a solely or purely objective process since the claimed relative term "substantially" leaves the possibility of including additional material such as narratives</u>.

(A2932 (emphasis added)).

In fact, the District Court's *sua sponte* requirement of <u>strictly objective</u> content cannot be reconciled with the Court's previous ruling that the editing step could include subjectively selected content. Specifically, in its *Markman* order, in addressing the transitional phrase "comprising" in Claim 1 the District Court stated that "[t]he editing step also permits additional optional material to remain in the edited recording, such as showing a young fan, a coach's signals, a narrative to explain play, or original soundtrack recordings"—i.e., subjectively selected content. (A54; A59-60).

This possibility of subjective content is also demonstrated by the District Court's rejection of MLBAM's third theory of non-infringement—based on its claim that by adding video content (copyright notice, graphics etc.) it avoided the '716 patent. The District Court properly rejected this as simply not a claim

requirement. (A85 ("[I]t does not follow that because MLBAM's method permits the inclusion of additional content, MLBAM cannot use BQ's claimed method—if a party uses another's method for producing a video and then layers additional images on top of it, they have still used the other party's method.").

The intrinsic record demonstrates that the District Court's late arrival at its strictly objective claim definition was an error that resulted in an incorrect ruling that should be reversed.

### 1. District Court Improperly Resolved Disputed Material Facts And Resolved All Inferences In Favor Of MLBAM—The Moving Party

Although it failed to articulate any meaningful intrinsic support for its new "strictly objective" claim construction, the District Court discussed at length its factual determination that MLBAM's accused editing process was "rel[ying] on subjective decision making" (A82 (emphasis added)) as a foundation for the first basis of its non-infringement ruling.

In particular, the District Court relied on MLBAM's written editing instructions, which it found "describe[s] a generally subjective process." (*Id*.). The District Court accepted these instructions at face value as conclusive of their extensive and subjective application notwithstanding clear and compelling evidence to the contrary.

But even here, the logic of the District Court's determination is undermined by its actual findings. Indeed, it specifically noted that MLBAM's editing included unquestionably <u>objective</u> criteria in its instructions:

> 1.     Any action that results in a hitter reaching base—and what happens after they reach
>
> 2.     All runs scored
>
> 3.     All strike-outs.[20]

(A82). To this, the District Court then contrasted three editing instructions it characterized as involving "value judgment" plays (i.e., "subjective" content):

> 1.     Great defensive plays
>
> 2.     Costly errors
>
> 3.     Historic plays.

(A82-83). By describing MLBAM's process as "generally subjective," the Court apparently concluded, without evidence, that the "subjective" aspects of the instructions would dominate the video content found in MLBAM's CGs, and that this by itself avoided the '716 claims.

Not only does the District Court fail to articulate how this would avoid the '716 patent claims, its factual conclusions are clearly wrong. The objective

---

[20] MLBAM's instructions include other ostensibly objective criteria. *See* discussion *supra*, Part VI.A.1. However, the District Court's summary judgment opinion only referenced these rules.

**CONFIDENTIAL MATERIAL OMITTED**

instructions above correspond to the vast majority of captured plays taken from a full game and thus dominate the game content selected for nearly every CG produced. In contrast, the supposed "subjective" instructions are rare and remote events—and events that would otherwise actually be captured by MLBAM's simple objective rules.[21] Even MLBAM's instruction to avoid "routine outs" are "objective" as are the vast majority of "instructions" used by MLBAM. (A4956).

By design, the more instructions MLBAM provides in its editing protocol the less "subjective" the overall content becomes. Moreover, the aggregate of these instructions conforms to the primary editing step of the '716 patent: exclude all non-final pitches. It was however, the extensive nature of these multi-layered instructions that led the District Court astray on this issue, notwithstanding MLBAM's failure to point to a single CG that included "subjective" content from its new instructions.

Indeed, the District Court analogized the foundation of its decision on the old adage: "there is more than one way to skin a cat" (A73); suggesting that MLBAM's editing instructions demonstrated that it skinned the same cat but in a

---

[21] This is by design. [ ███████████████████████████████████████
████████████████████████████████ ] (A3876-77; A4859). Time and cost considerations would prohibit editors from making an involved value judgment as to whether to include each play as they occur in near real time. Furthermore, the lack of significant value judgments made by individual editors is evident in the consistency in content between published CGs.

different way. The analogy fails and in fact highlights a key misunderstanding by the District Court. Their use of different editing instructions that result in the claimed editing procedure still infringes—no matter the "intent" of the operator performing the editing steps. The claims are merely directed to taking a full video recording and removing content to result in a reduced length video called a condensed game. Infringement stems solely on the evidence of what was taken out and what was left behind—not the underlying thought processes of the editors.

In reaching its conclusion that MLBAM editing process was different, it ignored the actual CGs that resulted. This led to the wrong factual conclusion as the review of the CGs actually prepared by MLBAM demonstrates editing that excluded the "non-final" pitches and captured the "final pitches" precisely as claimed by the '716 patent.[22]

### 2.    The Record Is Nearly Silent On Evidence Supporting The Novel Basis For Judgment Rendered By The Court

Because the District Court's theory was not sponsored by either party, there is no meaningful record to support it.

---

[22] To demonstrate the problem with the District Court's construction, assume that MLBAM's instructions further state: "each editor must decide whether to include or exclude each final pitch in the exercise of their own judgment," and also assume that the resulting CGs include all final pitches–but nothing else. Can the mere addition of this instruction immunize an obviously infringing outcome? Simply stated, the intent behind an editing choice is irrelevant. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997) (intent of accused infringer is irrelevant to infringement analysis either literally or under doctrine of equivalents).

The District Court's reliance on the written instructions produced by MLBAM as conclusive evidence of the actual process employed by MLBAM editors was improper. In effect, the District Court *inferred* that these instructions reflected that the actual editing protocol practiced by MLBAM was a departure from the claims. This inference is not supported by the record and should never have been drawn in favor of MLBAM—the moving party here. *See Masson*, 501 U.S. at 520. Indeed, the record included ample support for the opposite conclusion or at least it creates an issue of fact.

1. MLBAM—prior to issuance of the '716 patent—implemented the exact same protocol provided in the '716 patent, with no subjective instructions.

2. MLBAM—after issuance, added a new instruction: drop "routine outs" (A3905, ¶23; A3967, ¶19)—an obvious effort to avoid the literal scope of the '716 patent with no other reason for its use.

3. A number of CGs are produced that, notwithstanding the new instructions, include all final pitches. (A3913, ¶72 ("These results were surprising and inconsistent with the instructions that were given to CG editors…."); A3976, ¶65).

4. MLBAM instituted a Quality Control operation—solely to assure that CGs have at least one final pitch that is removed from the final CG

product. Again, there is no business reason for this and it results in an insubstantial change to its previous method.

5. While instructed to avoid "routine outs" CGs include these in their content. (A4099, ¶¶14-15). MLBAM's written instructions to "avoid routine ground balls, routine pop outs, and routine fly balls." (A3911-12, ¶¶54, 59).[23]

6. The record is silent on actual guidance by MLBAM to its editors on the newly subjective instructions—instructions that allegedly require "value judgments."

Because there was clear evidence contradicting the inference that MLBAM's written instructions exactly matched the implementation of its editing process or differed from the '716 patent in any meaningful way, a review of actual CG content was the <u>most</u> reliable evidence of the results of the editing process actually practiced by MLBAM's editors. (*See* A3913, ¶72; A3976, ¶65). Indeed, the District Court acknowledged "[i]t may well be that…'there is no discernible difference between [Condensed Games] that include all final pitches and those that do not.'" (A83 (quoting A4444). This was powerful evidence that MLBAM's CG

---

[23] The key point here is that BQ focused its case—and proofs—on the content of published CGs as an indicator of the actual method steps employed by MLBAM's editors (A4100-1, ¶¶18, 20, 22); this is evidence that the Court improperly rejected out of hand. (A89, n.10).

content—and the method actually used to create it—was insubstantially, if at all, "subjective." Instead, MLBAM's method in practice conforms directly to the editing step claimed by the '716 patent.

Taking these inferences properly in BQ's favor, the District Court's summary judgment of non-infringement was in error and should be reversed as it was wrong in the face of the evidence of record.

**B.     District Court's *Sua Sponte* Construction Of "Editing By Deleting" Has No Basis In Intrinsic Evidence And Conflicts With The Proper and Accepted Construction Of This Term**

The District Court erred by newly adopting an "editing by deleting" construction that neither party asserted and that is wholly unsupported by the record. This error appears to emanate from its misunderstanding of MLBAM's second theory for summary judgment. In this second theory, MLBAM asserted a new claim construction of "editing by deletion" that required "destructive editing" such as clipping/splicing of actual video or film. (A3884, 3895, ¶¶10, 21).[24]

The District Court properly rejected MLBAM's second theory, characterizing it as "borderline frivolous" (A85). However, the District Court called it a "strawman" argument, appearing to mistakenly believe that MLBAM was actually sponsoring a different construction of "editing by deletion"—one that

---

[24] In support of this purported distinction, MLBAM could only point to declarations by its employees that "[MLBAM's] CGs are not created by deleting." (A3884 (citing A3977-78, ¶71 & A3959, ¶18)).

was not destructive, but involved the preparation of a second copy of the original three hour full game video. In accordance with this construction, editing required the physical removal of video content—by erasure—from this second copy followed by the removal of the "time gaps" left behind after the erasing of the rejected video passages. (A84).

It is unclear why this construction—raised for the first time in the District Court's Opinion on summary judgment—was adopted. It was not the construction sponsored by MLBAM and it lacked any support in the record. In fact, there is no evidence that anyone has ever edited in this manner or if the process is even possible. In any event, MLBAM does not practice this form of editing, and thus the District Court easily ruled there was no infringement based thereon. (A85-86).

### 1. The Proper Construction Of "Editing By Deleting" Is Editing That <u>Excludes Content</u> From The Final Condensed Game By Any Accepted Editing Methods Commonly Used

As stated above, the District Court did not point to anything in the intrinsic record that supported this distinction. Nor could it. The specification instead provides that "Editing of…a pre-recorded baseball game is well within the skill in the art and requires <u>no elaboration of the editing equipment or techniques</u>." (emphasis added). Editing in the '716 patent is not confined to any particular technique and is consistently described as a process whereby a game recording is reduced to a condensed version that retains specific content. (*See* A114, col. 1:20-

24 ("[T]his invention relates to a method of condensing…a baseball game by…editing it to retain the action portions….") & 2:10-37 ("The video record…is edited down to retain the last pitch thrown to each player, plus any resulting action for that pitch….Base running activity…can also be retained…. [S]ome additional material…can be included….")). Game action that is not specified to be included in the claim is therefore **excluded**—i.e., deleted.

BQ produced extrinsic evidence that "editing by deleting" in the proper context is interpreted in the art consistently with this construction. Long before initiating the present action and before filing his utility application, Greg Mockry retained a professional video editor to reduce his invention to practice. (A4089, ¶6; A4102, ¶¶26-27). Given the instruction to "edit the complete game recording to remove all game content other than the final pitch to every batter in the game," the editor produced an edited recording that *included* the desired final pitch content and excluded the remaining, undesired content using an editing process very much like that of MLBAM (i.e., non-final pitches, etc.). (A4090, ¶¶8, 15-16).

The District Court initially agreed with this construction as reflected by its initial claim construction. Specifically, it interpreted the editing step properly as "producing an edited recording that retains [the desired content]" (A59); and, by implication, excludes the rejected content defined by the claim. This conformed to

the specification and it was fully consistent with the file history.[25] There was never

any discussion or argument distinguishing the claims as different from this

approach.

BQ also identified earlier declarations made by Dinn Mann, Executive Vice

President of Content at MLBAM, that directly contradicts MLBAM's latest

assertion that "CGs are not created by deleting." Mr. Mann testified on numerous

occasions in support of MLBAM's first summary judgment motion, and

consistently declared that, during their editing process, content is "deleted" or

"removed." (A913, ¶6 ("During [MLBAM's] subjective editing process…,

outs…are removed from the edited recording." (emphasis added)) *and* A1423-24

¶¶7-9). Other extrinsic evidence confirms this understanding. (A4297-306; A4307-

9).

The District Court's decision to abandon its earlier claim construction on this

term in favor of its newly determined "deleting" construction was made in error.

### C.    The District Court Committed Legal Error By Dismissing BQ's Infringement Claim As A Matter of Law

The above-noted flawed claim construction contributed directly to the

District Court's dismissal of BQ's literal infringement and infringement under the

Doctrine of Equivalents claim.

---

[25] (*See* A2968 (BPAI decision affirming the patentability of application claim 24—
issued as claim 1—and characterizing editing as a process that excludes content)).

With respect to literal infringement, there were at least 15 CGs distributed by MLBAM that included all final pitches (A1424-25, ¶10) and, thus, even though a small number, these CGs infringed. In addition to these, there are an unknown number of CGs that included all final pitches reviewed by the game editors before further editing and distribution. (A4547-48, ¶29; A4578-79). Because the game editors were "subscribers" this edit/review process literally infringed the '716 patent—as it satisfied each step in the claimed editing protocol. (*Id.*).

In addition to literal infringement, BQ provided ample evidence demonstrating that the CGs produced with less than all final pitches were insubstantially different from the CGs produced with all final pitches. While the District Court dismissed BQ's doctrine of equivalents claim, it never separately compared CGs made by an editing process that captures all final pitches with CGs that dropped a handful of final pitches. The doctrine of equivalents theory considered and dismissed by the District Court was not the basis of BQ's claim for doctrine of equivalents infringement.

In fact, the only basis MLBAM used to challenge BQ's doctrine of equivalents theory was predicated on its claim that the final pitch difference in content had been surrendered during prosecution by argument—i.e., "argument-based estoppel." (A3890-93). Importantly, the District Court considered this and ruled that there was no argument based estoppels by BQ on final pitches. (A92).

57

There is no barrier to BQ in presenting its doctrine of equivalents case to the jury once the above noted flawed claim constructions are corrected.

### D. The Relevant Law On Doctrine Of Equivalents Provides A Compelling Foundation Supporting BQ's Infringement Claim

The doctrine of equivalents has played an important role in patent law since 1854. *See Winans v. Adam*, 56 U.S. 330 (1854). It developed as a judicial doctrine in response to the courts' recognition that "to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (U.S. 1950). "The essence of the doctrine is that one may not practice a fraud on a patent." *Id.* at 608.

At its core, doctrine of equivalents holds that a product or process that does not literally infringe upon the express terms of a patent may nonetheless be found to infringe if the difference between the accused product or process and the patented invention is "insubstantial." *Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citing *Graver Tank*, 339 U.S. at 608). An accepted test for proving equivalence is determining whether "the

accused product performs substantially the same function in substantially the same way with substantially the same result." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1352 (Fed. Cir. 2012) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)).

### 1.     BQ's Evidence Of Doctrine Of Equivalents Is Compelling

The factual record and all reasonable inferences provide a solid foundation to BQ's doctrine of equivalents claim. First, the record reflects that the only reason MLBAM dropped a few final pitches was an attempt to avoid the claim while still distributing CGs. After nearly a decade of using all final pitches, the editing protocol dropped some only after the '716 patent issued.

In addition to this, the editors were not particularly careful and final pitches still were included, notwithstanding the new instructions. (A1424-25, ¶10). To stop this, a second editing round was established but with sole intent to make sure a final pitch had been removed—and for no other purpose.

Moreover, CGs with all final pitches were indistinguishable to a CG where several final pitches had been dropped. All other aspects of the CGs remained unchanged. For example, MLBAM editing removed all non-final pitches; the resulting CGs provided the same ordered progression of batters through the line-up and corresponding chronological string of final pitch "game action" within the same 10-12 minute window; CGs retained the narrative of the game, and CGs

remained about the same level of popularity. In fact, there is no evidence that MLB's fan base even noticed the change.

Mr. Mockry studied a published CG that contained all final pitches and one that excluded a few final pitches, and the prototype reduction-to-practice video. (A4456-57 (citing A4093-106)). After a thorough analysis of the CGs with respect to each other and the '716 video, Mr. Mockry concluded that, as a person of ordinary skill in the art, there were insubstantial differences between the videos as they all retain the narrative of the game. (A4100-101, 104, ¶¶18, 22, 36). BQ's statistical expert sampled 11,080 published CGs and found a wide distribution of CGs in terms of final outs. (A4262). There was a significant outlier population with fewer "outs" removed. Overall, the study reflected CGs that retained the vast majority of final pitches and this captured the "narrative of the game."

The District Court, rather than drawing any reasonable inferences from the testimony presented by BQ—the only evidence in the record on the issue of equivalence—simply rejected any comparisons between the products of MLBAM and BQ's competing methods on a limitation-by-limitation basis. (A88-89). The District Court's finding on this point is thus premised entirely on its flawed claim construction and overreliance on MLBAM's written instructions as a proxy for its actual editing process.

As fully established *supra*, these foundations are unsubstantiated and contradict the evidence made of record. The District Court's summary judgment on DOE should therefore be reversed.

## VII.  CONCLUSION

For the reasons discussed above, the District Court's Dismissal of BQ's provisional rights and infringement claims should be reversed.

Dated:       May 1, 2015                    Respectfully submitted,

TROUTMAN SANDERS LLP

/s/ James M. Bollinger
James M. Bollinger
Joshua Berman
Timothy P. Heaton
Phoenix S. Pak
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
james.bollinger@troutmansanders.com
joshua.berman@troutmansanders.com
timothy.heaton@troutmansanders.com
phoenix.pak@troutmansanders.com


Matthew D. Murphey
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
(949) 622-2756
matt.murphey@troutmansanders.com

Paul E. McGowan
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E. Suite 5200
Atlanta, GA 30308-2216
(404) 885-3270
paul.mcgowan@troutmansanders.com

Eric Jaegers
TROUTMAN SANDERS LLP
11682 El Camino Real
San Diego, CA 92130-2092
(858) 509-6000
eric.jaegers@troutmansanders.com

*Counsel for Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

### ADDENDUM PAGE

Stipulated Protective Order Regarding Confidentiality of
    filed June 24, 2011.........................................................................A1

Opinion of
The Honorable Thomas P. Griesa
Re:  Granting in Part and Denying in Part Motion for Summary Judgment
    filed March 30, 2012....................................................................A14

Opinion and Order of
The Honorable Katherine B. Forrest
Re:  Granting Defendant's Motion for Partial Summary Judgment
    filed July 25, 2014 ......................................................................A26

Opinion and Order of
The Honorable Katherine B. Forrest
Re:  Granting Summary Judgment
    filed December 4, 2014................................................................A73

Order of
The Honorable Katherine B. Forrest
Re:  Denying Motion for Reconsideration
    filed January 28, 2015 .................................................................A96

Joint Stipulation of Dismissal of MLBAM's Counterclaim for
Declaratory Judgment of Invalidity of U.S. Patent No. 7,628,716
    filed February 5, 2015 ...............................................................A109

U.S. Patent No. 7,628,716 B2...........................................................A113

U.S. Patent Application No. 2003/0060311 A1...................................A116

Griesa, S

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/11

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

BASEBALL QUICK, LLC, a New York &sect;  
limited liability company, &sect;  
&sect;  
   **Plaintiff,** &sect;  
&sect;  
vs. &sect;  **CASE NO. 1:11-cv-1735-TPG**
&sect;  
MLB ADVANCED MEDIA, L.P., a &sect;  
Delaware corporation, and DOES 1 &sect;  
THROUGH 5, Inclusive., &sect;  
&sect;  
   **Defendants.** &sect;  

### STIPULATED PROTECTIVE ORDER REGARDING CONFIDENTIALITY

  The Court recognizes that at least some of the documents and information ("materials") being sought through discovery in the above-captioned action are, for competitive reasons, normally kept confidential by the parties. The parties have agreed to be bound by the terms of this Stipulated Protective Order Regarding Confidentiality ("Protective Order") in this action.

  The materials to be disclosed and exchanged throughout the course of the litigation between the parties may contain trade secret or other confidential research, technical, cost, price, marketing or other commercial information, as is contemplated by Federal Rule of Civil Procedure 26(c)(7). The purpose of this Protective Order is to protect the confidentiality of such materials as much as practical during the litigation. It is therefore **ORDERED** as follows:

### DEFINITIONS

  1.  The term "Confidential Information" shall mean and include information contained or disclosed in any materials, including documents, portions of documents, answers to interrogatories, responses to requests for admissions, trial testimony, deposition testimony, and transcripts of trial testimony and depositions, including data, summaries, and compilations

---

derived therefrom, that any party to which it belongs reasonably believes should be subject to this Protective Order.

2.     The term "materials" shall include, but shall not be limited to: documents, correspondence, memoranda, bulletins, blueprints, specifications, customer lists or other material that identifies customers or potential customers, price lists or schedules or other matter identifying pricing, minutes, telegrams, letters, faxes, e-mails, statements, cancelled checks, contracts, invoices, drafts, books of account, worksheets, notes of conversations, desk diaries, appointment books, expense accounts, recordings, photographs, motion pictures, compilations from which information can be obtained and translated into reasonably usable form through detection devices, sketches, drawings, notes (including laboratory notebooks and records), reports, instructions, disclosures, other writings, models and prototypes and other physical objects.

3.     The term "attorney" or "counsel" shall mean designated in-house attorneys and outside counsel of record in this litigation ("trial counsel") who are engaged in trial preparation in this case, and employees of such trial counsel to whom it is necessary that the material be disclosed for purposes of this litigation, including support personnel, paralegals, consultants, legal secretaries, legal clerks, technical advisors, employees of outside vendors providing copy services, document and exhibit preparation services, and jury consultant and research services. The terms expressly do not include outside counsel involved in the prosecution of any patents for either party ("prosecution counsel") that are related to the technology at issue in this case.

4.     The term "Court Staff" shall mean the Court and its personnel, court reporters, independent shorthand reporters, and their staffs, and videographers, interpreters, or translators engaged for depositions or proceedings necessary to this case.

5.     The term "Outside Consultant" shall mean any outside person (and their support personnel) who is not an employee of a party or any of the individuals or entities described in paragraph 3, who agrees to be bound by this Protective Order, and who is identified as an expert whose opinions may be presented at trial of this case, or is retained or specially employed in

anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, including, but not limited to, a proposed expert witness with whom trial counsel may deem it necessary to consult concerning technical, financial, or other aspects of this case for the preparation of trial thereof.

6. The technology at issue in this case is described in U.S. Patent 7,628,716 ("the '716 Patent"), including any related patents and/or patents relying on the same provisional application from which the '716 Patent derives.

### GENERAL RULES

7. Each party to this litigation that produces or discloses any materials, answers to interrogatories, responses to requests for admission, trial testimony, deposition testimony, and transcripts of trial testimony and depositions, or information that the producing party believes should be subject to this Protective Order may designate such Confidential Information as either "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY."

a. Designation as "CONFIDENTIAL": Any party may designate information or materials as "CONFIDENTIAL" only if, in the good faith belief of such party and its trial counsel, the unrestricted disclosure of such information could be potentially prejudicial to the business or operations of such party.

b. Designation as "CONFIDENTIAL – ATTORNEYS' EYES ONLY": Any party may designate information or materials as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" only if, in the good faith belief of such party and its trial counsel, the information is among that considered to be most sensitive by the party, including but not limited to trade secret or other confidential research, development, financial or other commercial information.

8. In the event the producing party elects to produce materials for inspection, no marking need be made by the producing party in advance of the initial inspection. For purposes of the initial inspection, all materials produced and/or inspected shall be considered as "CONFIDENTIAL – ATTORNEYS' EYES ONLY," and shall be treated as such pursuant to the

terms of this Protective Order.  Thereafter, upon selection of specified materials for copying by the inspecting party, the producing party shall, within a reasonable time prior to producing those materials to the inspecting party, mark the copies of those materials that contain Confidential Information with the appropriate confidentiality marking.

     9.    Whenever a deposition taken on behalf of any party involves a disclosure of Confidential Information of any party:

    a.    said deposition or portions thereof shall be designated as containing Confidential Information subject to the provisions of this Order; such designation shall be made on the record whenever possible, but a party may designate portions of depositions as containing Confidential Information after transcription of the proceedings; a party shall have until fifteen (15) days after receipt of the deposition transcript to inform the other party or parties to the action of the portions of the transcript designated "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY";

    b.    the disclosing party shall have the right to exclude from attendance at said deposition, during such time as the Confidential Information is to be disclosed, any person other than the deponent, trial counsel (including their staff and associates), the court reporter, and the person(s) agreed upon pursuant to paragraph 11 below; and

    c.    the originals of said deposition transcripts and all copies thereof shall bear the legend "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY", as appropriate, and the original or any copy ultimately presented to a court for filing shall not be filed unless it can be accomplished under seal, identified as being subject to this Protective Order, and protected from being opened except by Order of this Court.

    10.    All Confidential Information designated as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" shall not be disclosed by the receiving party to anyone other than those persons designated herein and shall be handled in the manner set forth below and, in any event, shall not be used for any purpose other than in connection with this litigation, unless and until such designation is removed either by agreement of the parties, or by Order of the Court.

    11.    Information designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY" shall be viewed only by trial counsel (as defined in paragraph 3) of the receiving party, Court Staff (as

defined in paragraph 4), and by Outside Consultants (as defined in paragraph 5) under the conditions set forth in this Paragraph. The right of any Outside Consultant to receive any Confidential Information shall be subject to the advance approval of such Outside Consultant by the producing party or by permission of the Court. The party seeking approval of an Outside Consultant shall provide the producing party with the name and curriculum vitae of the proposed Outside Consultant, and an executed copy of the form attached hereto as Exhibit A, in advance of providing any Confidential Information of the producing party to the Outside Consultant. Any objections by the producing party to an Outside Consultant receiving Confidential Information must be made in writing within fourteen (14) days following receipt of the identification of the Outside Consultant. Confidential Information may be disclosed to an Outside Consultant if the fourteen (14) day period has passed and no objection has been made. If an objection is made in good faith within the proscribed period, the parties must meet and confer within seven (7) calendar days of the objection and attempt to resolve the dispute. If the parties are unable to resolve the dispute, the producing party may bring a motion for protective order with the Court within seven (7) calendar days of the meet and confer. The approval of Outside Consultants shall not be unreasonably withheld.

12. Information designated "CONFIDENTIAL" shall be viewed only by trial counsel (as defined in paragraph 3) of the receiving party, by Outside Consultants (as defined in paragraph 5, and pursuant to the terms of paragraph 11), and a maximum of three (3) employees of each party. Each party shall designate the employees who will receive information designated under this paragraph and must notify the producing party of the identity of each such employee at least ten (10) calendar days before the disclosure of information designated under this paragraph to such employee. Within the same time period, the receiving party will also provide to the producing party an executed copy of the form attached hereto as Exhibit A for each such employee. Any objections by the producing party to such an employee receiving Confidential Information must be made in writing within the ten (10) calendar days following receipt of the identification of the employee. Confidential Information may be disclosed to such employee if

the ten (10) calendar day period has passed and no objection has been made. If an objection is made in good faith within the proscribed period, the parties must meet and confer within seven (7) calendar days of the objection and attempt to resolve the dispute. If the parties are unable to resolve the dispute, the producing party may bring a motion for protective order with the Court within seven (7) calendar days of the meet and confer.

13.     Designated employees under paragraph 12 may not be employees who are presently involved, other than in an administrative or ministerial way, in the prosecution of any patents for either party that are related to the technology at issue in this case.  Regardless of the provisions set forth in paragraph 12 above, no waiver results from the failure to object to employees who are improperly designated, and no Confidential Information should be provided to them absent express informed consent or order of this Court.

14.     With respect to material designated "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY," any person indicated on the face of the document to be its originator, author or a recipient of a copy thereof, may be shown the same.

15.     All information which has been designated as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" by the producing or disclosing party, and any and all reproductions thereof, shall be retained in the custody of the trial counsel for the receiving party, except that Outside Consultants authorized to view such information under the terms of this Protective Order may retain custody of copies such as are necessary for their participation in this litigation.

16.     Before any materials produced in discovery, answers to interrogatories, responses to requests for admissions, deposition transcripts, or other documents which are designated as containing Confidential Information are filed with the Court for any purpose, the party seeking to file such material shall seek permission of the Court to file said material under seal.

17.     At any stage of these proceedings, any party may object to a designation of the materials as Confidential Information. The party objecting to confidentiality shall notify, in writing, trial counsel for the designating party of the objected-to materials and the grounds for

the objection. If the dispute is not resolved consensually between the parties within seven (7) business days of receipt of such a notice of objections, the objecting party may move the Court for a ruling on the objection. The materials at issue shall be treated as Confidential Information, as designated by the designating party, until the Court has ruled on the objection or the matter has been otherwise resolved.

18. All Confidential Information shall be held in confidence by those inspecting or receiving it, and shall be used only for purposes of this action. Confidential Information, including documents and things, exchanged during this case shall not be used for drafting, filing or prosecution of new or currently pending patent applications, or for re-examination and/or reissues on behalf of a party to this litigation. No person who is currently involved in the drafting, filing or prosecution of new or currently pending patent application, or re-examination and/or reissues involving the technology at issue in this case may have access to Confidential Information. Trial Counsel for each party, and each person receiving Confidential Information shall take reasonable precautions to prevent the unauthorized or inadvertent disclosure of such information. If Confidential Information is disclosed to any person other than a person authorized by this Protective Order, the party responsible for the unauthorized disclosure must immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other party and, without prejudice to any rights and remedies of the other party, make every effort to prevent further disclosure by the party and by the person(s) receiving the unauthorized disclosure.

19. No party shall be responsible to another party for disclosure of Confidential Information under this Protective Order if the information in question is not labeled or otherwise identified as such in accordance with this Protective Order.

20. If a party, through inadvertence, produces any Confidential Information without labeling or marking or otherwise designating it as such in accordance with this Protective Order, the designating party may give written notice to the receiving party that the document or thing produced is deemed Confidential Information, and that the document or thing produced should

be treated as such in accordance with that designation under this Protective Order. The receiving party must treat the materials as confidential, once the designating party so notifies the receiving party. If the receiving party has disclosed the materials before receiving the designation, the receiving party must notify the designating party in writing of each such disclosure. Trial counsel for the parties shall agree on a mutually acceptable manner of labeling or marking the inadvertently produced materials as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES ONLY" – SUBJECT TO PROTECTIVE ORDER.

21.     Nothing herein shall prejudice the right of any party to object to the production of any discovery material on the grounds that the material is protected as privileged or as attorney work product.

22.     Nothing in this Protective Order shall bar trial counsel from rendering advice to their clients with respect to this litigation and, in the course thereof, relying upon any information designated as Confidential Information, provided that the contents of the information shall not be disclosed.

23.     This Protective Order shall be without prejudice to the right of any party to oppose production of any information for lack of relevance or any other ground other than the mere presence of Confidential Information. The existence of this Protective Order shall not be used by either party as a basis for discovery that is otherwise improper under the Federal Rules of Civil Procedure.

24.     Nothing herein shall be construed to prevent disclosure of Confidential Information if such disclosure is required by law or by order of the Court.

25.     Upon final termination of this action, including any and all appeals, trial counsel for each party shall, upon request of the producing party, return all Confidential Information to the party that produced the information, including any copies, excerpts, and summaries thereof, or shall destroy same at the option of the receiving party, and shall purge all such information from all machine-readable media on which it resides. Notwithstanding the foregoing, trial counsel for each party may retain all pleadings, briefs, memoranda, motions, and other

documents filed with the Court that refer to or incorporate Confidential Information, and will continue to be bound by this Protective Order with respect to all such retained information. Further, attorney work product materials that contain Confidential Information need not be destroyed, but, if they are not destroyed, the person in possession of the attorney work product will continue to be bound by this Protective Order with respect to all such retained information.

26.     The restrictions and obligations set forth herein shall not apply to any information that: (a) the parties agree should not be designated Confidential Information; (b) the parties agree, or the Court rules, is already public knowledge; (c) the parties agree, or the Court rules, has become public knowledge other than as a result of disclosure by the receiving party, its employees, or its agents in violation of this Protective Order; or (d) has come or shall come into the receiving party's legitimate knowledge independently of the production by the designating party. Prior knowledge must be established by pre-production documentation.

27.     The restrictions and obligations herein shall not be deemed to prohibit discussions of any Confidential Information with anyone if that person already has or obtains legitimate possession thereof.

28.     Facsimile or e-mail is acceptable for all notification purposes herein.

29.     This Protective Order may be modified by agreement of the parties, subject to Court approval.

30.     The Court may modify the terms and conditions of this Protective Order for good cause, or in the interest of justice, or on its own order at any time in these proceedings. The parties prefer that the Court provide them with notice of the Court's intent to modify the Protective Order and the content of those modifications, prior to entry of such an Order.

<u>**ACKNOWLEDGED AND AGREED**</u>:

**ATTORNEYS FOR PLAINTIFF**
**BASEBALL QUICK, LLC.**

Date:   June 13, 2011

Timothy P. Heaton
**TROUTMAN SANDERS LLP**
405 Lexington Avenue
New York, NY 10174
Telephone:    212.704.6000
Facsimile:    212.704.8383
E-mail timothy.heaton@troutmansanders.com

Matthew D. Murphey
**TROUTMAN SANDERS LLP**
550 West B Street, Suite 400
San Diego, CA 92101
Telephone: (619) 557-4310
Facsimile: (619) 894-7133
Email: matt.murphey@troutmansanders.com

Douglas D. Salyers (Pro Hac Vice )
Paul E. McGowan (Pro Hac Vice )
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E. Suite 5200
Atlanta, GA 30308-2216
Telephone: 404.885.3000
Facsimile: 404.885.3900
E-mail: doug.salyers@troutmansanders.com
E-mail: paul.mcgowan@troutmansanders.com

**ATTORNEYS FOR DEFENDANT**
**MLB ADVANCED MEDIA, L.P.**

Date:   June 13, 2011

Peter N. Wang
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016-1314
Telephone:   212.682.7474
Facsimile:    212.687.2329

Cynthia J. Franecki
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
Telephone:   414.297.5580
Facsimile:    414.297.4900

Justin Edwin Gray
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
3579 Valley Centre Drive, Suite 300
San Diego, CA  92130-3302
Telephone:   858.847.6764
Facsimile:    858.792.6773

IT IS SO ORDERED this _24th_ day of ____June____, 2011.

Thomas P. Griesa

Judge, United States District Court         by JL

---

## EXHIBIT A

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **BASEBALL QUICK, LLC, a New York limited liability company,** | § § § | |
| **Plaintiff,** | § § § | |
| **vs.** | § § | **CASE NO. 1:11-cv-1735-TPG** |
| **MLB ADVANCED MEDIA, L.P., a Delaware corporation, and DOES 1 THROUGH 5, Inclusive.,** | § § § § | |
| **Defendants.** | § § | |

I, _____ , declare and say that:

1.    I am employed as_____

by _____ .

2.    I am not involved, other than in an administrative or ministerial way, in the drafting, filing or prosecution of new or currently pending patent applications, or re-examination and/or reissues that are related to the technology at issue in this case on behalf of a party to this litigation, nor have I been involved in the prosecution of any patents for either party that are related to the technology at issue in this case.

3.    I have read the Stipulated Protective Order Regarding Confidentiality ("Protective Order") entered in *Baseball Quick, LLC v. MLB Advanced Media, L.P., et al.*, Case No. 1:11-CV-1735-TPG, I have received a copy of the Protective Order, and I agree to be bound by its terms.

3.    I promise and agree that I will use any and all "Confidential" or "Confidential – Attorneys' Eyes Only" information, as defined in the Protective Order, given to me only in a

manner authorized by the Protective Order, and only to assist counsel in the litigation of this matter.

4.      I promise and agree that I will not disclose or discuss such "Confidential" or "Confidential – Attorneys' Eyes Only" information with anyone other than the persons described in paragraphs 3, 11 and 12 of the Protective Order.

5.      I acknowledge that, by signing this agreement, I am subjecting myself to the jurisdiction of the United States District Court for the Southern District of New York with respect to enforcement of the Protective Order.

6.      I understand that any disclosure or use of "Confidential" or "Confidential – Attorneys' Eyes Only" information in any manner contrary to the provisions of the Protective Order may subject me to sanctions for contempt of court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _____, 2011.

_____

Printed Name: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------x
                              :

BASEBALL QUICK, LLC,              :

                              :

                     Plaintiff,     :      11 Civ. 1735 (TPG)

                              :

        – against –          :      **OPINION**

                              :

MLB ADVANCED MEDIA, L.P., et al.,  :

                              :

                    Defendants.   :

                              :

--------------------------------------------x



Plaintiff Baseball Quick, LLC ("Baseball Quick") has sued MLB[1]

Advanced Media, L.P. ("MLB") for infringement of Baseball Quick's U.S.

Patent No. 7,628,716 (the "716 Patent"). MLB moves for summary

judgment. Baseball Quick opposes the motion and moves under Federal

Rule of Civil Procedure 56(d) for an order allowing it to conduct discovery

to develop facts in opposition to MLB's motion for summary judgment.

Baseball Quick also moves for sanctions under Federal Rule of Civil

Procedure 56(h).

The motion for summary judgment is granted in part and denied

in part. The motions for relief under Rule 56(d) and sanctions under

Rule 56(h) are denied.

## FACTS

The following facts are undisputed, unless otherwise indicated.

---

[1] MLB stands for Major League Baseball.

Plaintiff Baseball Quick is the assignee of the rights to the '716 Patent, involving an invention by George Mockry and Greg Mockry. The Mockrys made their invention, which they call Baseball Quick, around June of 2000. As will be described more fully below, Baseball Quick is a method for shortening a baseball game to approximately fifteen minutes, by editing the game to remove routine game action (such as pitches where the baseball is not put in play) and delivering the edited recording to subscribers in a condensed version.

The Mockrys filed a provisional application with the United States Patent Office ("PTO") on June 13, 2000. The patent application was published as United States Patent Publication No. 2003/0060311 on March 27, 2003.

It is necessary to quote a portion of the published application. The reason that this is relevant is that, among other things, Baseball Quick asserts provisional rights based on this application pursuant to 35 U.S.C. § 154(d)(1).

Claim 4 of the invention claimed in the published application was a method comprised of the following steps:

> recording the appearances-at-bat for each player, in turn, plus other action that ensues during or after the appearances-at-bat;
>
> editing the recorded appearances-at-bat to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on base to advance to another base; and

**A15**

presenting the edited recording game as a condensed
recorded game showing important action portions of the
game.

The published application also contained the following Claim 8:

The method according to claim 4 wherein said step of
presenting the edited game as a condensed recorded game
includes delivering the recorded game to subscribers over
the Internet.

On August 1, 2000, the Mockrys approached MLB in an effort to
license their invention to MLB. MLB declined the offer. The Mockrys
again approached MLB, and MLB again declined on January 24, 2001, in
a letter signed by Bud Selig, Commissioner of MLB. The Mockrys again
attempted to license their invention to MLB during 2004 as well, but to
no avail.

The '716 Patent ultimately was issued on December 8, 2009. The
claims in the '716 Patent cover a process designed to allow one to enjoy a
complete baseball game in approximately fifteen minutes. It is now
conceded by both parties that Claim 1 is the important claim in the
present case, and the only claim at issue in the present motions. Claim
1 describes the following steps:

(1) recording each appearance-at-bat for every player and
game action resulting from an appearance-at-bat to
produce a game recording;

(2) editing the game recording of each appearance-at-bat
to produce an edited recording by deleting substantially all
game action other than (i) game action from a final pitch
thrown to each player, (ii) successful attempts of runners
on base to advance to another base not associated with
the game action resulting from the final pitch and (iii)
unsuccessful attempts of the runners on base to advance

**A16**

to another base resulting in and not associated with the game action resulting from the final pitch;

(3) obtaining subscribers for viewing the edited recording and

(4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

The parties have not completely detailed the procedural history surrounding the issuance of the '716 Patent. However, it is apparent from the record that the Mockrys' application was rejected by the PTO once, and that the Mockrys subsequently appealed this determination to the Board of Patent Appeals and Interferences, which allowed the patent to issue by a two to one vote.

During the time period between plaintiff's invention of Baseball Quick and the issuance of the '716 Patent, MLB developed and introduced its own similar product called "Condensed Games." MLB's Condensed Games are condensed versions of a baseball game that, like the Mockrys' Baseball Quick invention, enable viewers to watch the crucial plays of a baseball game in a short period of time. Baseball Quick claims that these Condensed Games infringe the '716 Patent.

The Causes of Action and the Present Motions

Baseball Quick seeks remedies for alleged infringement of the '716 Patent. In addition to its basic contention that MLB committed infringement after the patent was issued, Baseball Quick argues that it is entitled to provisional rights during the time the application was pending.

MLB moves for summary judgment dismissing the cause of action for infringement. MLB proposes a construction of Claim 1 of the '716 Patent. Based on that construction, MLB argues that Baseball Quick cannot possibly prove infringement of Claim 1. Baseball Quick has set forth its own proposed construction of Claim 1 and argues that under either its construction or MLB's construction, summary judgment should be denied. MLB also seeks a ruling in its favor on two particular issues. MLB claims that it cannot be liable for infringement in connection with those Condensed Games it created after the issuance of the '716 Patent where part of the activity—namely the recording of baseball games— occurred before issuance of the patent. MLB also contends that Baseball Quick has no valid case of provisional rights.

Baseball Quick also seeks discovery under Rule 56(d) to assist it in dealing with the summary judgment motion. It also moves for sanctions under Rule 56(h).

## DISCUSSION

Infringement of Claim 1

Under MLB's proposed claim construction, Claim 1 requires that (1) each use of the method create a recording that includes the final pitch of each at-bat; and (2) the edited recordings be played to "subscribers" who pay for the right to view the edited recording. Baseball Quick disputes this claim construction, and claims that the edited recordings

**A18**

do not need to include the final pitch of every at-bat, nor do any subscribers need to be paying subscribers.

First, MLB argues that it has not infringed Claim 1 because its Condensed Games, with rare exceptions, do not include the final pitch for each at-bat. MLB therefore argues that it is entitled to summary judgment on this issue, allowing perhaps for some de minimis degree of infringement. The court held an extensive hearing today, which included a lengthy discussion of these issues. The court concludes that the issues cannot be decided on summary judgment. For the reasons developed more fully at the hearing, it is not clear at the present time if Claim 1 should be construed to require a showing of the final pitch of each at-bat. Moreover, the record is not fully developed as to what the Condensed Games actually show. It would seem logical that the final pitch to a batter would generally be of interest. There surely might be exceptions to this. However, the facts are not clear enough on this point to justify summary judgment.

Second, MLB also initially argued that it did not infringe Claim 1 because it did not offer its Condensed Games to paid subscribers. MLB claimed that all of its Condensed Games were available for free on its website, with no payment, password, or login required. Baseball Quick contested this interpretation of "subscribers" and argued that "agreement or assent," not payment, was all that was required to be a subscriber. Baseball Quick also set forth sufficient evidence to create an issue of fact

that under either of the dueling definitions of subscribers, MLB was offering its Condensed Games to subscribers. In its reply papers, MLB withdrew its argument concerning subscriptions, explicitly conceding that there "may be" issues of material fact relating to the application of that claim term. Therefore, summary judgment is also inappropriate on this issue.

Summary judgment is denied with respect to infringement of Claim 1, with the exception of an issue to be discussed shortly.

The court will not at this time engage in claim construction of the disputed terms because it is not necessary for the rulings just announced.

Baseball Games Occurring Before the Issuance of the '716 Patent

MLB also seeks summary judgment with respect to its condensed versions of baseball games that were played before the issuance of the '716 Patent on December 8, 2009. This argument does not rely on MLB's proposed, disputed construction of Claim 1 of the '716 Patent. Rather, according to MLB, a method patent cannot be infringed unless all the steps of the method are performed during the term of the patent. Because live baseball games are recorded when they occur, MLB claims it cannot have infringed Claim 1 of the '716 Patent by making recordings of baseball games before the issuance of the '716 Patent and then editing and providing them to subscribers after the issuance of the '716 Patent.

MLB relies on <u>Monsanto Co. v. Syngenta Seeds, Inc.</u>, 503 F.3d 1352 (Fed. Cir. 2007). In that case, the plaintiff argued that the defendant had infringed its method patent by completing one of four steps during the patent term. The other three steps of the method had been completed before the patent term, by the eventual patent holder. The court found no infringement of the method patent because three steps occurred before the issuance of the patent. <u>Id.</u> at 1359-60.

Here, one of the steps in Claim 1 requires "recording each appearance-at-bat for every player and game action resulting from an appearance-at-bat to produce a game recording." Baseball Quick claims that MLB infringed its patent by creating Condensed Games of baseball games that occurred both before the patent issued on December 8, 2009, and after December 8, 2009. However, it is impossible for MLB to perform the step of recording a baseball game that occurred before December 8, 2009, after December 8, 2009. Thus, it is not possible for MLB to infringe the '716 Patent by making Condensed Games of baseball games played prior to December 8, 2009, because MLB would not be performing all of the steps required in Claim 1 of the '716 Patent during the term of the patent.

Baseball Quick attempts to distinguish <u>Monsanto</u> by arguing that in <u>Monsanto</u>, it was actually the patent holder who had performed the three steps prior to issuance of the patent. Baseball Quick claims that <u>Monsanto</u> is distinguishable because here, MLB performed one of the

steps, without authority, before the term of the patent. Although Baseball Quick's characterization of the facts of <u>Monsanto</u> is accurate, the rule announced in <u>Monsanto</u> applies more broadly. <u>Monsanto</u> held that "infringement of a multi-step method claim cannot lie by the performance of a single step after issuance of the patent when the initial steps were performed prior to issuance." 503 F.3d at 1360; <u>see also</u> <u>id.</u> ("This case lacks any basis for infringement under claim 1 because [three] steps occurred before patent issuance."); 35 U.S.C. § 271(a) (requiring that infringement occur "during the term of the patent").

Accordingly, defendants are entitled to partial summary judgment, to the effect that they cannot be liable for making Condensed Games of baseball games that were filmed prior to the issuance of the '716 Patent.

<u>Provisional Rights</u>

MLB also claims it is entitled to summary judgment on Baseball Quick's claim for royalties during the period between the posting of its patent application and the issuance of the patent.

As discussed above, generally a patentee can only recover for infringement that occurs after issuance of the patent. 35 U.S.C. § 271(a); <u>id.</u> § 154(a)(2). However, under § 154(d)(1), a patent holder has "provisional rights" to recover reasonable royalties for infringing conduct that occurred prior to the issue date of the patent. The right to a royalty attaches only where the "invention as claimed in the patent is substantially identical to the invention as claimed in the published

patent application." Id. § 154(d)(2); see Loops, LLC v. Phoenix Trading, Inc., No. C08-1064 (RSM), 2010 U.S. Dist. LEXIS 78426, at *14 (W.D. Wash. July 30, 2010) (citing Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346 (Fed. Cir. 1998)).  This analysis requires a comparison of the scope of the claims in the patent application and the issued patent.  Laitram, 163 F.3d at 1346.  Although an "amendment that merely clarifies the terms of a claim is not a substantial change, . . . an amendment that narrows the scope of a claim is a substantial change." Prestige Pet Products, Inc. v. Pingyang Huaxing Leather & Plastic Co., 767 F. Supp. 2d 806, 812 (E.D. Mich. 2011) (citing Bloom Eng'g Co. v. N. Am. Mfg. Co., 129 F.3d 1247, 1250 (Fed. Cir. 1997)).

Here, both the invention claimed in the published application and the invention claimed in the issued '716 Patent require recording a baseball game and editing the game.  The patent application also provided for delivering the game to subscribers over the Internet.  The patent itself provided for playing or broadcasting the recorded game for viewing by subscribers.  These two passages regarding subscribers are essentially synonymous.  However, MLB alleges that there is a difference between the patent application and the actual patent because the actual patent describes "obtaining subscribers," and this precise language is not contained in the application.  The language about "obtaining" does not involve anything approaching a difference of substance from the application.

Therefore, the court denies MLB's request for a judgment denying provisional rights to Baseball Quick.

Rule 56(d) Motion

Baseball Quick also moves for discovery to assist it in opposing the summary judgment application of MLB. Such discovery is not necessary and would not be helpful.

Motion for Sanctions

Baseball Quick contends that MLB should be sanctioned under Rule 56(h) for submitting false sworn statements in declarations, in bad faith.

The court declines to impose sanctions. Any misstatements were either mistakes or have been corrected, and there has been no prejudice to Baseball Quick.

## Conclusion

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. The motions for discovery under Rule 56(d) and sanctions under Rule 56(h) are denied.

This opinion resolves the motions listed as numbers 55, 63, and 78 on the docket.

Dated: New York, New York
      March 30, 2012

                                      Thomas P. Griesa
                                      U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/30/12

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 25 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

BASEBALL QUICK, LLC,                        :
                                            :
                          Plaintiff,        :          11-cv-1735 (KBF)
             -v-                            :
                                            :          OPINION & ORDER
                                            :
MLB ADVANCED MEDIA L.P. et al.,             :
                                            :
                          Defendants.       :
                                            :
-------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

We may admit without embarrassment that the great American pastime,
baseball, can at times prove boring to watch; games may take hours to complete,
intersected by short bursts of exciting action. The patent at issue in this case
sought to invent a novel method of solving the related problems of not wanting to
miss game action while also not wanting to invest the necessary time in slogging
through an entire game.

On June 13, 2000, Baseball Quick, LLC ("BQ") filed a provisional patent
application with respect to what became U.S. Patent No. 7,628,716 (the "'716
Patent" or the "Patent"), with respect to its invention. Shortly thereafter, BQ
alleges that it disclosed the concept of its invention to Major League Baseball
("MLB"), the parent company for MLB Advanced Media, L.P. ("MLBAM"). MLB
informed BQ that it was not interested in a business arrangement and, in March
2001, MLB announced its own "Condensed Games" product which also sought to
condense baseball game action. The parties have been locked in legal disputes ever

since, with BQ asserting that Condensed Games infringes on its invention, and MLBAM asserting a variety of defenses including invalidity and non-infringement.

Pending before this Court are two motions: the first is for claim construction as to eight terms in the '716 Patent; the second is a motion by MLBAM for partial summary judgment on the issue of whether BQ may assert provisional rights pursuant to 35 U.S.C. § 154(d)(2). This Opinion & Order sets forth the Court's resolution of both motions.

## I.    THE PATENT

BQ's initial patent application was filed on June 13, 2000; BQ filed a non-provisional application a year later, on June 9, 2001, and a preliminary amendment to that application in 2002. On March 27, 2003, the application was published (the "2003 Published Application"), and it is this Application that must be compared to the issued Patent for purposes of MLBAM's motion for partial summary judgment as to provisional rights. The Patent issued on December 8, 2009; all claims are currently subject to reexamination pursuant to an Office Action Determination issued November 27, 2012.

As issued, the Patent is entitled "Method of Recording and Playing Baseball Game Showing Each Batter's Last Pitch." (Pak Decl. Ex. A, Col. 1, lines 1-3, ECF No. 153.)

The invention is described as a method of providing a subscription for viewing an edited recording. It "broadly relates to a method for reducing the time needed to enjoy a complete baseball game, and especially relates to a method for

2

**A27**

replaying or rebroadcasting a baseball game in a manner so that the viewer sees only the outcome-determinative actions that occurred during the original game." (Id. Ex. A, Col. 1, lines 15-20.) The method involves recording an entire game and "editing it to retain the action portions, i.e., the last pitch thrown to the batters for each turn at plate," (id. Ex. A, Col. 1, lines 22-24), and retaining the game action resulting from that pitch (id. Ex. A, Col. 1, lines 59-60). This process results in a recording of "each safe base hit, each walk, strike out, sacrifice fly, ground out, etc." (Id. Ex. A, Col. 1, lines 60-62.) Fielding would also be recorded. (Id. Ex. A, Col. 1, lines 61-63.) The video resulting from this editing process would be approximately ten to fifteen minutes. (Id. Ex. A, Col. 1, line 64.) Finally, "some additional material (e.g. narrative) can be included to explain pitching changes, pinch runners, and other substitutions that may affect play." (Id. Ex. A, Col. 2, lines 1-3.)

According to the Patent's specification:

> The invention does not constitute merely a compilation of the highlights of a particular baseball game. Rather, the invention is directed to making a record of each and every outcome-determinative action that takes place during the complete game, while eliminating all of the action that ultimately does not impact the outcome.

(Id. Ex. A, Col. 2, lines 60-65.) The edited recording would be available to viewers on a subscription basis. (Id. Ex. A, Col. 2, lines 40-43.)

## A.  Claims

The Patent contains five claims (the "Patent Claims"), the first of which is independent while the remaining four claims are dependent:

> 1. A method of providing a subscription for viewing a recorded baseball game in which players from each team appear at bat, and

3

**A28**

attempt to place a pitched baseball into play and to reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising: (1) recording each appearance-at-bat for every player and game action resulting from an appearance-at-bat to produce a game recording; (2) editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch; (3) obtaining subscribers for viewing the edited record and (4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

2. The method of claim 1 wherein the edited recording for a nine-inning baseball game is about 15 minutes.

3. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet.

4. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted by playing a videotape recording.

5. The method of claim 1 wherein the edited recording contains audio explaining any substitution of players.

(Id. Ex. A, Cols. 3-4, lines 21-26 and 1-24.)

The 2003 Published Application consisted of the following ten claims (the

"Application Claims"):

1. I claim the name "Baseball Quick" as our trademark. The name is an integral part of our invention and describes in 2 words how a fan can view a baseball game. "Baseball Quick" is a method of recording and editing a baseball game by showing only the last pitch to each batter and any subsequent action. Any action between the last pitch of any batter to the last pitch of another batter shall also be recorded. The result shall be a complete game of every player at bat in approximately 15 minutes.

4

**A29**

2. I claim that this method of dispensing a baseball game can be used in the following medias. Television, Radio, Internet, Telephone, and Pagers.

3. I claim there are many ways "Baseball Quick" can be shown or heard. For example it can be dispensed, a) inning by inning while the game is in progress, b) 3rd inning, or 6th inning review while the game is in progress, or c) the whole game shown or heard after the game is over, d) all of the above can also be dispensed on the internet telephone, pay per view or any hand held device. Finally all these methods can be repeated at prime time slots or the next morning.

4. A method of recording and editing a baseball game in which players from each side appear at bat, in turn, and attempt to place a pitched baseball into play and reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising:

> recording the appearances-at-bat for each player, in turn, plus other action that ensues during or after the appearances-at-bat;

> editing the recorded appearances-at-bat to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on base to advance to another base; and

> presenting the edited recorded game as a condensed recorded game showing important action portions of the game.

5. The method according to claim 4 wherein said editing includes omitting all pitches that do not result in either the player at bat placing the ball into play, producing an out, or the player at bat or another player advance to another base.

6. The method according to claim 4 wherein the edited recorded game is about 15 minutes for a nine-inning game.

7. The method according to claim 4 wherein said edited recorded game comprises only a specific portion of the game.

8. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes delivering the recorded game to subscribers over the Internet.

9. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes distributing the recorded game as a video recording.

10. The method according to claim 4 wherein the step of editing leaves in narrative material to explain substitution of players.

(Id. Ex. B.)

     B.    Prosecution History

The '716 Patent wound its way through the United States Patent and Trademark Office ("PTO") for more than eight years prior to its issuance. The parties dispute the relevance and importance of a number of events and statements made during prosecution. The 2003 Published Application, which would ultimately become the '716 Patent, was first published in March 2003; in May 2003, the PTO issued a Final Office Action rejecting Application Claims 4-10 as indefinite and vague. (Franecki Decl. Ex C at 6, ECF No. 95.) On August 27, 2003, plaintiff responded by submitting new claims 11-22. (Id. Ex. D.)

According to the remarks accompanying plaintiff's August 2003 submission, "the sum total of all the action of an entire baseball game that is reflected in the box score for each participant in the game is consolidated into about 10-20 minutes of video." (Id. Ex. D at 6.) Plaintiff stated that "[a]nyone with even a rudimentary knowledge of the game of baseball can envision what aspects of the pre-recorded game to remove and what to retain in the editing process to accomplish the stated

result based on the originally filed application." (Id. Ex. D at 8.)  Plaintiff also

stated that:

> Of course, one can, within the spirit of this invention, include a minor
> amount of extraneous recorded information in the edited version, e.g.,
> a video clip of a young fan watching the game, or a video clip of a coach
> or manager giving signals or changing the pitcher, so as to accent the
> summary presentation provided by this invention.  Thus, the use of the
> word "substantially" to modify certain aspects of the claimed method.

(Id.)  Plaintiff further stated that the "objective of the invention" was to present a

"complete summary of the action that is recorded in the original game, as reflected

in the box score for each participant in the game, so that the action is consolidated

into about 10-20 minutes of video." (Id.)  Plaintiff distinguished the invention from

a "'highlight' tape of a baseball game, as for example one might see on ESPN's

SportCenter" because the invention would "show every outcome-determinative pitch

to each batter, while substantially eliminating all non-outcome determinative action

from the edited recording." (Id. Ex. D at 9.)  As a result, according to plaintiff, the

"edited video shows only the outcome of each at bat in the game." (Id. Ex. D at 10.)

> Claim 11 in this submission claims:

> A method of replaying or rebroadcasting a baseball game, or a portion
> thereof, for which a video recording of the baseball game, or a portion
> thereof, was produced containing substantially every pitch thrown to
> every batter from a first pitch to a final pitch and game action
> resulting from every pitch, together with other action occurring during
> each appearance by every batter, the method comprising (a) editing the
> video recording to produce an edited recording, the edited recording
> having video of substantially only (i) the final pitch thrown to every
> batter and any game action resulting from the final pitch; (ii)
> successful attempts of runners on base to advance to another base not
> associated with the game action resulting from the final pitch and (iii)
> unsuccessful attempts of the runners on base to advance to another
> base resulting in an out not associate with the game action resulting

7

**A32**

from the final pitch and (b) playing or broadcasting the edited
recording for viewing.

(Id. Ex. D at 3.)

In a submission dated February 18, 2004, plaintiff added further claims—
numbers 23 through 29—with claim 24 ultimately becoming Patent Claim 1.  (Id.
Ex. E at 4-5)  Both claims 23 and 24 added the limitation of "obtaining subscribers
for viewing the broadcast of the edited recording."  (Id. Ex. E at 4-6.)

In a further submission dated June 10, 2005, plaintiff cancelled claims 1-22
and amended claim 23 (as well as others).  (Id. Ex. I.)  In that amendment, plaintiff
made the following changes[1] to claim 23:

> A method of replaying or rebroadcasting a baseball game~~, or a portion
> thereof,~~ for which a video recording of the baseball game~~, or a portion
> thereof,~~ was produced containing substantially every pitch thrown to
> every batter from a first pitch to a final pitch and game action
> resulting from every pitch, together with other action occurring during
> each appearance by every batter, the method comprising (a) editing the
> video recording to produce an edited recording, the edited recording
> having video ~~of substantially only~~ <u>consisting essentially of</u> . . . .

(Id. Ex. I at 2.)  In its remarks presented with this amendment, plaintiff stated that
claims 23 and 24 had been amended and others added

> in a way such that they are directed specifically to a method in which a
> baseball game . . . is edited . . . to remove "substantially" all aspects of
> the pre-recorded game that do not directly impact the outcome of the
> game, i.e., save for the outcome-determinative action associated with
> each batter that comes to the plate and a minor amount of additional
> content (such as between inning banter by the announcers, occasional
> crowd shots, or certain foul balls that may have fan interest).  In this
> way, essentially all the action of an entire baseball game that is
> reflected in the box score for each participant in the game is
> consolidated or condensed into about 10-20 minutes of video.

---

[1] Deletions to claim 23 are denoted by "strike-throughs," while additions are denoted by underlines.

8

**A33**

(Id. Ex. I at 7-8.) Plaintiff also specifically sought to distinguish claims 23 through 34 over certain prior art—SeasonTicket and Rangan et al.—stating that plaintiff sought protection for a method of making an edited recording, not the content of the edited recording itself. (Id. Ex. I at 9.) In fact, plaintiff stated that the claimed method "involves a pre-selection of the content of the edited recording that breathes patentability into the invention." (Id. Ex. I at 11.) According to plaintiff, prior art

> generally represents a subjective assessment of those aspects of the game that a viewer might find particularly interesting. The present invention, in contrast, establishes an objective, pre-selection of the game action to be included, selecting essentially all of the game action that contributes to the box score of the game.

(Id. Ex. I at 12.) Moreover, plaintiff argued that nothing in the prior art suggests a method of "distilling the recording of a baseball game down to essentially only those actions that contribute directly to the outcome of the contest." (Id.)

According to plaintiff, the method teaches an objective process and "anyone with even a rudimentary knowledge of the game of baseball can envision what aspects of the pre-recorded game to exclude and what to retain in the editing process to accomplish the stated result—there is nothing subjective in carrying out the claimed method." (Id. Ex. I at 13.) In explaining the use of the words "essentially" and "substantially," plaintiff stated that one could, within the spirit of the invention, include a "minor amount of extraneous recorded information in the edited version," again giving the example of the young fan or a coach giving signals. (Id.) Plaintiff stated that the words "essentially" and "substantially" were included to prevent one from "slavishly limiting the literal scope of the method to the

9

**A34**

essential actions"; plaintiff also stated, however, that "[t]he objective of the invention is to present a complete summary of the action that is recorded in the original game, as reflected in the box score for each participant in the game, so that the action is consolidated into about 10-20 minutes of video." (Id.)

In a Final Office Action dated June 23, 2005, the PTO rejected claims 23 through 40 as obvious. (Id. Ex. J at 2.) On September 8, 2005, plaintiff filed a "Pre-Appeal Brief Request for Review," in which plaintiff argued various points of distinction from prior art. (Id. Ex K.) For instance, with regard to HistoricFilms, plaintiff argued that it is simply a video clip of historic highlights and "[n]o part of the clip could even be considered any one of (1) A method of replaying or rebroadcasting a baseball game (claim 23); (2) A method of providing a subscription for viewing a recorded baseball game (claim 24) . . . ." (Id. Ex. K at 2 n.1.)

In defending its claims, plaintiff presented it as a method to "show essentially all of, and essentially only all of, the outcome-determinative pitches to each batter (specific game action); while substantially eliminating all non-outcome-determinative action from the edited recording." (Id. Ex. K at 4.) In distinguishing the invention from prior art, plaintiff argued that highlight reels represent "a subjective assessment of those aspects of the game that the editor believes a viewer might find particularly interesting. The present invention, in contrast, establishes an objective, pre-selection of the game action to be included in the edited recording." (Id.) Plaintiff then stated that the invention shows game action "that occurs following the last pitch thrown to each batter for each turn at the plate, or the

10

**A35**

tagging out or safe advancement of a base runner as may occur in a pick-off play or if the runner is caught stealing." (Id.)  Plaintiff reiterated that there is "nothing subjective in carrying out the claimed invention." (Id.)  Plaintiff further reiterated that "[t]he objective of the invention is to present a complete summary of the action that is recorded in the original game, as reflected in the box score for each participant in the game, so that the action is consolidated into about 10-20 minutes of video and then that product is provided to subscribers." (Id. Ex. K at 5.)

Plaintiff then received a Notice of Panel Decision from Pre-Appeal Brief Review dated October 25, 2005, which rejected all claims as unpatentable over prior art—in particular, ProQuest Producing Sports Channel ("ProQuest"). (Id. Ex. L.) In response, plaintiff filed an amendment and accompanying remarks, cancelling claims 1-22, 26 and 31, but maintaining claims 23-25, 27-30 and 32-40. (Id. Ex. N at 6.)  Plaintiff reiterated that its claimed invention was "NOT the production of a highlight show!!  In stark contrast, the claimed method is an objective procedure for producing a specific edited version of a baseball game in which every batter's appearance at the plate is shown . . . ." (Id. Ex N at 8-9.)  In contrast, plaintiff argued that "[a] highlight show edits a baseball game according to the **subjective** whims of the individual doing the editing . . . . The present invention, in a completely different manner, requires totally **objective** treatment of the baseball game.  The product of the method does not change depending on who is assigned the task of editing the video." (Id. Ex. N at 9 (emphasis in original).)  Further emphasizing this point, plaintiff stated:

The editing is not varied based on the bias or interests of [the] person doing the editing and is not influenced by the nature of the game itself (its length, the number of hits made or runs scored.) The claimed method is not simply a matter of choice that varies from one time to another. Nothing in the prior art's production of a "highlight" show provides any suggestion of the radically different approach embraced by the claimed method.

(Id. Ex. N at 10.)[2] Plaintiff then provided further detail stating

[T]he edited video shows substantially only the outcome of each at bat in the game (all of the "pay-off pitches"), such as the strike-out pitch, the base hit, the home run, the hit batter, the ground out, the fly out, the double play ball, etc. Obviously, such a record is not merely a highlight reel—indeed much of the action required to be included by applicants' claimed invention would not even be considered a highlight.

(Id. Ex. N at 11.)

Plaintiff's appeal of the rejection proceeded. In its appeal brief filed on August 21, 2006, plaintiff again argued that its invention was fundamentally different from ProQuest and other "highlight reel" inventions. (Id. Ex. O at 2.) Plaintiff argued that it was claiming a "specific and consistent method or algorithm which can be applied to the editing of a baseball game . . . The essence of that method, as described and claimed, is in its simplest terms, to show the last pitch to each batter. In other words, every batter is shown for every at "bat," but only one pitch to each batter is retained in the edited game, namely the last pitch to each such batter." (Id. (emphasis in original).)

---

[2] Later in the same submission, plaintiff made a similar statement, contrasting a set of highlights consisting of a "subjective assessment" of what "a viewer might find particularly interesting" to the invention's "objective, pre-selection of the game action to be included." (Id. Ex. N at 12.) As a result, "[i]n a nine inning baseball game this would require at a minimum 54 pitches, with a typical number being about 70-85 (and the resulting game action)." (Id.)

12

In a Substitute Brief on Appeal filed April 1, 2008, plaintiff made the same points again, referring to the claimed invention as an "objective procedure" as to which there was "no subjective component to selecting the essential aspects of the original video to include in the edited video of the claimed invention." (Id. Ex. P at 8-9.) Similarly, plaintiff stated in the brief that "[t]he essential product of the method does not change depending on who is assigned the task of editing the video." (Id. Ex. P at 9.)[3] Attached to this and other filings by plaintiff in support of its prosecution of the Patent is a letter from plaintiff to MLB in August 2000, which describes the invention as editing a film or video tape to "retain the action portions, i.e., the last pitch thrown to the batters for each turn at the plate." (Id. Ex. P at 33.)

The Board of Patent Appeals held oral argument on plaintiff's appeal on June 9, 2009. At that hearing, counsel for plaintiff reiterated that the invention is an "objective way of repackaging a baseball game." (Id. Ex. R at 2.) He argued further that "[w]hat defines, I think, our invention from the art is the Inventors require objectively that each last pitch is part of this record," and that every pick-off play "has to be part of our recording." (Id. Ex. R at 4.) Moreover, plaintiff's counsel stated that "[y]ou don't make any decision on what plays to keep in the claimed method. It's dictated. It's objective." (Id. Ex. R at 5.) Finally, plaintiff's counsel ends by arguing, in substance, that the invention requires the inclusion of all strike-outs even in a game that involves an unusually high number of strike-outs, and that

---

[3] In this "substitute" brief, plaintiff also refers to the invention as providing a "consistent method or algorithm" (id. Ex. P at 10) for which "every batter is shown for every at 'bat'" (id. Ex. P at 11 (emphasis in original)).

13

this aspect differs from a highlight reel that would likely eliminate many of the strike-outs as uninteresting. (Id. Ex. R at 7-8.)

The Board of Patent Appeals issued its decision on August 3, 2009. A majority of the panel (the "Majority") affirmed the rejection of, inter alia, claim 23 but reversed the rejection of claim 24. (Id. Ex. S at 12.) The decision states that "We interpret 'edited recording having video consisting essentially of' as necessarily including the three categories of action recited in claim 23, and as optionally including any additional action category listed in the quoted Specification passage." (Id. Ex. S at 9.) According to the Majority, a recording of an entire game would render claim 23 obvious because the edited recording would "'consist essentially of' the last pitch thrown to each player and attempted base running activity." (Id.) In contrast, the majority allowed claim 24 because "even the prior art chose to exclude portions of the baseball game which would be required by claim 24. Claim 24 expressly requires that 'unsuccessful attempts of the runner on base to advance to another base resulting in an out not associated with game action resulting from the final pitch' be included in the edited game video." (Id. Ex. S at 11.) Put simply, claim 24 requires including "uninteresting game elements," which the Majority found was not obvious. (Id. Ex. S at 11-12.) The Majority also "recognized[d] that this editing was clearly within the skill of the ordinary artisan." (Id. Ex. S at 11.)

14

## II.  CLAIM TERMS OR PHRASES TO BE CONSTRUED

The parties have requested that the Court construe the following eight terms

or phrases, and have provided the following proposed constructions for each term or

phrase:

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | A method of providing a subscription for viewing a recorded baseball game | This is not a claim limitation. | This is a claim limitation. |
| 2 | comprising | "Comprising" is an open-ended transitional phrase defined as 'including but not limited to.' | The method of "providing a subscription . . ." must include the recited method steps, but may include additional steps not otherwise excluded from or contradictory to those steps. For example, "playing" or "broadcasting" the "edited recording" for "subscribers" as defined is a recited step that cannot be eliminated by unrecited method steps. |
| 3 | edited recording | A game recording that excludes substantially all game action, but includes essentially all final pitches and attempts by base runners to advance on the bases not associated with a final pitch – e.g., base stealing attempts. | A recording edited to leave not only all (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base, but also may include optional material from the game recording including, but not limited to, original soundtrack recordings or narrative to explain play. |

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 4 | obtaining subscribers | "Subscribers:" Users that either agreed or requested in some manner to view the edited recording. | Obtaining viewers that either agreed or requested in some manner to view the edited recording. |
| 5 | condensed recorded game | The edited recording. | The edited recording (defined above) played or broadcasted to subscribers. |
| 6 | playing | Providing the edited recording for display. | Causing a device to display. |
| 7 | broadcasting | Providing the edited recording for display to multiple subscribers | Simultaneously sending in a one-way transmission to multiple recipients. |
| 8 | editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch | Baseball Quick objects to construing this lengthy and sweeping passage which combines numerous discrete elements and contends that the elements "edited recording" and "final pitch" should be construed separately as shown above. There is no prejudice to Advanced Media, as Baseball Quick's positions for the discrete elements are set forth above. Baseball Quick disputes any requirement that the "edited recording" includes all "final pitches" and all base running attempts not associated with the game action resulting from final pitches. | Editing the game recording of each appearance-at-bat by deletion to produce an edited recording that must include all: (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base. Optional material that may also remain in the edited recording as part of this process includes, but is not limited to, original soundtrack recordings or narrative to explain play. |

III.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION

A.   Question of Law for the Court

Claim construction is a question of law for the Court.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). Determining the meaning of terms within a claim assists a fact finder in making subsequent and ultimate decisions as to whether an invention has in fact been infringed, or is in fact valid.  In construing the meaning of a term, the issue is not what that term would mean to an average lay person, but what that term or phrase would have meant to one "of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (citations omitted).  A court's job is, then, to try and place itself in the position of one of ordinary skill in the art of the invention(s) at issue.

One skilled in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.  The specification is the "single best guide to the meaning of a disputed term."  Id. at 1315; see also On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1338, 1340 (Fed. Cir. 2006) ("[T]he scope and outer boundary of claims is set by the patentee's description of his invention," id. at 1338, and "the claims cannot be of broader scope than the invention that is set forth in the specification," id. at 1340.).  However, although specifications contain one or more examples of the embodiment of an invention, they

17

**A42**

need not contain every possible embodiment. Therefore, courts should not read into the claims limitations based on the embodiments in the specification. See Phillips, 415 F.3d at 1323; see also Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1370 (Fed. Cir. 2008) ("[The defendant] argues that a patent can never be literally infringed by embodiments that did not exist at the time of filing. Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.").

    B.    <u>Evidence Used in Claim Construction</u>

A court may use intrinsic—and, if necessary, extrinsic—evidence in construing claims. See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1368 (Fed. Cir. 2005) (instructing courts to look to intrinsic evidence first). Intrinsic evidence includes the claims and specifications in the patent itself, as well as the patent's file history (or wrapper). "Foremost among the tools of claim construction is of course the claim language itself, but other portions of the intrinsic evidence are clearly relevant, including the patent specification and prosecution history." All Dental Prodx, LLC v. Advantage Dental Prods., Inc., 309 F.3d 774, 780 (Fed. Cir. 2002); see Phillips, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In patents with multiple claims using similar terms, such as the patents-in-suit, it is well accepted that terms in a claim should be construed consistently across claims. Southwall Techs.,

Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995) ("[C]laim terms must be interpreted consistently.").

Extrinsic evidence that courts may use includes dictionaries used by one of ordinary skill in the art, treatises, and expert testimony in the form of affidavits. Phillips, 415 F.3d at 1317.[4]

C.    The Preamble of a Patent

The preamble of a patent is generally not construed as a claim limitation. Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). This general rule may be altered, however, when (1) the preamble "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim," Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002), quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999); or (2) there has been "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art," Catalina Mktg., 289 F.3d at 808, citing Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1375 (Fed. Cir. 2001).

---

[4] The Federal Circuit directed that courts should use dictionaries when necessary and useful, but with appropriate caution. See Innogenetics, 512 F.3d at 1371 (citing Phillips, 415 F.3d at 1321, for its cautionary language regarding elevation of dictionaries "to such prominence that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim limitations").

IV.    STANDARD OF REVIEW ON SUMMARY JUDGMENT[5]

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

---

[5] This is MLBAM's second motion for summary judgment that seeks, inter alia, the denial of provisional rights to BQ. Its prior motion was brought before United States District Judge Thomas P. Griesa, to whom this case was assigned prior to its transfer to this Court on June 6, 2013. In an Opinion dated March 30, 2012, Judge Griesa denied MLBAM's prior motion for summary judgment. Judge Griesa reasoned, in general terms, that the portions of the Patent and the 2003 Published Application "regarding subscribers are essentially synonymous," and that the addition of the description of "obtaining subscribers" to the Patent "does not involve anything approaching a difference of substance from the application." (3/30/12 Opinion at 10, ECF No. 85.) BQ argues that this determination precludes an additional motion on the issue of provisional rights. (BQ SJ Opp. at 13-17, ECF No. 176.) The Court disagrees. "[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 694-95 (S.D.N.Y. 1999), aff'd, 220 F.3d 43 (2d Cir. 2000). Further, there have been intervening developments since Judge Griesa's March 30, 2012 Opinion—further reexamination proceedings, a Markman hearing, additional claim construction submissions, and the Court's claim construction discussed herein. In light of the fact that Judge Griesa did not grant summary judgment to either MLBAM or BQ on the issue of provisional rights, this issue remains open and must be decided by this Court.

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## V. LEGAL STANDARDS GOVERNING PROVISIONAL RIGHTS

"Provisional rights" allow an inventor to recover royalties for infringing conduct occurring during the period after publication of a patent application but prior to the patent's issuance. 35 U.S.C. § 154(d). Since provisional rights extend back to the initial patent application, the statute requires that, for recovery, a patent holder must demonstrate that "the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application." Id. § 154(d)(2).[6] As stated in the Congressional Record when the provisional rights statute was enacted:

> To allow anything less than substantial identity would impose an unacceptable burden on the public. If provisional rights were available in the situation where the only valid claim infringed first appeared in substantially that form in the granted patent, the public would have no guidance as to the specific behavior to avoid between publication and grant.

145 Cong. Rec. S14,696 at S14,719 (daily ed. Nov. 17, 1999) 145 Cong. Rec. H11,769 at H11,804 (daily ed. Nov. 9, 1999).

The "substantially identical" standard set forth in § 154(d)(2) was explicitly based on the case law interpreting that phrase as used in 35 U.S.C. § 252, which deals with royalties for the period between the date of issued claims and reexamined claims. See 21st Century Patent System Improvement Act, H.R. Rep. No. 105-39, at 56 (Mar. 20, 1997).

---

[6] The provisional rights statute also requires that the infringing party have "had actual notice of the published patent application." 35 U.S.C. § 154(d)(1)(B). Though MLBAM does not concede that it received the requisite notice, its motion for summary judgment as to provisional rights is not directed at this issue. (See MLBAM SJ Mem. of Law at 5 n.2, ECF No. 164.)

22

**A47**

Claims are "identical" if they are without substantive change.  Laitram Corp.
v. NEC Corp., 163 F.3d 1342, 1346 (Fed. Cir. 1998) ("Laitram IV") (citing Seattle
Box Co. v. Industrial Crating & Packing, 731 F.2d 818, 827-28 (Fed. Cir. 1984)).
Substantial identity does not require literal sameness of words, but rather requires
substantial identity in scope.  See Laitram IV, 163 F.3d at 1346; Bloom Eng'g Co. v.
N. Am. Mfg. Co., 129 F.3d 1247, 1250 (Fed. Cir. 1997); Slimfold Mfg. Co. v. Kinkead
Indus., Inc., 810 F.2d 1113, 1115 (Fed. Cir. 1987) ("'Identical' has consistently been
interpreted as not excluding minor word changes.") (citation omitted); Kaufman Co.
v. Lantech, Inc., 807 F.2d 970, 978 (Fed. Cir. 1986) (identical does not mean
verbatim).  "An amendment that clarifies the text of the claim or makes it more
definite without affecting its scope is generally viewed as identical for purposes of
§ 252."  Bloom, 129 F.3d at 1250.  Further, "[d]etermination of whether a claim
change during reexamination is substantive requires analysis of the scope of the
original and reexamined [or issued] claim in light of the specification, with occasion
to the references that occasioned [or allowed] the reexamination [or issuance], as
well as the prosecution history and any other relevant information."  Id.

In comparing the scope of original claims to those later issued, a court must
be mindful not to import limitations appearing only in the specification.  Laitram,
163 F.3d at 1347 (citing Electro Med. Sys. v. Cooper Life, 34 F.3d 1048, 1054 (Fed.
Cir. 1994)).  "It is the claims, not the written description, which define the scope of
the patent right."  Laitram IV, 163 F.3d at 1347 (citing Novo Nordisk of N. Am. v.
Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996)).

In <u>Laitram IV</u>, the Federal Circuit agreed with NEC that the claims had been substantively changed—the original claims covered a printer or method of printing which generates "any" quality of characters, while the amended claims covered only a printing apparatus or method of printing which generates "type quality" of characters. <u>Id.</u> at 1348. The court noted that the addition of the "type quality" limitation, along with other amendments, resulted in the allowance of the claims over prior art and was therefore a "highly influential piece of prosecution history." <u>Id.</u> While recognizing that there may be exceptions, the Court signaled a presumption that when an amendment has resulted in the allowance of claims in this manner, the claims will likely have been substantively changed. <u>See</u> <u>id.</u>

In <u>Seattle Box</u>, the Federal Circuit found that the phrase "substantially equal to or greater than" was a substantive change from the limitation "greater than" in the original claim, and noted that the change was "not a matter of a mere clarification of language to make specific what was always implicit or inherent." 731 F.2d at 828; <u>see also</u> <u>Laitram Corp. v. NEC Corp.</u>, 952 F.2d 1357, 1360-61 (Fed. Cir. 1991) ("<u>Laitram I</u>").

Not every change or amendment made during prosecution results in an altered scope of a claim. <u>See</u> <u>Kaufman</u>, 807 F.2d at 978; <u>see also</u> <u>Medisim Ltd. v. BestMed LLC</u>, 910 F. Supp. 2d 591, 620 (S.D.N.Y. 2012) (word changes made to reduce redundancy did not affect claim scope).

24

**A49**

VI.    THE COURT'S CLAIM CONSTRUCTION

There is one essential dispute between the parties which permeates most of the debate regarding the proper construction of certain claims in the '716 Patent: whether the claimed invention requires the inclusion of each and every final pitch to each batter, or something less than that. The remaining arguments, including whether the preamble constitutes a claim limitation, are secondary to this overarching issue.

As set forth below, the claims, read in the context of the specification and amply confirmed by the prosecution history, leave no doubt that the claimed invention approved by the PTO was for an edited recording that included each final pitch to a batter for each at bat. The scope of the Patent is, therefore, narrower than plaintiff urges. Plaintiff's proposed constructions would result in the scope of the invention returning to that which was disallowed—an edited recording that could have something less than all final pitches to a batter for each at bat, and something less than the resulting game action—rendering it virtually indistinguishable from a highlight tape. As is clear from the prosecution history described supra, highlight tapes were well-represented in the prior art at the time of patent issuance, and plaintiff spent several years convincing the PTO that its claimed invention was not that.

A.    Claim Term 1: The Preamble

The first question for the Court is whether the preamble, which refers to "A method of providing a subscription for viewing a recorded baseball game"

25

**A50**

constitutes a claim limitation.  Plaintiff argues "no," defendant argues "yes."  (Claim Constr. Chart at 1, ECF No. 151.)

Though preambles are generally not claim limitations, they may serve as a limitation if a plaintiff expressly relied on the preamble in order to obtain claim allowance, or if the preamble gives life and meaning to a claim.  Catalina Mktg., 289 F.3d at 808-09.

The preamble in Patent Claim 1 is essential to each of the claims in the Patent.  As noted supra, Patent Claim 1 is the sole independent claim in the Patent; each of Patent Claims 2-5 are dependent on claim 1.  Patent Claim 1 describes a method patent; the referenced language from the preamble provides the reader with notice as to what kind of method the Claim discloses.  Given this use of the preamble, it constitutes a claim limitation.  See Pitney Bowes, 182 F.3d at 1305.

In addition, plaintiff expressly relied on the preamble in its Pre-Review Appeal Brief.  There, in an effort to distinguish the invention from the prior art, plaintiff relied on language taken only and directly from the preamble.  The preamble in Patent Claim 1 refers to "[a] method of providing a subscription for viewing a recorded baseball game."  (Pak Decl. Ex. A, Col. 3, lines 21-22.)  In its Pre-Review Appeal Brief, plaintiff argues that HistoricFilms is not "A method of providing a subscription for viewing a recorded baseball game (claim 24)." (Franecki Decl. Ex. K at 2 n.1.)  Claim 24 became Patent Claim 1.  There is no other source for this argument other than the preamble to Patent Claim 1.  While the word "subscription" does appear once in the specification, the context in which it

appears is unrelated: "The completed (edited) version can be sold on a per-game basis, i.e., through cable subscription arrangement, or delivered digitally over the Internet to subscribers . . . ."  (Pak Decl. Ex. A, Col. 2, lines 40-41.)  Accordingly, the preamble to Patent Claim 1 serves as a claim limitation.

    B.    <u>Claim Term 2:  "Comprising"</u>

    The parties do not disagree that, as a matter of law, the term "comprising" has long been construed as meaning "that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." <u>Genentech, Inc. v. Chiron Corp.</u>, 112 F.3d 495, 501 (Fed. Cir. 1997); <u>see also</u> <u>Invitrogen Corp. v. Biocrest Mfg., L.P.</u>, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps.").  The debate here ultimately returns to claim scope— has plaintiff conceded that an "edited recording" within the meaning of the claims consists of certain game action that it now urges may be deleted?  (<u>See</u> Claim Constr. Chart at 1.)

    In this regard, plaintiff urges that the term "comprising" is an open-ended transitional phrase that means "including but not limited to," and in particular, that it allows for additional deletion steps.  (<u>See id.</u>; BQ Supp. Claim Constr. Br. at 12-13, ECF No. 152.)  Bluntly put, plaintiff asserts that "comprising" refers not to inclusion, but deletion.  This is incorrect.

    As an initial matter, a plain reading of the claim language itself fails to support plaintiff's assertion.  The claim language clearly uses the term "comprising"

as it was intended to be used: as a list of steps which may be included in the method, while leaving open the possibility that other steps may also occur.  There is nothing about the use of the term "comprising" in Patent Claim 1 which suggests that the deletion step, which is set forth in some detail in step 2 and subparts (i) through (iii), was itself incomplete.

In addition, the specification and prosecution history leave no doubt that the invention required the inclusion of certain game action, including all final pitches to every batter for each at bat.  Indeed, those words were used repeatedly throughout the prosecution history.  (See Franecki Decl. Exs. D at 10, I at 7-8, 11, K at 4-5, N at 8-9, 11-12, O at 2, P at 11, 33, R at 7-8.)  Plaintiff's proposed construction of the word "comprising" would broaden that which it committed during the prosecution history to narrow.  See Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1380 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with which to abrogate claim limitations.").  To the extent there was any room in the term "comprising" to allow for additional deletions beyond those specified in step 2, plaintiff specifically and repeatedly excluded those during the prosecution history.  This is precisely what occurred in Dippin' Dots, Inc. v. Mosey, and which led to the Federal Circuit's determination that while "beads" might generally have shapes other than spherical, the patentee had narrowed the definition during prosecution.  476 F.3d 1337, 1343 (Fed. Cir. 2007).  Here, for instance, in attempting and then succeeding in overcoming prior art that contained methods consisting of less than all final pitches, plaintiff argued that its process was "objective" and that all final pitches were

"required" (Franecki Decl. Exs. D at 8, 10, I at 12-13, K at 4, N at 8-9, R at 2, 4-5), and that even boring elements were required to be included if those elements were part of the retained game action (id. Exs. K at 4, N at 12). Plaintiff even called its invention an "algorithm" and stated that for a nine-inning game, "at least" 54 pitches would be included. (Id. Ex. N at 12.) In the absence of the inclusion of these game elements, the invention becomes indistinguishable from a highlight tape, which plaintiff has repeatedly and vigorously urged that it is not.

In support of its construction of comprising as allowing additional—and therefore necessarily subjective—deletions, plaintiff argued at the Markman hearing the Court held on May 29, 2014 that editing is "subjective by definition." (See 5/29/14 BQ Presentation at 30-32, ECF No. 175-1.) This argument flatly contradicts plaintiff's repeated statements that the invention claimed an objective method, not a subjective one.[7]

Accordingly, the Court construes the term "comprising" as used in Patent Claim 1 in the manner proposed by defendant—conveying that the enumerated method steps shall be included, but that additional and non-contradictory steps may be included as well.

---

[7] To the extent plaintiff relies on statements made by PTO Examiner Cameron Sadat during reexamination of the Patent regarding claim 24 (see Pak Decl. Ex. H), such reliance is misplaced. For instance, in his January 17, 2014 decision, Examiner Sadat explains that while deletions leaving the required game action occur by way of an objective process under the method, there is also a subjective component in the step allowing for the inclusion of additional material. (Id. Ex. H at 8.)

29

**A54**

C.    Claim Term 3: "Edited Recording"

The parties' dispute with respect to the phrase "edited recording" is a reprise

of their dispute with respect to "comprising."  Plaintiff argues that an edited

recording need not include all final pitches for each at bat or attempts to advance on

the bases not associated with a final pitch (e.g., base stealing attempts).  (See Claim

Constr. Chart at 1.)  Defendant urges that it must, but that an edited recording can

also include additional optional material.  (See id.)

For the reasons set forth above, the Court agrees with defendant's proposed

construction; on its face, the term "edited recording," used in all claims, describes an

edited recording that includes all—not just some, not just those which an editor

subjectively defines as interesting—final pitches and attempts to advance.  See

Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (stating that

courts look to the "words of the claims themselves . . . to define the scope of the

patented invention").  This construction is consistent with the plain language of the

claims themselves, the specification, and the many statements by plaintiff about the

invention during the Patent's prosecution.[8]  See Phillips, 415 F.3d at 1316 ("The

construction that stays true to the claim language and most naturally aligns with

the patent's description of the invention will be, in the end, the correct

construction.") (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d

1243, 1250 (Fed Cir. 1998)).

_____

[8] During prosecution, plaintiff removed language from claim 23 that suggested that the edited
recording could include only a portion of an entire game.  (See Franecki Decl. Ex. I at 2.)
Subsequently, plaintiff cancelled dependant claims 26 and 31, which each also suggested that the
edited recording "comprises only a portion of a nine-inning baseball game."  (See id.; id. Ex. N at 3.)

Further support for this construction is found in step 2 of Patent Claim 1, which describes the "production" of the edited recording through deletion of "substantially all game action other than" game action associated with the final pitch to each batter, as well as successful and unsuccessful attempts to advance to another base not associated with final pitches. (Pak Decl. Ex. A., Col. 4, lines 3-11.) The specification discusses this step in additional detail, stating that the tape is edited down "to retain the last pitch thrown to each player, plus any resulting action for that pitch." (Id. Ex. A, Col. 2, lines 10-14.)

D.    Claim Term 4: "Obtaining Subscribers"

The Patent Claims all relate to an edited recording that is ultimately played or broadcasted for viewing by "subscribers." The parties disagree as to whether "subscribers" are "users" (plaintiff's preferred construction) or "viewers" (defendant's proposed construction) or "subscriber-viewers." (See Claim Constr. Chart at 1.)

The Court adopts a construction of this term as including both subscribing and viewing and therefore as "subscriber-viewers." The preamble to Patent Claim 1 describes the invention as "[a] method of providing a subscription for viewing a recorded baseball game." (Pak Decl. Ex. A, Col. 3, lines 21-22 (emphasis added).) Step 3 in Patent Claim 1 refers to "obtaining subscribers for viewing the edited recording." (Id. Ex. A, Col. 4, lines 11-12 (emphasis added).) Step 4 in Patent Claim 1 refers to playing or broadcasting the edited recording "for viewing by the subscribers." (Id. Ex. A, Col. 4, lines 12-14 (emphasis added).) Similarly, Patent

31

**A56**

Claims 3 and 4 both refer to playing or broadcasting the edited recording "for viewing." (Id. Ex. A, Col. 4, lines 17-22 (emphasis added).) This construction is also consistent with the specification, which describes releasing the edited recording to "its viewership." (Id. Ex. A, Col. 2, lines 45-48 (emphasis added).)

Plaintiff's proposed construction—defining subscribers as "users"—seeks to distance the act of viewing the edited recording from the subscriber. This distance is not supported by the intrinsic evidence. The Patent discloses a method of producing an edited recording of a baseball game that will, in some fashion, be viewed by subscribers. A plain reading of the claim language therefore supports the construction of "subscribers" as "subscriber-viewers." This does not mean that subscribers cannot also be "users" of an Internet service, but they must be viewers as well. The only role for the subscribers is to view; and, according to the Patent, the edited recording is created for that specific purpose.

E.    Claim Term 5: "Condensed Recorded Game"

The parties agree that a "condensed recorded game" is, at a minimum, the edited recording. (See Claim Constr. Chart at 2.) Defendant proposes that the Court also require that the condensed recorded game be "played or broadcasted to subscribers." (Id.) The Court finds this addition to be contrary to the plain language of the Patent.

Step 4 of Patent Claim 1 refers to "playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers." (Pak Decl. Ex. A, Col. 4, lines 12-14.) Though MLBAM is correct that the phrase "condensed

32

recorded game" only appears in this "playing or broadcasting" step, the inclusion of this same language again in its proposed construction of the phrase itself creates redundancy and is unnecessary.[9]

F.   Claim Terms 6 and 7: "Playing" and "Broadcasting"

Plaintiff's proposed construction for the terms "playing" and "broadcasting" seeks to interpose an intermediate step unsupported by the intrinsic evidence. Plaintiff urges that "playing or broadcasting the edited recording for viewing" is something other than "playing or broadcasting"—plaintiff argues, instead, that it should also encompass "providing" the recording for display. (See Claim Constr. Chart at 2.)  The Court rejects this argument, and adopts the more natural proposed constructions for these terms offered by defendant.

"Playing" and "broadcasting" are not defined in the Patent Claims or the specification as having any special meaning.  See CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting that a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history").  The Court gives these terms their plain and ordinary meaning.  See, e.g., Phillips, 415 F.3d at 1312.  They are both used in an active and direct sense:  the act of playing, and the act of broadcasting.  In that regard,

---

[9] In light of the fact that the Court construes the "edited recording" in the manner proposed by defendant, there does not appear to be any remaining dispute as to the construction of the "condensed recorded game."  (See 5/29/14 Tr. at 63-64, ECF No. 186 ("MS. RIGSBY: . . . But if the edited recording is construed as we believe it should be, then I agree, there is really nothing to add [to the construction of condensed recorded game].").)

"playing the edited recording" means causing a device to display it; "broadcasting the edited recording" means sending a simultaneous transmission to subscribers who may view the recording upon receipt. (See Franecki Decl. Exs. I, J.)

G.    Claim Term 8: The Editing Step

Defendant requests that this Court construe the editing step—step 2 of Patent Claim 1—while plaintiff argues that this step contains "numerous discrete elements" that should be construed separately. (See Claim Constr. Chart at 2.) The law is clear that "[p]roper claim construction, however, demands interpretation of the entire claim in context, not just part of the claim language." Wechsler v. Mack Int'l Trade, Inc., 56 F. App'x 935, 940 (Fed. Cir. 2003) (citing Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999)). The scope and meaning of a claim is a legal question for the Court to decide. E.g., Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1376 (Fed. Cir. 2005).

The various constructions set forth above resolve the dispute as to the editing step. For these reasons, the Court finds that the editing step requires producing an edited recording that retains: (1) game action resulting from a final pitch thrown to each player for each at bat; and (2) all successful and unsuccessful attempts of runners on base to advance to another base not otherwise associated with game action resulting from a final pitch. The editing step also permits additional optional material to remain in the edited recording, such as showing a young fan, a coach's signals, a narrative to explain play, or original soundtrack recordings. This construction is again supported by a plain reading of the claim language, the

34

specification, and the prosecution history.  (See Pak Decl. Ex. A, Col. 2, lines 10-14, Col. 4, lines 3-11; Section I.B ("Prosecution History"), supra.)

## VII.  ANALYSIS OF PROVISIONAL RIGHTS

As set forth above,[10] the 2003 Published Application was published on March 27, 2003; after more than six and a half additional years of prosecution, the Patent was issued in its final form on December 8, 2009.  (Pak Decl. Exs. A, B.)  In its complaint, plaintiff seeks damages for infringement relating to two time periods—the period after publication but prior to issuance of the '716 Patent (March 27, 2003 through December 7, 2009), and then from issuance (December 8, 2009) to the present.  Defendant's motion for summary judgment on provisional rights relates to the first period.  (See MLBAM SJ Mem. of Law at 4 n.1, ECF No. 164.)  If defendant is found to have infringed the Patent, BQ may be entitled to damages for this period, during which it had only "provisional" rights, if it is able to meet its burden of proving that its claims in the 2003 Published Application were "substantially identical" to those in the Patent as issued.  See 35 U.S.C. § 154(d)(2).  Defendant has moved for summary judgment as to this second issue—substantial identicality—only.  (See MLBAM SJ Mem. of Law at 3.)

Defendant argues that the Patent Claims are substantively different from Application Claims in three ways: (A) the inclusion of the word "substantially" in

---

[10] In support of and in opposition to defendant's motion for summary judgment on provisional rights, the parties submitted statements pursuant to Local Rule 56.1.  (See ECF Nos. 166, 177, 182.)  Though the Court has reviewed these statements, its cites herein to the '716 Patent and the 2003 Published Application directly because the substantive differences between the claims in each are clear on their face.

Patent Claim 1, which was added as part of the August 2003 amendments (see Franecki Decl. Ex. D at 8); (B) the inclusion of the "obtaining subscribers" step in Patent Claim 1, which was added as part of the February 2004 amendments (see id. Ex. E at 4-6); and (C) the inclusion of the words "play" and "broadcast" in Patent Claims 1 and 3, which replaced the word "present" in Application Claims 4 and 8 as part of the August 2003 (id. Ex. D at 3-4). (See MLBAM SJ Mem. of Law at 14-25.)

There is no dispute that these changes were made. There is also no dispute that plaintiff has the burden of proof as to substantial identicality.[11] (See BQ SJ Opp. at 8, ECF No. 176.) The question, however, is whether there is a material issue of fact as to whether these changes simply clarified that which was previously inherent in the Application Claims, and therefore whether the scope of the Application Claims was unchanged following these pre-issuance amendments. The answer is no. Accordingly, defendant's motion for summary judgment on provisional rights is GRANTED.

---

[11] At least one out-of-Circuit district court has explicitly stated that "[i]t is Plaintiffs' burden, as the party seeking damages, to prove the claims are substantially identical." Loops, LLC v. Phoenix Trading Inc., No. C08-1064 RSM, 2010 WL 3041866, at *5 (W.D. Wash. July 30, 2010).

> The differences between the Application and Patent Claims are reflected in the redline, below.

| Redline (with deleted language in red strike through and added language in green italics) |
|---|
| ~~4.~~ *1.* A method of ~~recording and editing a~~ *providing a subscription for viewing a recorded* baseball game in which players from each ~~side~~ *team* appear at bat, ~~in turn,~~ and attempt to place a pitched baseball into play and *to* reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising: *(1)* recording ~~the~~ *each* appearances-at-bat for ~~each~~ *every* player~~, in turn, plus other~~ *and game* action *resulting from an* ~~that ensues during or after~~ the appearances-at-bat *to produce a game recording, (2) editing the game recording of each* ~~recorded~~ appearances-at-bat to ~~leave only~~ *produce an edited recording by deleting substantially all game action other than (i) game action from a final* ~~the last~~ pitch thrown to each player~~, plus any action ensuing after that pitch~~ *(ii) successful* ~~and any~~ attempts of runners on base to advance to another base *not associated with (i) game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in at least one out not associated with successful attempts from the final pitch, (3) obtaining subscribers for viewing the edited recording,* and *(4)* ~~presenting~~ *making available for viewing* the edited ~~recorded game~~ *recording* as a condensed recorded game ~~showing important action portions of the game~~ *for viewing by the subscribers.* |
| ~~5.~~ *3.* The method ~~according to~~ *of* claim ~~4~~ *1* wherein said step of ~~presenting~~ *making available for viewing* the ~~edited game as a condensed recorded game~~ *edited recording for viewing* includes ~~delivering the recorded game to subscribers~~ *is conducted* over the Internet. |

MLBAM - 12

(See 6/26/14 MLBAM Presentation at 12, ECF No. 188-3.)

A.     Inclusion of "Substantially"

Application Claim 4 is closest to the claim that became Patent Claim 1.  In Application Claim 4, the method of producing the edited recording included the following step 2: "editing the recorded appearances-at-bat <u>to leave only</u> the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on base to advance to another base . . . ."  (Pak Decl. Ex. B at 1 (emphasis added).)  As issued, step 2 of Patent Claim 1 provides: "editing the game recording of each appearance-at-bat to produce an edited recording <u>by deleting substantially all</u> game action other than (i) game action from a final pitch thrown to

37

each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch . . . ." (Id. Ex. A, Col. 4, lines 4-11 (emphasis added).)

Defendant asserts that the deletion of the phrase "leave only" and inclusion of the phrase "by deleting substantially all" broadens—and thereby alters—the scope of the claim. The Court agrees. The issue is not, as plaintiff urges, simply a non-substantive word change, which would not defeat identicality under Laitram I or Seattle Box. This change to the claim language both alters and broadens the scope of the invention.

In Application Claim 4, the phrase "leave only" provides distinct boundaries as to the content that may be retained in the edited recording. The retained content must be, and can be no more than, what follows in step 2: the final pitch for each player's at-bat(s) and resulting game action, as well any attempts to advance not associated with those final pitches. Put another way, an edited recording which retained more than such material could not infringe on Application Claim 4.

In contrast, step 2 of Patent Claim 1 allows for deletions of content that retain final pitches and attempts to advance, as well as additional content. This additional content was described during prosecution history as non-game action material such as showing a young fan, showing a coach's signals to players, and other narrative. Thus, inclusion of such material in an edited recording would have

defeated a claim for infringement under the 2003 Published Application whereas, under the Patent, it would not.

The substantive nature of this difference between the Application Claims and the Patent Claims is further confirmed by the ongoing reexamination proceedings. Earlier this year, Examiner Saadat stated that he "agrees with patent owner that the claim term 'substantially' cannot be ignored." (Pak Decl. Ex. H at 6.)

Plaintiff now argues that inclusion of "substantially" and removal of "leave only" is simply a clarification. According to plaintiff, both "deleting substantially all" and "leave only" refer to the allowance of additional deletions. In other words, plaintiff argues that deleting substantially all game action other than the enumerated items in step 2 is not inconsistent with eliminating some portion of those enumerated items; the focus here is on "substantially" constituting less than "all." Similarly, according to plaintiff, "leave only" is not inconsistent with "leave only "x" type of material, but you need not leave all of "x" type of material available. In both cases, plaintiff argues that the type of material set forth in the following numerettes in step 2 may itself be subject to some deletion.

Plaintiff's argument ignores the key phrase "other than," which follows the phrase "deleting substantially all game action" and is read in its entirety as: "to produce an edited recording by deleting substantially all game action <u>other than</u> (i) game action from a final pitch thrown to each player . . . ." The inclusion of "other than" precludes plaintiff's proposed reading of step 2 of Patent Claim 1. "Other than" clearly and unambiguously refers to deletions, set forth in numerettes (i), (ii),

and (iii), which must occur. "Deleting substantially all," therefore, refers to the deletion of some, but not all, of the additional material in the recording other than that described in the three numerettes.

Plaintiff proffered a pictorial example of the similarity between "leaving only" and "deleting substantially all."



(See 6/26/14 BQ Presentation at 21, ECF No. 188-1.)

According to plaintiff, if one assumes that a full water glass constitutes a complete game recording, and the edited recording is created by pouring water from the first glass into the bottom-third of a second, empty glass, this bottom-third of liquid is what was "left" after the deletions; and that the empty two-thirds of the glass constitutes the deletion of "substantially all" other game action.

Using the glass example, the Court's view is that "leave only" means that the water level in the second glass is certain and determinate, whereas "delete substantially all" permits the water level to be variable depending on the amount of additional material the editor has decided to include.

40



The Court's view is confirmed by the prosecution history. During the oral argument before the Board of Patent Appeals, counsel for plaintiff confirmed that the items in the numerettes contained in step 2 were required, referring to the fact that unsuccessful pick-off plays have to be part of the edited recording. (Franecki Decl. Ex. R at 4 ("So they cut out a pick-off play. That has to be part of our recording.").) Plaintiff also represented to the Board that in, contrast to plaintiff's invention, prior art does not show "every routine ground out, every routine fly out, every, however it takes place." (Id. Ex. R at 8.)

In its August 3, 2009 decision, the Majority found that while prior art "chose to exclude portions of the baseball game which would be required by claim 24 [which became Patent Claim 1]," "[c]laim 24 expressly requires that 'unsuccessful attempts of the runners on base to advance to another base resulting in an out not associated with the game action resulting from the final pitch' be included in the

41

**A66**

edited recording." (Id. Ex. S at 11.) In allowing claim 24, the Majority also specifically relied upon the fact that the claim "requires inclusion of uninteresting game elements such as a quick three out inning with three ground outs to second base. Consequently, there is no reason for the creative person of ordinary skill to have edited a baseball game as required by claim 24 to shorten the game but include boring game elements." (Id. (emphasis added).)

During reexamination, plaintiff has argued that "[n]one of [the prior art references] will show all of the claimed criteria, in the manner claimed, including the 'boring' elements." (Pak Decl. Ex. F at 22.) Plaintiff has also specifically distinguished one piece of prior art, Mariners Fast Forward, as allowing for less than all final pitches to be included, in contrast to its invention, which "required" the inclusion of all final pitches. (Id. Ex. E at 13.)

B.   Inclusion of "Obtaining Subscribers

Application Claim 4 consists of two steps: recording and editing. Application Claim 4 was the sole independent claim of the 2003 Published Application, as is Patent Claim 1 in the Patent. Application Claim 8 claimed a method "according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes delivering the recorded game to subscribers over the Internet." Claim 8 is, on its face, a dependent claim. It is the only reference to subscribers in the 2003 Published Application.

In contrast, Patent Claim 1 includes a recording step, an editing step, an obtaining subscribers step, and a playing or broadcasting step. The addition of the

obtaining subscribers step narrowed thus the scope of Patent Claim 1 as compared to Application Claims 4 and 8. See Laitram IV, 163 F.3d at 1348 (original and amended claims substantively changed where "the original claims appear to cover a printer or method of printing which generates any quality of alphanumeric characters, while the amended claims seem to cover only a printing apparatus or method of printing which generates 'type quality' alphanumeric characters").

Defendant argues that the "obtaining subscribers" step in Patent Claim 1 marks a clear difference in the scope of Application Claim 4. This Court agrees. There is simply no way to read Application Claim 4 against Patent Claim 1 so that the two claims have substantially identical scope. Application Claim 4 does not require that any subscribers be obtained at all; thus, it would permit a claim of infringement in the absence of any subscribers. This is clearly not the case with respect to Patent Claim 1. Because a claim for infringement requires that an infringer violate each of the claimed steps in a method patent, the failure to "obtain subscribers" would preclude an infringement claim as to Patent Claim 1 but would not as to Application Claim 4. See Limelight Networks, Inc. v. Akamai Technologies, Inc., 134 S. Ct. 2111, 2117 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out.") This is the essence of a difference in scope.

Further, in its original claim construction briefing before Judge Griesa, plaintiff acknowledged that the preamble of the temporarily allowed claims (which included the 2003 Published Application) "did not include the 'providing a

43

**A68**

subscription' element"; rather, "[t]he claims were allowed because the claim body of each of the allowed claims included the step of 'obtaining subscribers for viewing the edited recording' which was not found in the prior art." (BQ Responsive Claim Constr. Br. At 30, ECF No. 100.) This statement is consistent with the PTO's Reasons for Allowance dated February 24, 2004, which stated that "[t]he prior art does not show or suggest a method of replaying a baseball game which includes obtaining subscribers." (2/24/04 Notice of Allowance at 2, ECF No. 94-5.)

C.     Change from "Presenting" to "Playing" or "Broadcasting"

Application Claim 4 included a step of "presenting" the edited recorded game. That step was altered in claim 24 (which became Patent Claim 1) so that the step referenced "playing or broadcasting the edited recording." The question for this Court is whether this change resulted in an alteration of the scope of the claims. The Court finds that it does.

In contrast, "to broadcast" something may be narrower than "presenting" it. Yet, though "playing" encompasses "broadcasting," that difference does not signal a change of scope. Rather, the Court finds that using the words "playing" and "broadcasting" clarifies the term "presenting."

There is a good argument that "playing or broadcasting" simply clarifies the word "presenting", the claims themselves treat the terms as different. For "playing" to have the breadth that plaintiff argues would require that all manner of showing or presenting the recording would be encompassed; in this way, playing would equate with presenting. This is in tension with dependent Patent Claim 3,

44

however. Patent Claim 3 claims the method of Patent Claim 1—and is thus additive to, and not co-extensive with, Patent Claim 1—"wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet."[12] Patent law requires that courts construe claims to preserve their validity. <u>Phillips</u>, 415 F.3d at 1328. Thus, if this Court were to construe "playing or broadcasting" in Patent Claim 3 as equivalent to "presenting," there would be no difference between the scope of Patent Claim 3 and Patent Claim 1—thereby invalidating Patent Claim 3. This would violate basic principles of patent law.

For all of the reasons set forth above, the Court finds that the scope of the claims in the 2003 Published Application are not substantially identical to those in the Patent. Accordingly, plaintiff fails to meet its burden of proof as to any such provisional rights, and the Court grants defendant's motion for summary judgment on this issue.

---

[12] This language contrasts with Application Claim 8, in which "presenting" the recording "includes delivering" the recording over the Internet. Application Claim 8, therefore, has an additional "providing" step that Patent Claim 3 does not.

## VIII. CONCLUSION

For the reasons set forth above, the eight disputed claim terms and phrases
in the '716 Patent are construed as follows:

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | COURT'S CONSTRUCTION |
|---|---|---|
| 1 | A method of providing a subscription for viewing a recorded baseball game | This is a claim limitation. |
| 2 | comprising | The method of "providing a subscription . . ." must include the recited method steps, but may include additional steps not otherwise excluded from or contradictory to those steps. For example, "playing" or "broadcasting" the "edited recording" for "subscribers" as defined is a recited step that cannot be eliminated by unrecited method steps. |
| 3 | edited recording | A recording edited to leave not only all (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base, but also may include optional material from the game recording including, but not limited to, original soundtrack recordings or narrative to explain play. |
| 4 | obtaining subscribers | Obtaining viewers that either agreed or requested in some manner to view the edited recording. |
| 5 | condensed recorded game | The edited recording. |
| 6 | playing | Causing a device to display. |
| 7 | broadcasting | Simultaneously sending in a one-way transmission to multiple recipients. |

| CLAIM TERM NO. | DISPUTED CLAIM TERM/PHRASE | COURT'S CONSTRUCTION |
|---|---|---|
| 8 | editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch | Editing the game recording of each appearance-at-bat by deletion to produce an edited recording that must include all: (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base. Optional material that may also remain in the edited recording as part of this process includes, but is not limited to, original soundtrack recordings or narrative to explain play. |

In addition, defendant's motion for partial summary judgment on provisional rights is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 163.

SO ORDERED.

Dated:     New York, New York
           July 25, 2014

                                        _K B. Foe_
                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge

```
UNITED STATES DISTRICT COURT                    USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                   DOCUMENT
------------------------------------------- X   ELECTRONICALLY FILED
                                            :   DOC #: _____
BASEBALL QUICK, LLC,                        :   DATE FILED: DEC 0 4 2014
                                            :
                      Plaintiff,            :
            -v-                             :
                                            :       11-cv-1735 (KBF)
                                            :
MLB ADVANCED MEDIA L.P.,                    :   OPINION & ORDER
                                            :
                      Defendant.            :
                                            :
------------------------------------------- X
```

KATHERINE B. FORREST, District Judge:

Defendant MLB Advanced Media, L.P. ("MLBAM") has brought this motion for summary judgment of non-infringement against plaintiff Baseball Quick, LLC ("Baseball Quick" or "BQ"), which brought this suit against MLBAM alleging infringement of U.S. Patent 7,628,716 ("the '716 Patent"). Both BQ and MLBAM produce condensed versions of baseball games that can be streamed over the internet. The '716 Patent describes a particular method for producing such a condensed game.

As the old saying goes, there is more than one way to skin a cat. Because MLBAM uses a subjective editing process focused on copying and pasting material, whereas BQ's is objective and focused on deleting material, MLBAM does not use the method described by the '716 Patent, nor does it use an equivalent method. Accordingly, the Court GRANTS summary judgment of non-infringement for MLBAM.

# I.  BACKGROUND

## A.  Factual Background[1]

On June 13, 2000, BQ[2] filed a provisional patent application for what later became the '716 Patent.[3] At numerous points in the application process, BQ described its claimed invention as an "objective" algorithm or method for producing a condensed version of a professional baseball game. (DSOF ¶¶ 130, 133, 135-37, 139, 147-50.) The '716 Patent, which is entitled "Method of Recording and Playing Baseball Game Showing Each Batter's Last Pitch," issued on December 8, 2009. (ECF No. 1 ex. A ("'716 Patent.").) It has five numbered claims:

> 1.  A method of providing a subscription for viewing a recorded baseball game in which players from each team appear at bat, and attempt to place a pitched baseball into play and to reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising: (1) recording each appearance-at-bat for every player and game action resulting from an appearance-at-bat to produce a game recording; (2) editing the game recording of each

---

[1] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials. (ECF Nos. 201 ("DSOF"), 211 ("PSOF," for responses; "PSOAF" for additional statements of fact), 218 ("DRSOF" for objections to responses; "DRSOAF" for responses to additional statements of fact).) The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). The Court generally recites only those facts relevant to the claims and defenses at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case.

[2] The inventors listed on the patent are George M. Mockry and Greg M. Mockry. (ECF No. 1 ex. A.) Greg Mockry is a co-founder of BQ. (PSOAF ¶ 1.)

[3] The history of the '716 Patent is set forth in greater detail and with full citations in the Court's July 25, 2014 Opinion & Order. (ECF No. 194 ("Markman Op.") at 2-14.)

2

appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and [sic] out not associated with the game action resulting from the final pitch; (3) obtaining subscribers for viewing the edited recording and (4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

2. The method of claim 1 wherein the edited recording for a nine-inning baseball game is about 15 minutes.

3. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet.

4. The method of claim 1 wherein said step of playing or broadcasting the edited recording for viewing is conducted by playing a videotape recording.

5. The method of claim 1 wherein the edited recording contains audio explaining any substitution of players.

('716 Patent ll. 3:21-4:24.)

As can be gleaned from the text of the patent, Claim 1 is an independent claim with four numbered steps, and the remaining four claims are dependent. (See '716 Patent ll. 3:21-4:24.) Claim 1 Step 2 requires the production of "edited recording[s]" that retain "game action from a final pitch thrown to each player and all "attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch." ('716 Patent ll. 4:3-11.). It also permits the inclusion of "additional material," such as "portions of an original soundtrack recorded by the announcers at the game or other added narrative," in order to

"explain pitching changes, pinch runners, and other substitutions that may affect play, as well as other aspects of the recorded action." (See '716 Patent ll. 2:34-39.) This optional material must be "from the game recording," and may include "original soundtrack recordings or narrative to explain play." (Markman Op. at 46.)

Claim 1 Step 4 provides that the "edited recordings" are "play[ed]" or "broadcast[]" for viewing by "subscribers," ('716 Patent ll. 4:20-22), who are "subscriber-viewers" that "either agreed or requested in some manner to view the edited recording," (Markman Op. at 31, 46). "Playing" the edited recording means causing a device to display it, and "broadcasting" the edited recording means simultaneously sending it in a one-way transmission to multiple recipients. (Markman Op. at 46.)

Like BQ, MLBAM also produces condensed versions of professional baseball games, which it calls "Condensed Games." (DSOF ¶¶ 4, 6.) MLBAM's editors build Condensed Games from telecast feeds, (see DSOF ¶ 25), generally by identifying and copying clips from the game telecast and placing those clips on a timeline, (DSOF ¶ 79; see DSOF ¶ 25).[4] The editors typically assemble the Condensed Game as the baseball game is being played. (DSOF ¶ 79.) Other graphical material, which may include graphical overlays and advertisements, is added later on.

---

[4] In a declaration, MLBAM's Executive Vice President of Content, Dinn Mann, stated that in connection with this litigation, a team of MLBAM editors was tasked with reviewing every Condensed Game since the end of the 2009 MLB season and noting every instance in which an entire at-bat was "deleted." (ECF NO. 74 ¶¶ 6-9 & ex. A.) BQ urges this Court to construe these statements as an admission by MLBAM that its editing method was based in part on deletion. The Court declines to do so. Mann's statements do not concern the specific editing processes used by MLBAM. The most reasonable way to construe the term "deleted" as used by Mann is as synonymous with "not included." BQ's contention that MLBAM performs deletion-based editing is unsupported by evidence that would be admissible.

4

(DSOF ¶¶ 82-86.) As a final step before approval and publication, MLBAM conducts a quality control procedure, and then publishes the Condensed Game so that it is available for download on MLB.com.[5] (PSOAF ¶¶ 28-29, 31; DRSOAF ¶ 31). Viewers can then stream the Condensed Game to an electronic device. (See DSOF ¶¶ 94, 96, 102.)

There is some dispute as to how exactly MLBAM instructed its editors to produce Condensed Games before the issuance of the '716 Patent, (see DRSOAF ¶ 15), but it is clear that before 2009, MLBAM editors were generally instructed to include "every final pitch" in Condensed Games, (PSOAF ¶ 17). At least since 2009, Condensed Games have been built by editors based on instructions provided to them by MLBAM, (DSOF ¶ 4), which have been provided in written form since at least the 2010 baseball season, (DSOF ¶ 52). Although the specific instructions have changed over time, they have generally stated that the editors can avoid "routine ground balls, routine pop outs, and routine fly balls," and that editors can or should include, inter alia, "any action that results in a hitter reaching base and what happens after they reach," "all runs scored," "any costly errors," "all [strikeout]s," "great defensive plays," and "anything historic." (DSOF ¶¶ 54, 59).

Between the 2010 season and August 2014, MLBAM produced approximately 11,770 Condensed Games. (DSOF ¶ 77.) Only 15 of the Condensed Games published by MLBAM before July 2011 included all outs in the game, and all of

---

[5] MLBAM also provides Condensed Games to content distribution network providers such as Akamai and Level 3, who then distribute the Condensed Games to end users on behalf of MLBAM. (DSOF ¶ 99; PSOAF ¶¶ 34-35.)

5

these Condensed Games were produced during April 2010 and April 2011, the first month of the baseball season.[6]  (DSOF ¶ 72.)

### B.  Procedural Background

BQ filed this action on August 23, 2010.[7]  (ECF No. 1 ("Compl.").)  Count I of BQ's complaint alleges infringement of the '716 Patent under 35 U.S.C. § 271(a), (b), and/or (c).  (Compl. ¶¶ 17-23.)  Count II of BQ's complaint requests injunctive relief for the infringement alleged in Count I.  (Compl. ¶¶ 24-26.)  On January 3, 2011, MLBAM filed an answer and counterclaims.  (ECF No. 21 ("Answer & Countercl.").)  Count I of MLBAM's counterclaims requests declaratory judgment of non-infringement of the '716 Patent, and Count II requests declaratory judgment of invalidity of the '716 Patent.  (Answer & Countercl. ¶¶ 37-40.)

On March 30, 2012, the Court granted defendants partial summary judgment to the effect that they cannot be liable for making Condensed Games that were filmed prior to the issuance of the '716 patent, based on the rule announced in Monsanto Co. v. Syngenta Seeds, Inc., 503 F.3d 1352, 1360 (Fed. Cir. 2007).  (ECF No. 85.)  Consequently, because in 2009 there were no MLB games after December 8, when the '716 Patent issued, only games filmed in 2010 or after are now at issue.

The Court entered an Opinion and Order on claim construction (the "Markman Opinion") on July 25, 2014.  (Markman Op.)  In the same Opinion, the

---

[6] Although BQ asks this Court to infer from the failure rate for MLBAM's quality control procedure in the 2010 and 2011 season that "an additional 31 CGs from the unaudited 2011 and 2012-14 seasons included or will include all final pitches," (PSOF ¶ 77), it is not proper for the Court to make such an assumption, as BQ's assertion is not supported by evidence that would be admissible.

[7] BQ initially filed this action in the Southern District of California.  On March 14, 2011, it was transferred to this District.  Judge Griesa was originally assigned to the case.  It was reassigned to this Court on June 6, 2013.  (ECF No. 108.)

Court also granted MLBAM partial summary judgment on the issue of provisional rights. (Markman Op. at 45.) MLBAM moved for summary judgment of non-infringement on August 20, 2014.[8] (ECF No. 200.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true

---

[8] Counsel for BQ has stated that BQ does not intend to pursue any "Doe" defendants in this action. (Declaration of Cynthia J. Rigsby, ECF No. 201 ex. F.) The instant motion thus resolves all of BQ's live claims.

7

nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

On a motion for summary judgment of non-infringement, the movant need only "stat[e] that the patentee had no evidence of infringement and point[] to the specific ways in which accused [methods] did not meet the claim limitations." Exigent Tech., Inc. v. Altrana Solutions, Inc., 442 F.3d 1301, 1309 (Fed. Cir. 2006).

III.    DISCUSSION

Infringement can be established in either of two ways: through direct infringement (which is also known as literal infringement), or through the doctrine of equivalents. See J&M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1366 (Fed. Cir. 2001). There is no triable issue as to whether MLBAM has committed

8

**A80**

infringement of the '716 Patent under either theory, and there is therefore also no triable issue as to whether MLBAM has induced infringement or engaged in contributory infringement.

A.    Direct Infringement.

"To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed." Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1362 (Fed. Cir. 2013); see also Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1582 (Fed. Cir. 1995) (direct infringement occurs when "each limitation in the asserted claim [can] be found present in the accused device or process"). The patentee must prove that the accused method or process was performed by the defendant itself or that the defendant exercised "control or direction over the entire process such that every step is attributable to [them]." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 (Fed. Cir. 2008) (quotation omitted). "One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." Monsanto, 503 F.3d at 1359 (quoting Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 (Fed. Cir. 1989)). "[T]he patentee bears the ultimate burden of proof to demonstrate infringement by a preponderance of the evidence." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008).

There is no triable issue as to whether MLBAM has committed direct infringement, for two reasons. First, BQ's claimed method is objective and allows little room for editorial discretion, whereas MLBAM's accused method is subjective

9

and is premised on its editors' exercising a great degree of discretion. Second, BQ's claimed method is based on deletion, whereas MLBAM's accused method is based on accretion (that is, copying and pasting). There is thus no evidence sufficient to create a genuine dispute of material fact as to whether MLBAM or anyone subject to MLBAM's direction or control performed Claim 1 Step 2 of the '716 Patent.

Claim 1 Step 2 provides for an _objective_ editing process that leaves little if any discretion to BQ's editors. Indeed, BQ's counsel themselves describes BQ's invention as "follow[ing] a set of _objective_ criteria" and "an _objective_ algorithm," (ECF No. 207 ("Opp. Br.") at 3, 5 (emphasis added)), and at numerous points in the application process, the applicants described their claimed invention as an "objective" algorithm or method for producing a condensed version of a professional baseball game. (See DSOF ¶¶ 130, 133, 135-37, 139, 147-50.) This objective algorithm is most obviously encapsulated in Claim 1's requirement that _all_ final pitches be included in the game recording, no matter how boring or mundane their result.

MLBAM's accused method, by contrast, relies on _subjective_ decision-making. Since at least the 2010 baseball season, MLBAM has provided its editors with specific written instructions about what editors can include in Condensed Games. These instructions describe a generally subjective process—while they ask the editors to include "any action that results in a hitter reaching base and what happens after they reach," "all runs scored," and "all [strikeout]s," they also require editors to make value judgments, specifically regarding which defensive plays are

10

**A82**

"great" enough, which errors are "costly" enough, and which game events are "historic" enough to merit inclusion in a Condensed Game. (See DSOF ¶¶ 54, 59.) Editors are also instructed to avoid "routine ground balls, routine pop outs, and routine fly balls," but they need not eliminate them entirely, and sometimes such plays are included in Condensed Games, as BQ acknowledges. (See Opp. Br. at 10.)

As such, MLBAM produces its Condensed Games by using a method that substantially differs from that described in the '716 Patent. Further, this method does not incorporate and build on BQ's, as evidenced by the rarity of Condensed Games that include all final pitches. Of MLBAM's approximately 11,770 published Condensed Games, the parties have identified only 15 where all final pitches are included (DSOF ¶¶ 72, 77), which represents less than approximately 0.1% of the total number of Condensed Games.

It may well be that, as BQ argues, "there is no discernable difference between [Condensed Games] that contain all final pitches as opposed to those that do not." (Opp. Br. at 10.) However, BQ's patent is for a method, not the end-product of that method. If nearly all of MLBAM's Condensed Games do not include all final pitches, MLBAM cannot be using one of the most important parts of BQ's claimed method, as reflected by its title, "Method of Recording and Playing Baseball Game Showing Each Batter's Last Pitch." ('716 Patent ll. 1:1-3 (emphasis added).)

A second reason that there is no triable issue as to direct infringement is that BQ's claimed method is based on deletion, while MLBAM's accused method is based on accretion. That BQ's claimed method is based on deletion is apparent both from

BQ's arguments and from the text of Claim 1 Step 2, which specifies that the game recording must be edited by "deleting" game action. ('716 Patent ll. 4:4-5.)

MLBAM does not create Condensed Games by deleting content from a recorded game. Rather, MLBAM creates Condensed Games through a subjective accretive process, by identifying and copying portions of a telecast and placing them on a timeline, generally as the game is being played. (DSOF ¶ 79; see DSOF ¶ 25.) This process is reflected in the written instructions that MLBAM has provided to its editors since at least the 2010 baseball season. (DSOF ¶ 52.)

BQ nevertheless argues that MLBAM's editing process must be based on deletion, because its editors start the editing process with a complete game recording, and end up with a final product consisting of portions of that game recording. This argument lacks merit. Even assuming that MLBAM starts its editing process with a complete game recording, which is a difficult assumption to make given that MLBAM's editors generally assemble the Condensed Game as the baseball game is being played, it does not follow that MLBAM must create Condensed Games by deletion. It is possible to reduce a full-game recording to an edited recording or a Condensed Game either by deleting material from a copy of the full-game recording and then eliminating the time gaps, or by copying portions of the full-game recording into a new recording. BQ's '716 Patent describes the former method; MLBAM uses the latter. The methods may produce similar end-products, but they are fundamentally different. Accordingly, MLBAM does not use BQ's claimed method, and thus does not infringe the '716 Patent.

12

**A84**

Further, the Court rejects BQ's straw man arguments regarding "destructive" editing. Nowhere has MLBAM argued that the '716 Patent's claims are limited to "destructive" forms of deletion, meaning that the full-game recordings on which edited recordings are based are destroyed during the production process. There is a good reason for this: the '716 Patent issued in 2009, well into the digital era, and it contemplates streaming videos over the Internet, which would make any arguments premised on the idea that the patent contemplates the "destructive" editing of film or other analog recording media borderline frivolous. Moreover, as explained above, it is possible to reduce a full-game recording to a Condensed Game without using a deletion-based method of editing.

It bears mentioning that the Court <u>does not</u> grant summary judgment as to non-infringement for MLBAM because MLBAM's accused method permits the inclusion of certain additional content not permitted by BQ's claimed method. The '716 Patent only permits edited recordings to be made from material from the game recording, specifically game action from final pitches, attempts by runners to advance, and "optional material <u>from the game recording</u> including, but not limited to, original soundtrack recordings or narrative to explain play." (<u>Markman</u> Op. at 46 (emphasis added).) MLBAM's Condensed Games sometimes include additional content beyond what would be found in a game recording, specifically, graphical overlays and advertisements. (DSOF ¶¶ 82-86.) However, it does not follow that because MLBAM's method permits the inclusion of this additional content, MLBAM cannot use BQ's claimed method—if a party uses another's method for producing a

13

**A85**

video and then layers additional images on top of it, they have still used the other party's method.

In a similar vein, the Court does not grant summary judgment as to non-infringement for MLBAM because MLBAM does not perform Claim 1 Step 4, which consists of "playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers." ('716 Patent ll. 4:12-14.) Under the Court's construction, "playing" the edited recording means causing a device to display it; "broadcasting" the edited recording means simultaneously sending it in a one-way transmission to multiple recipients; and "subscribers" are "subscriber-viewers" that the parties agree "either agreed or requested in some manner to view the edited recording." (Markman Op. at 46.) As both BQ and MLBAM offer their condensed baseball games for streaming over the Internet, there is a triable issue as to whether each performs this step.

In sum, MLBAM does not use BQ's claimed method, and thus does not infringe the '716 Patent. Because there is no evidence sufficient to create a genuine dispute of material fact as to whether MLBAM or anyone subject to MLBAM's direction or control performed all of the steps of the claimed method, MLBAM is entitled to judgment as a matter of law on BQ's § 271(a) direct infringement claim. Because an accused method that does not infringe an independent claim also does not infringe the associated dependent claims, it follows that MLBAM is also entitled to summary judgment on Claims 2, 3, 4, and 5.

B.    Doctrine of Equivalents.

There is no triable issue as to whether MLBAM infringes the '716 Patent

because MLBAM's accused method is equivalent to the method claimed by the

patent.

1.    Generally.

Under the doctrine of equivalents, "a product or process that does not literally

infringe upon the express terms of a patent claim may nonetheless be found to

infringe if there is 'equivalence' between the elements of the accused product or

process and the claimed elements of the patented invention." Warner-Jenkinson

Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997) (citing Graver Tank & Mfg.

Co. v. Linde Air Prods. Co., 339 U.S. 605, 609 (1950)). "An element in the accused

product is equivalent to a claim limitation if the differences between the two are

'insubstantial' to one of ordinary skill in the art." Amgen Inc. v. F. Hoffman-La

Roche Ltd., 580 F.3d 1340, 1382 (Fed. Cir. 2009) (citing Warner-Jenkinson, 520 U.S.

at 40). The doctrine of equivalents permits a patentee to "claim those insubstantial

alterations that were not captured in drafting the original patent claim but which

could be created through trivial changes," in recognition that "[u]nimportant and

insubstantial substitutes for certain elements could defeat the patent, and its value

to inventors could be destroyed by simple acts of copying." Festo Corp. v. Shoketsu

Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731, 733 (2002).

The steps in BQ's and MLBAM's methods are not facially the same, but this

does not necessarily mean that the methods are not equivalent. It is theoretically

possible for a subjective or an accretive method to be equivalent to that claimed by

15

**A87**

BQ.  For example, a party could create a condensed version of a baseball game by using BQ's objective algorithm for selecting footage from a game recording, and then adding in a few short clips of subjectively chosen game footage, such as shots of fan reactions or a few foul balls.  Or a party could create a condensed version of a baseball game by merely objectively copying and pasting all game action from final pitches and attempts by runners to advance into a new gapless recording, as opposed to deleting all other game action and eliminating the resulting time gaps.

However, MLBAM's accused method is not merely some trivially modified version of BQ's claimed method.  Rather, as explained above, it is fundamentally different—it is both subjective and based on accretion, and it relies on value judgments by human editors as opposed to algorithmic rules.  Accordingly, there are fundamental non-trivial differences between BQ's claimed method and MLBAM's accused method, such that it is clear that a person of ordinary skill in the art would think that there are substantial differences between the steps used by MLBAM and those claimed by BQ.

It matters not that the end-products of BQ's claimed method and MLBAM's accused method are substantially similar in some respects.  As the Court has stated, there is more than one way to skin a cat—and more than one way to produce a condensed version of a baseball game.  This is precisely why it is of no import to the doctrine of equivalents that MLBAM did not disclose or promote the changes to its editing process post-issuance of the '716 Patent, or that Condensed Games were approximately the same length in the year before and the year after the '716 Patent

issued. It may very well be that MLBAM's accused method produces a similar end-product to BQ's claimed method—but it is the method that BQ has patented, not the end-product.[9]

Accordingly, there is no genuine dispute of material fact, and BQ cannot show equivalence as a matter of law.[10]

### 2. Prosecution history estoppel.

"Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process."

---

[9] BQ makes much of the fact that MLBAM's editors were instructed in August 2011: "[J]ust scan through the run times on the [Condensed Games] looking to make sure none are unusualy [sic] long. If one looks out of whack just check it out to make sure that at least one out is skipped along the way." (Declaration of Brett D. Kaplan, ECF No. 207 ex. K.) BQ argues that this statement shows that MLBAM's intent is to practice a fraud on the patent. But if anything, this statement is evidence of MLBAM's intent to produce results similar to BQ's without using the same method, which tends to show that MLBAM sought to avoid infringing BQ's method patent. Further, while this statement may show that MLBAM editors at times use deletion-based editing techniques, it remains the case that MLBAM's accused method is primarily based on accretive copy-and-paste editing.

[10] MLBAM argues that summary judgment in its favor on the doctrine of equivalents is warranted because BQ has not offered any expert evidence supporting this theory. This argument fails because expert testimony is not required for establishing equivalence. Although testimony by a qualified expert is "typically" offered to establish that a person of ordinary skill in the art would recognize the equivalence, "particularized testimony" by a non-expert "versed in the technology" may suffice. AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (citations omitted). Inventors are typically skilled in the art, Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005), and their testimony may therefore be used to establish equivalence, see, e.g., Forest Labs., Inc. v. Abbott Labs., 239 F.3d 1305, 1309 (Fed. Cir. 2001) (at trial, party offered testimony from primary inventor in attempt to rebut claim of infringement under the doctrine of equivalents). Here, BQ has proffered sworn statements by Gregory Mockry, the co-inventor of the '716 Patent. Whether Mockry is qualified to offer this testimony is a disputed question of fact that the Court need not now decide.

However, even assuming qualification in the art for purposes of this motion, Mockry has not offered an admissible opinion on the equivalence between the two methods because he failed to actually review one of them—as MLBAM points out, Mockry's opinion as to whether there are substantial differences between BQ's and MLBAM's editing criteria and methods is based on having viewed and compared Condensed Games to edited recordings, not on having reviewed MLBAM's editing instructions or on firsthand knowledge of how MLBAM's editors create Condensed Games. (See Reply Memorandum in Support of MLBAM's Motion for Summary Judgment of Non-Infringement, ECF No. 218 at 4 ¶ 5 (citing Declaration of Gregory M. Mockry, ECF No. 209 ¶¶ 18, 20, 22).) Accordingly, BQ's failure to provide admissible testimony by an expert or a non-expert versed in the technology provides an alternative basis for the Court's conclusion that BQ cannot show equivalence as a matter of law.

_Festo_, 535 U.S. at 733. There are two forms of prosecution history estoppel: argument-based and amendment-based. _Voda v. Cordis Corp._, 536 F.3d 1311, 1325 (Fed. Cir. 2008). Amendment-based estoppel precludes BQ from asserting the doctrine of equivalents against MLBAM with respect to Claim 1 Step 2.

Argument-based estoppel may be appropriate "[when the applicant surrenders] claim scope through argument to the patent examiner . . . ." _Voda_, 536 F.3d at 1325 (alteration in original) (quoting _Conoco, Inc. v. Energy & Envtl. Int'l, L.C._, 460 F.3d 1349, 1363 (Fed. Cir. 2006)). To invoke argument-based estoppel, the prosecution history must evince "a clear and unmistakable surrender of subject matter." _Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc._, 347 F.3d 1314, 1326 (Fed Cir. 2003) (quoting _Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc._, 305 F.3d 1303, 1316 (Fed. Cir. 2002)). To constitute such a clear and unmistakable surrender of subject matter, "the statements in question must be such that 'a competitor would reasonably believe that the applicant had surrendered the relevant subject matter.'" _Cordis Corp. v. Medtronic Ave, Inc._, 511 F.3d 1157, 1177 (Fed. Cir. 2008) (quoting _Cyber Corp. v. FAS Techs., Inc._, 138 F.3d 1448, 1457 (Fed. Cir. 1998) (en banc)).

Generally, courts will only find argument-based estoppel appropriate when the patentee has explicitly disavowed a specific feature in the prior art; additional statements meant to further distinguish the claimed invention from prior art do not constitute clear and unmistakable surrender. _Compare, e.g._, _Deering_, 347 F.3d at 1326-27 (statement made to clarify examiner's mistake and distinguish from prior

18

**A90**

art did not constitute clear and unmistakable surrender of subject matter), and Eagle Comtronics, 305 F.3d at 1315-16 (patentee's use of specific claim language to further define the location of the claimed invention, a physical seal, along an interface did not amount to a surrender of claims to other seals elsewhere along the interface), with PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1367-68 (Fed. Cir. 2007) (argument-based estoppel applied to prevent patentee from asserting claim to non-rectangular-shaped frame where patentee explicitly limited its claims to a rectangular-shaped frame), and Reese v. Nortel Networks Inc., 60 Fed. App'x 274, 278 (Fed. Cir. 2003) (patentee estopped from asserting an equivalent "when he expressly disavowed that interpretation during prosecution"), and Medinol Ltd. v. Guidant Corp., 417 F. Supp. 2d 280, 310 (S.D.N.Y. 2006) (patentee estopped from asserting an equivalent because they made an "unequivocal statement" disavowing the claim at issue).

Amendment-based estoppel is appropriate "when an amendment is made to secure the patent and the amendment narrows the patent's scope." Festo, 535 U.S. at 736. Specifically, a patentee's "decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim," id. at 734, and it is therefore "presumed to be a general disclaimer of the territory between the original claim and the amended claim," id. at 740 (citation omitted). Once this presumption is established, the patentee bears the burden of "showing that the amendment does not surrender the particular equivalent in question." Id.

19

**A91**

Although any narrowing amendment made to satisfy the Patent Act may give rise to estoppel, "there are some cases . . .where the amendment cannot reasonably be viewed as surrendering a particular equivalent." Id. at 740. For example, it may be unreasonable to view an amendment as surrendering a particular equivalent when "[t]he equivalent may have been unforeseeable at the time of the application," or when "the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question," or for "some other reason suggesting that the patentee could not reasonably be expected to have describe the insubstantial substitute in question." Id. at 740-41.

MLBAM argues that argument-based estoppel should apply to BQ because BQ repeatedly stressed that its method was distinguishable from prior art due to its "objective" nature. But BQ's statements do not amount to an explicit disavowal of any specific feature in the prior art. At most, they are an attempt to more particularly distinguish the novelty of BQ's method, and it is not clear that they identify or specify any surrendered subject matter. Further, accepting MLBAM's argument here would effectively eviscerate the doctrine of equivalents, because all patent applicants must explain with particularity how their claimed invention differs from prior art in order to obtain a patent. Accordingly, argument-based estoppel does not apply to BQ.

But amendment-based estoppel is a different story. BQ amended the editing step (what is now Claim 1 Step 2) in the course of securing the '716 Patent. Originally, the editing step consisted of "editing the recorded appearances-at-bat to

leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on based to advance to another base." ('716 Patent Application Publication dated March 27, 2003, ECF No. 153 ex. B ("Mar. 2003 Application").) In its original form, the editing step was not particular about the meaning of the term "editing." After the claim containing this step was rejected for a variety of patentability reasons, BQ amended the claim to specify that "editing the game recording of each appearance-at-bat" would be achieved by "deleting substantially all game action other than" final pitches and attempts by runners to advance.[11] ('716 Patent ll. 4:3-11.) As explained above, MLBAM's method is based on subjective accretion, not objective deletion, and as such MLBAM's method falls within the territory conceded by the amendment.

BQ therefore bears the burden of showing that the amendment does not surrender the particular equivalent in question. This is a burden that BQ cannot meet, as there is no reason to believe a subjective and accretive, copy-and-paste editing method was unforeseeable at the time of the application, nor is the rationale underlying the amendment merely tangential to the equivalent in question— indeed, by specifying a deletion-based editing method, the amendment strikes at a core distinguishing characteristic of the claimed equivalent. Accordingly, because in the course of prosecuting the '716 Patent BQ changed what became Claim 1 Step 2 to clarify that "editing" means "deleting substantially all" game action other than

---

[11] BQ also amended its claims to replace the term "presenting" with "playing or broadcasting." (Compare Mar. 2003 Application, with '716 Patent ll. 4:12-13, 4:17-18, 4:20-21.) However, this amendment matters only if MLBAM does not play or broadcast Condensed Games, and as explained above, this is a triable issue.

final pitches and attempts by runners to advance, BQ is estopped from asserting the doctrine of equivalents against MLBAM with respect to Claim 1 Step 2. MLBAM is therefore also granted summary judgment on § 271(a) on this alternative ground.

C.   Inducement and Contributory Infringement.

To prevail on an inducement claim under 35 U.S.C. § 271(b) or a contributory infringement claim under 35 U.S.C. § 271(c), a plaintiff must first prove direct infringement. AquaTex, 419 F.3d at 1380 ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." (quoting Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993))). As established above, there is no triable issue as to whether MLBAM has directly infringed the '716 Patent. Consequently, BQ cannot prevail under § 271(b) or § 271(c).

D.   Injunctive Relief.

Count II of BQ's complaint requests injunctive relief for the infringement alleged in Count I. Because the Court grants summary judgment for MLBAM on Count I, the Court must also grant summary judgment for MLBAM on Count II.

IV.   CONCLUSION

For the reasons stated above, the Court GRANTS summary judgment of non-infringement for MLBAM. Judgment is hereby entered for MLBAM as to Counts I and II in the Complaint and Count I of MLBAM's Counterclaims.

The Clerk of Court is directed to close the motion at ECF No. 200.

SO ORDERED.

Dated:      New York, New York
             December ___, 2014

                              KATHERINE B. FORREST
                            United States District Judge

COURTESY COPY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BASEBALL QUICK, LLC, a New York corporation,<br><br>           Plaintiff,<br><br>v.<br><br>MLB ADVANCED MEDIA, L.P., a Delaware corporation, and DOES 1 through 5, inclusive,<br><br>           Defendants. | Case No. 1:11-cv-01735-KBF<br><br>ECF Case |

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #:_____           │
│ DATE FILED: JAN 2 8 2015          │
└──────────────────────────────────┘
```

**BASEBALL QUICK, LLC'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING MLB ADVANCED MEDIA, L.P.'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

**FILED UNDER SEAL**

_Order_

Motion for reconsideration denied. Plaintiff's arguments are without merit and do not meet the standard for granting reconsideration.

K. B. Forrest
USDJ

1/28/15

24351879v7

A96

BQ has provided a compelling case for this Court to reconsider its summary judgment ruling (D.I. 229) ("Opinion") and to correct errors that would prevent a "manifest injustice." MLBAM's Opposition (D.I. 240) ("Opp.") identifies no meaningful reason to deny BQ's motion and only further highlights the proper basis for reconsideration.

## I.    PRELIMINARY STATEMENT

Defendant's Opposition is an amazing document—a document with a countering argument that actually reinforces BQ's position and demonstrates the need for reconsideration. BQ's first point supporting reconsideration is that MLBAM did not raise and thus BQ did not receive notice of the novel theory relied upon by the Court on *summary judgment*[1]—a theory based on a new claim construction that excludes subjectively based editing instructions (defined now as "strictly objective" editing by MLBAM (Opp. at 2)). MLBAM's opposition confirms this point by completely failing to identify any argument raised by MLBAM before the Court's ruling that was based on this theory.

Instead of directing the Court's attention to any presentation of this argument in its motion papers on summary judgment or at any other point of time in this litigation, MLBAM refers to the nearly decade old patent file history as "notice" of this possible theory, followed by various references to claim construction briefing, but briefing ultimately directed to the issue of whether all "final pitches" were required by the claims. (*Id.* at 3). Of course, that issue was not the basis of the Court's summary judgment ruling. A more telling omission of a core fact—that the argument/claim construction was never raised—is difficult to imagine.

Second, MLBAM's Opposition regarding the Court's new construction of the term "deleting" vacillates between two poles. MLBAM first states that the term was defined by the Court's Markman Order (D.I. 194)—defining "deleting" as "deletion" (Opp. at 9). This does not

---

[1] In its ruling on MLBAM's Motion for Summary Judgment (D.I. 200) ("MSJ"), the Court construed the editing step as limited to objectively selected content–thus excluding an editing process that provides one or more subjective selection instructions (Opinion, D.I. 229, at 9-10).

- 1-

24351879v7

**A97**

constitute a specific construction of the term, and the suggestion that a term individually construed by essentially repeating the same term in a longer passage is without merit. Thus, MLBAM additionally argues that BQ waived any arguments regarding how this term should be construed. This is also not true.

Critically missing from MLBAM's Opposition is any indication (i) that MLBAM actually proposed the construction of "deleting" now applied by the Court, or (ii) of any intrinsic evidence that remotely supports the non-destructive deletion process described by the Court as the process taught by the '716 patent.[2] Indeed, MLBAM actually acknowledges that the Court's construction of the editing step is impossible or "unheard of," but then deceptively suggests that this was the core teaching of the '716 patent. (Opp. at 11). It was not, and the record before this Court clearly supports the proper construction of "deleting" as "not including" or "excluding."

The further *telling* omission from MLBAM's Opposition is any discussion of MLBAM's actual, previous argument that deletion in the '716 patent should be construed as requiring "destructive editing" (MSJ Br., D.I. 201, at 10 & 21)—an MLBAM argument the Court rightly found to be "frivolous," but ignored as a "strawman" (Opinion at 13). Of course, MLBAM's current silence on this point is a clear and powerful confirmation that in fact this was not a strawman, but actually MLBAM's sole position in its motion. (MSJ Br. at 10.)

The impossibility of MLBAM's Opposition task—to justify a clearly wrong decision by the Court—is thus best illustrated by MLBAM's failure to identify these points in the record. Because these findings go to the core of the Court's ruling, including infringement under the doctrine of equivalents, reconsideration of these rulings will prevent "manifest injustice."

---

[2] The Court construed the editing step as mandating a "non-destructive" deletion process limited to *the erasing* of game content from a copy (leaving time gaps). (Opinion at 10.)

- 2 -

## II. MLBAM FAILURE TO IDENTIFY ANY ARGUMENT MADE TO THIS COURT SUPPORTING A JUDGMENT BASED ON A CLAIM CONSTRUCTION REQUIRING "STRICTLY OBJECTIVE" EDITING DEMONSTRATES LACK OF NOTICE TO BQ AND JUSTIFYING RECONSIDERATION OF THIS RULING

MLBAM's Opposition had a simple objective: identify where in its summary judgment papers—its Opening Brief, Statement of Undisputed Facts, Reply Brief or Reply Statement of Facts—that the "strictly objective" editing theory for judgment had been raised by MLBAM. This, it couldn't do.

### A. MLBAM Admits That Neither Party Argued For The Court's Claim Construction *Strictly* Limiting The '716 Patent Claims To Include Only Objectively Selected Content In The Editing Step

The simple truth is that MLBAM set forth four specific theories of non-infringement in its motion for summary judgment, but none were predicated on the allegedly subjective nature of their editing process and the strict objective requirements of the claimed method now relied on by the Court. (*See, e.g.*, MSJ Br. at 2)

MLBAM's first argument suggesting that the scope of the claim should be limited to "strictly objective" editing (Opp. at 2) lacks any support. Indeed, while the Court's claim construction notes the objective nature of the content enumerated as romanettes (i)-(iii) in the claim, the Court never suggested that the claimed method was to the underline exclusion of any other content, objectively or subjectively selected. Critically, nothing in the Court's adopted construction of the editing step makes mention of objective selection as a limitation or exclusive requirement, let alone any restriction against subjective content:

> Editing the game recording of each appearance-at-bat by deletion to produce an edited recording that must include all: (a) game action from a final pitch thrown to each player, and (b) successful and unsuccessful attempts of runners on base to advance to another base. Optional material that may also remain in the edited recording as part of this process includes, but is not limited to, original soundtrack recordings or narrative to explain play.

(Markman Order, D.I. 194, at 47.) Notably, this construction explicitly allows for certain identified "optional material" that is *subjective* by nature. MLBAM reached this same conclusion. (*See* Opp.

- 3 -

at 3 ("The PTO found BQ's claim objective with regard to the required (i) – (iii) content, and found the claims subjective with regard to the additional content that could remain." (citation omitted)).)

Throughout the MSJ briefing, both parties admittedly noted the objective nature of the claimed selection of content, but purely as an observed quality. Neither party argued that this was a claim limitation that allowed only objective content to the exclusion of subjective content.

In its MSJ Opinion, and without notice to either party, the Court for the first time interpreted the "strictly objective" quality as a claim limitation. For example, in explaining the reasoning for granting summary judgment on the issue of no direct infringement, the Opinion first stated, "Claim 1 Step 2 provides for an <u>objective</u> editing process that leaves little if any discretion to BQ's editors." (Opinion at 10 (emphasis original).) It then stated, "MLBAM's accused method, by contrast, relies on <u>subjective</u> decision-making." (*Id.* (emphasis original).) While the Court acknowledged certain objective content described in MLBAM's editing instructions ("'any action that results in a hitter reaching base and what happens after they reach,' 'all runs scored,' and 'all [strikeout]s,'"), the Court concluded that, because the instructions provide for certain content "requir[ing] editors to make value judgments" (i.e., subjectively selected), "MLBAM produces its Condensed Games by using a method that substantially differs from that described in the '716 Patent." (*Id.* at 10-11.) All of this analysis is completely decoupled from any *actual claim language*—the claims simply do not recite either "objective" or "subjective" terms.

In an effort to justify the novel ruling by the Court and suggest that BQ was on notice of this issue, MLBAM cites to irrelevant comments made to the PTO almost a decade ago.[3] (Opp. at

---

[3] Even if these comments were relevant, which they are not, they do not go nearly as far as MLBAM suggests. MLBAM cites to part of an Appeal Brief in the '716 patent file history where the applicants differentiated the invention from a prior art reference describing highlight films. (D.I. 95-18 at 8.) In a portion not cited by MLBAM, the applicants argue that the cited prior art is primarily subjective in nature. (*Id.* at 9.) However, applicants never imply or suggest that the claimed method is exclusively objective, or restricted from including subjectively selected content. (*See id.* at 8-10.)

24351879v7

2-3.) However, MLBAM never articulates how this provided BQ notice of the Court's new theory of non-infringement and of course offers no authority suggesting otherwise. MLBAM supplements this with a further—and again irrelevant—discussion of the *Markman* process, arguments and rulings. (*Id.* at 3.) However, that is not the point BQ is making in *this motion*. In this motion, BQ is pointing out that the Court relied on limitations not found in its original claim construction—i.e., a restriction against subjectively selected content. MLBAM provides no argument or evidence to the contrary.

Contrary to MLBAM's assertion that "there is no reason to believe that [the Court] was revisiting its prior claim construction" (*Id.* at 4), the Court's ruling on this point hinged entirely on a new claim limitation that was neither argued nor noticed (i.e., restriction against subjectively selected content). MLBAM appears to agree on this point, yet still implausibly defends the decision based on this new construction. (*See id.* ("[I]t was the *overall difference* in the method employed by MLBAM – which did not *objectively* require the inclusion of final pitches and advance attempts – that…doomed BQ's claim." (emphasis added)).)

MLBAM blurs the issue further by asserting BQ's burden on *summary judgment* in an attempt to distract from facts laid out in BQ's *motion for reconsideration*. (*Id.*) BQ is not attempting to shed its burden on MSJ. MLBAM's complaints regarding the record and proofs before the Court (*id.* at 4-7) are merely "smoke and mirrors" used to mask the fact conceded by MLBAM that it never actually argued for theory now relied on by the Court.[4]

Because MLBAM's Opposition completely fails to identify the theory, facts and arguments that would support the Court's new claim construction and basis for ruling, MLBAM has conceded that BQ was not on notice on this issue. Thus, reconsideration is proper and necessary to prevent

---

[4] Despite MLBAM's protests to the contrary, circumstantial evidence of MLBAM's performance of the claimed method—i.e., CGs containing at least all of the content recited in the claim—is entirely proper given the fact that the MLBAM's editing instructions cannot be relied on as evidence of actual practice (see discussion *infra* Part II.B). MLBAM seeks to avoid the cases cited by BQ by narrowly interpreting their holdings to their specific facts.

24351879v7

"manifest injustice." And, given a correct claim construction, the record BQ submitted in support of its claim precludes summary judgment of non-infringement.

BQ's burden on this motion is only to show that the Court's MSJ decision was based on a new and incorrect claim construction that resulted in findings of material fact and law that are fundamentally in error. MLBAM, however, would rather have the Court conclude that BQ must reargue its position on MSJ in this motion for reconsideration.

### B. MLBAM Provides No Meaningful Argument Or Evidence That Its "Subjective" Instructions Are Not Otherwise Captured By The '716 Patent

Before the Court's MSJ ruling there was no indication that the supposed subjective nature of several of MLBAM's editing "instructions" would be an issue as neither party argued this point. The Opinion, however, turned on this as a key distinction between MLBAM's procedure and the claimed method. (Opinion at 10; discussion *supra* Part II.A.) In its opening brief, BQ provided a simple analysis of MLBAM's editing instructions to cast light on the supposedly "subjective" components of the instructions that the Court relied on in reaching its conclusion. (Brief at 5-6.)

It is odd and an affront to logic, then, that MLBAM protests the inclusion of this analysis because "a court cannot have committed 'clear error' in failing to consider arguments never previously made." (Opp. at 6.) By MLBAM's account, in opposition to MLBAM's summary judgment motion BQ should have argued an issue not actually raised by MLBAM.[5] MLBAM cannot truly expect such an absurd scenario.

In opposition, MLBAM clouds the issue by focusing on an insignificant discrepancy between *one* editing instruction and the claimed editing step as a whole, but utterly fails to respond to BQ's assertion that the allegedly "subjective" components *as a whole* are captured by the '716

---

[5] This also addresses note 2 in the Opposition. It was only after the Court's MSJ ruling that it became apparent that the allegedly subjective aspects of the instructions would be an issue requiring argument.

- 6 -

Patent. (*See* Pak Decl., Ex. A.) Thus, while the instruction to include "any action that results in a hitter reaching base" would not capture the final pitches resulting in an out, much of this type of game action would be captured by other instructions (for example, "Anything that is a top play," "Great defensive plays," "All strikeouts," "All double plays," "Bang-bang plays," and "Anything historic").[6] That is, these effectively instruct the editors to include game action stemming from final pitches resulting in an out.

MLBAM's opposition also fails to raise any doubt that the ostensible "subjective" components of its editing instructions are not actually subjective in practice and goes further to prove BQ's point. MLBAM offers the example of a defensive play that would not be included in the CG product if it was "routine," but would be if it was a "great defensive play" as instructed. (Opp. at 7.) Yet, this is precisely what happened on more than one occasion. (Mockry Decl., ¶¶ 14-15 (identifying numerous instances of routine outs found in published CGs).)

MLBAM merely provides an inaccurate hypothetical and points to no evidence to support its position that content was included in its CGs due solely to the subjective determinations of its editors. Thus, much of the "subjective" qualifiers in the instructions are negated by the practicalities of quickly editing a large number of games in a short amount of time and do not survive close scrutiny of what they actually mean. "Great defensive plays" becomes, essentially, "defensive plays." Fielding errors, which are by definition "costly," and "historic plays," are of the same vein—both capture game action resulting from a final pitch.

### C. MLBAM Overlooks The Clear Record And Does Not Address The Discrepancy Between The Written Instructions And Detailed Evidence Of Actual CG Content

MLBAM repeats the same erroneous notion that BQ is required to re-satisfy its burden on MSJ in its motion for reconsideration. This is not the law.

Reconsideration flows here from a demonstration that the Court has made a clear factual

---

[6] (Kaplan Decl., Ex. G (also produced as MLBAM-0042444 in this litigation).)

24351879v7

error by assuming the written editing *instructions* produced by MLBAM are conclusive evidence

of the actual process employed by MLBAM editors. The *record*, however, includes probative

evidence that demonstrates that this assumption was wrong. For example, many CGs included all

final pitches despite instructions to the contrary. (MLBAM SOF 72 ("These results were surprising

and inconsistent with the instructions that were given to CG editors...."); Kaplan Decl. ¶ 65; *see*

*also* Salzberg Rpt., D.I. 210-22, at 6 (estimating 61.4-67.2% of all outs were included in published

CGs from 2010-2014—a very high percentage of final pitches).)

III. **THE COURT'S ORIGINAL CONSTRUCTION OF THE EDITING STEP— PROPOSED BY MLBAM—EMBRACES MLBAM'S PROCESS**

MLBAM stands on the very strange contention that, because it once proposed a

construction for a long claim element that included the word "deleting" with a definition that

included the word "deletion," that it somehow raised an issue regarding the construction of the

single word "deleting." (Opp. at 8-9.) MLBAM could simply have offered a proposed construction

for the discrete term "deleting" since it is allegedly "key" to the editing step, but it never did so.

The Court adopted MLBAM's construction of the *editing step*, including the use of the

term "deletion" in place of "deleting," but did not define the term "deleting." In fact, the Court

explained that the editing step only requires "*producing an edited recording that retains*" the

content outlined in romanettes (i)-(iii). (Markman Order at 34 (emphasis added).) This definition

was entirely consistent with the understanding of both BQ and MLBAM—particularly in the

numerous MLBAM-sponsored challenges to the validity of the '716 patent. (*See* Request for *Inter*

*Partes* Reexam., D.I. 98-1, at 22 & 24-40 (asserting proposed rejections over prior art references

that only teach aspects of "generating" a summary of a game without reference to deletion).)

It was not until MLBAM's summary judgment motion that it came forward with the novel

notion that "deleting"/"deletion" was strictly limited to *destructive* techniques. (MSJ Opening Br.,

D.I. 201, at 10 & 21.) This construction was soundly rejected by the Court, which described such a

- 8 -

position as "borderline frivolous." (Opinion at 13.) However, the Court re-construed the editing

step in a manner not offered by either party and not found in its earlier claim construction ruling—

that it is non-destructive,[7] but required additional, unrecited steps for operation.[8] The fact that the

construed operation of the editing step is awkward and unorthodox is highly indicative of an

improper construction, despite MLBAM's protests to the contrary. *See Phillips v. AWH Corp.*, 415

F.3d 1303, 1313 (Fed. Cir. 2005) (claim terms interpreted as one of ordinary skill would

understand in light of the specification).

BQ identified this error in the Court's finding and, as a way to reconcile the construed

editing step with its non-destructive nature, BQ proposed an interpretation of "deletion" as

"excluding" or "not including."[9] This negates the superfluous and unsupported limitations on

"deletion," and avoids the need for additional, unrecited steps for operation. By proposing this

construction, BQ does not seek to reargue points raised during claim construction because, as

explained above, what constitutes "deleting" was never made an issue by either party. BQ only

seeks to hold to the original construction of the editing step adopted by the Court.

That "deletion" can and should be interpreted as "excluding" or "not including" is also

supported by the testimony of Mr. Edwards, one of ordinary skill in the art of video editing, who

understood the editing instruction to "*remove* all game content other than the final pitch to every

---

[7] This is a corollary of the Court's statement that "any arguments premised on the idea that the patent contemplates the 'destructive' editing of film or other analog recording media borderline frivolous." (*Id.*)

[8] "It is possible to reduce a full-game recording to an edited recording or a Condensed Game either by deleting material from a copy of the full-game recording and then eliminating the time gaps, or by copying portions of the full-game recording into a new recording. BQ's '716 Patent describes the former method; MLBAM uses the latter." (*Id.*)

[9] This construction is fully supported by the Specification. *See* '716 Patent at 1:20-24 ("[T]his invention relates to a method of condensing…a baseball game by…*editing it to retain* the action portions….") & 2:10-37 ("The video record…is *edited down to retain* the last pitch thrown to each player, plus any resulting action for that pitch….Base running activity…can also be *retained*…. [S]ome additional material…can be *included* …."); *Phillips*, 415 F.3d at 1315 (Fed. Cir. 2005) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." (citation and internal quotes omitted)) *and Toro Co. v. White Consolidated Industries Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (claim terms are not construed in a "lexicographic vacuum, but in the context of the specification and drawings").

- 9 -

**A105**

batter in the game" to include "cuts only editing." (Edwards Decl., D.I. 208, ¶¶ 8 & 11) Cuts only editing involved selectively copying and pasting desired content from a source videotape to a destination videotape to produce an edited recording. (*Id.* at 11) That is, in the context of non-destructive video editing, "removal" (i.e., deletion) of undesired content embraces the selective *inclusion* of desired content.[10]

BQ submits that the Court's original construction of the editing step—"producing an edited recording"—fully embraces MLBAM's editing process.

## IV. DOCTRINE OF EQUIVALENTS

MLBAM concedes that the above errors taint the Court's analysis of BQ's infringement claim under the Doctrine of Equivalents ("DOE"). Indeed, the only defense now offered by MLBAM on DOE resides in a footnote by the Court suggesting an "alternate basis"—but still stemming from the editing *instructions* and not the actual edited *content*—for judgment. Faith in this footnote ruling is misplaced. The existence of any difference between ancillary editing *instructions* at MLBAM and the "editing step" of claim 1 is completely irrelevant to BQ's DOE theory—a theory premised on *actual* "final pitches" in CGs and thus completely decoupled from these ancillary instructions. Thus, Mr. Mockry's knowledge of MLBAM's (allegedly confidential) instructions is not necessary in this regard.

If the Court reconsiders and reverses on the above-identified claim construction issues, BQ respectively submits that its evidence of record on DOE is substantial and compelling. (MSJ Opp., D.I. 212, at 20-25.)

## V. CONCLUSION

As set forth in detail herein, the error of the Court's Summary Judgment Order is manifest.

---

[10] In addition to the Court's comments identified in BQ's Opening Brief (Br., D.I. 234, n.11), MLBAM's counsel also made a similar comment during the *Markman* hearing that supports this interpretation. (Markman Transcript, D.I. 186, at 59:13-16 ("'Some additional material…can be included.' It's not added. *It's included. That means you don't have to delete it.*") (emphasis added).)

24351879v7

The record did not support the Court's grant of summary judgment of non-infringement and reconsideration to prevent manifest injustice is clearly appropriate.

Dated:          January 15, 2015                    Respectfully submitted,

                                                    TROUTMAN SANDERS LLP


                                                    _James M. Bollinger_____
                                                    James M. Bollinger
                                                    Timothy P. Heaton
                                                    Phoenix S. Pak
                                                    TROUTMAN SANDERS LLP
                                                    The Chrysler Building
                                                    405 Lexington Avenue
                                                    New York, NY 10174-0700
                                                    Telephone: 212.704.6000
                                                    Facsimile: 212.704.8383
                                                    Email: james.bollinger@troutmansanders.com
                                                           timothy.heaton@troutmansanders.com
                                                           phoenix.pak@troutmansanders.com
                                                    Matthew D. Murphey, Cal. SBN 194111
                                                    (Pro Hac Vice)
                                                    TROUTMAN SANDERS LLP
                                                    11682 El Camino Real
                                                    Suite 400
                                                    San Diego, CA 92130-2092
                                                    Telephone: 858.509.6000
                                                    Facsimile: 858.509.6040
                                                    Email: matt.murphey@troutmansanders.com

                                                    Paul E. McGowan, Ga. SBN 360460
                                                    (Pro Hac Vice)
                                                    TROUTMAN SANDERS LLP
                                                    600 Peachtree Street, N.E. Suite 5200
                                                    Atlanta, GA 30308-2216
                                                    Telephone: 404.885.3270
                                                    Facsimile: 404.962.6842
                                                    Email: paul.mcgowan@troutmansanders.com

                                                    *Attorneys for Plaintiff*
                                                    *BQ, LLC*

24351879v7

## CERTIFICATE OF SERVICE

The undersigned declares that a true and correct copy of the foregoing document (and all accompanying documents) was served upon the following counsel of record via the Court's CM/ECF notification system (redacted version), and by email (sealed version):

FOLEY & LARDNER LLP
Peter Neil Wang
90 Park Avenue
New York, NY 10016-1314
Tel: (212) 682-7474
Fax: (212) 687-2329
pwang@foley.com

Cynthia J. Rigsby
Michelle Moran
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel: (414) 271-2400
Fax: (414) 297-4900
crigsby@foley.com
mmoran@foley.com

*James M. Bollinger*

24351879v7

Correct, K.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

BASEBALL QUICK, LLC,

                                    Plaintiff,

            -v-

MLB ADVANCED MEDIA, L.P.,

                                    Defendant.

-------------------------------------------------------X

Civil Action No. 11-CV-01735
(KBF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **FEB 0 5 2015**

## JOINT STIPULATION OF DISMISSAL OF MLBAM'S COUNTERCLAIM FOR DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 7,628,716

Defendant MLB Advanced Media, L.P. ("MLBAM"), and Plaintiff Baseball Quick, LLC ("BQ"), by and through their undersigned counsel of record, submit this Joint Stipulation of Dismissal of Counterclaim II pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(ii) and 41(c).

In view of the Court's entry of summary judgment resolving all other claims, MLBAM has agreed to dismiss without prejudice Count II, its counterclaim for declaratory judgment of invalidity of U.S. Patent No. 7,628,716, with the understanding that such a claim could be reasserted by MLBAM at a later date in this or any other action. BQ has agreed to such a dismissal. Accordingly, counsel for MLBAM and BQ hereby stipulate, subject to the Court's approval, that:

1

1.    MLBAM's Count II, its counterclaim against BQ for declaratory judgment of invalidity of U. S. Patent No. 7,628,716 (Dkt. No. 21 at 39-40), shall be dismissed without prejudice; and

2.    Each party shall bear its own costs and attorneys' fees with respect to the dismissed counterclaim.

**A110**

Dated: February 2, 2015

Cynthia J. Rigsby /mann with
permission

FOLEY & LARDNER LLP
Peter N. Wang
Sara P. Madavo
90 Park Avenue
New York, NY 10016-1314
Tel: (212) 682-7474
Fax: (212) 682-2329
pwang@foley.com
smadavo@foley.com

Cynthia J. Rigsby
Kevin J. Malaney
Michelle A. Moran
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Tel: (414) 271-2400
Fax: (414) 297-4900
crigsby@foley.com
kmalaney@foley.com
mmoran@foley.com

*Attorneys for Defendant*
*MLB Advanced Media, L.P.*

Respectfully submitted,

James M. Bollinger

James M. Bollinger
Timothy P. Heaton
Phoenix S. Pak
TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0700
Telephone: (212) 704-6000
Facsimile: (212) 704-8383
james.bollinger@troutmansanders.com
timothy.heaton@troutmansanders.com
phoenix.pak@troutmansanders.com

Matthew D. Murphey, Cal. SBN 194111
(Pro Hac Vice)
TROUTMAN SANDERS LLP
11682 El Camino Real
Suite 400
San Diego, CA 92130-2092
Telephone: (858) 509-6000
Facsimile: (858) 509-6040
matt.murphey@troutmansanders.com

Paul L. McGowan, Ga. SBN 360460
(Pro Hac Vice)
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E. Suite 5200
Atlanta, GA 30308-2216
Telephone: (404) 885-3270
Facsimile: (404) 962-6842
paul.mcgowan@troutmansanders.com

*Attorneys for Plaintiff*
*Baseball Quick, LLC*

## SO ORDERED:

_____
**U.S.D.J.**        RPK   2/4/15

This action is now terminated.
K. B. Fo

A111

## Certificate of Service

I, Michelle A. Moran, an attorney, hereby certify that on February 2, 2015, pursuant to SDNY ECF Rule 18.3, I e-mailed a copy of the foregoing with the Clerk of the Court, copying counsel of record on the e-mail which constitutes service under the Federal Rules of Civil Procedure.

Michelle A. Moran

4

US007628716B2

(12) **United States Patent**
Mockry et al.

(10) Patent No.: **US 7,628,716 B2**
(45) Date of Patent: **Dec. 8, 2009**

(54) **METHOD OF RECORDING AND PLAYING BASEBALL GAME SHOWING EACH BATTER'S LAST PITCH**

(76) Inventors: **George M. Mockry**, 62880 W. Lasalle Rd., #125, Montrose, CO (US) 81401; **Greg M. Mockry**, 185 Cook Rd., Massena, NY (US) 13662

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1845 days.

(21) Appl. No.: **09/878,860**

(22) Filed: **Jun. 9, 2001**

(65) **Prior Publication Data**

US 2003/0060311 A1 Mar. 27, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/211,208, filed on Jun. 13, 2000.

(51) **Int. Cl.**
*A63B 67/00* (2006.01)

(52) **U.S. Cl.** .................................................. **473/468**

(58) **Field of Classification Search** ................ 473/468, 473/415–421, 434, 499–501, FOR. 102, 465; 273/317.6, 244.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,493,872 B1 * 12/2002 Rangan et al. ................ 725/32

OTHER PUBLICATIONS

School and Sports Video Projects- Jun. 2001- www. videoccasions-nw. com/voschool.html—pp. 1-4.*
Video Taping Your Sports Event- Dec. 2000 -www.fostervideo.com/ millennium-Pro-Sports-Video-2000.html -pp. 1-4.*
Cueing- Dec. 1997-http://www.sssm.com/editing/museum/rca/rca. html- SE1, p. 2.*
Web Page, Videoccasions: Do It for the Kids: School and Sports Video, 1998,1999,2000 copyright, Downloaded from web-Jan. 11, 2005, www.videoccasions-nw.com/voschool.html,4 pages.*
Web Page, FosterVideo Millennium Pro Sports Video 2000, Downloaded from web-Jan. 11, 2005, www.fostervideo.com/millennium-Pro-Sports-Video-2000.html, 2 pages.*
Web Page, Now Playing: Movies on The Net, Jan. 2000, Downloaded from web-Jan. 11, 2005, www.ecommerce-guide.com/news/trends/ print.php/289961,2 pages.*

Web Page, SeasonTicket, Apr. 2000, Downloaded from web-Feb. 8, 2005, www.findarticles.com,2 pages.*
Web Page, SeasonTicket, Aug. 2000, Downloaded from web-Feb. 8, 2005, www.gambling-associates.com, 1 page.*
Web Page, Customized video highlights, Aug. 24, 2000, Downloaded from web-Aug. 26, 2003, http://www.mlsnet.com/content/00/ mls0824seasonticket.html, 2 pages.*
Web page downloaded on Jun. 21, 2005, Software transforms TV into highlights, www.geeknews/2003/gee2003, 1 page.*
Web page downloaded on Jun. 21, 2005, Raptors Theater, www.nba/ com/Raptors/archive99.html, 2 pages.*
Web page downloaded on Jun. 21, 2005, HistoricFilms, www. historicfilms.com/historic/mainframe.asp, 1 page.*
Web page downloaded on Oct. 20, 2005, ProQuest-Producing SportChannel, Jul. 18, 1997, www.proquest.umi.com, 3 pages.*
Web page downloaded on Oct. 20, 2005, ProQuest-Baseball Lite, Jul. 26, 1995, www.proquest.umi.com, 1 page.*
Web page downloaded on Oct. 20, 2005, ProQuest-Watching in Fast Forward, May 5, 2002, www.proquest.umi.com, 1 page.*
Web page downloaded on Oct. 20, 2005, The Media Channell, 1998, www.web.archive.org/mediachannel.com, 6 pages.*
ProQuest Article- Full writeup, Baseball Lite: All the Hits without the fat, 1995, http://www.sfgate.com/cgi-bin/article.cgi?f=/e/a/1995/07/ 26/STYLE14634.dtl&type=printable, 5 pages.*
Press Release Major League Baseball, Mar. 27, 2001 (http:// pressbox.mlb.com/NASApp/mlb/pressbox/news/ pressbox_news_story.jsp?article_id+...).
Press Release Major League Baseball Mar. 5, 2002 (http://mlb.mlb. com/NASApp/mlb/mlb/homepage/mlb_homepage.jsp).
Press Release Major League Baseball, Apr. 1, 2003 (http://mlb.mlb. com.NASApp/mlb/mlb/news/mlb_com_press_release. jsp?ymd=20030401&...).
Dave Boling, Apr. 11, 2002, "Baseball for the Short Attention Span" (htpp://www.tcpalm.com/tcp/baseball/article/ 0,1651,TCP_1057_1082008,00.html).
Letter dated Aug. 1, 2000 from Greg M. Mockry to Ethan Orlinsky.

* cited by examiner

*Primary Examiner*—Gene Kim
*Assistant Examiner*—M Chambers
(74) *Attorney, Agent, or Firm*—Banner & Witcoff, Ltd.

(57) **ABSTRACT**

A recorded complete baseball game is condensed into about fifteen minutes of action. All of the at-bat appearances of the players, in turn, are recorded, and then the recorded game is edited to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners to advance to another base and any other outs, such a runner as being picked off base. Then the recorded edited game is presented to viewers as a condensed game. The condensed game can be presented to subscribers over the Internet, or may be presented on film or as a video recording.

**5 Claims, No Drawings**

US 7,628,716 B2

**1**

## METHOD OF RECORDING AND PLAYING BASEBALL GAME SHOWING EACH BATTER'S LAST PITCH

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit under 35 U.S.C. 119 of previously filed Provisional application 60/211,208 filed Jun. 13, 2000.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention broadly relates to a method for reducing the time needed to enjoy a complete baseball game, and especially relates to a method for replaying or rebroadcasting a baseball game in a manner so that the viewer sees only the outcome-determinative actions that occurred during the original game. In particular, this invention relates to a method of condensing the action portions of a baseball game by recording the game on film or video tape, and editing it to retain the action portions, i.e., the last pitch thrown to the batters for each turn at the plate.

2. Description of Related Art

In a baseball game, there are nine players in the field, i.e., on defense, at positions of catcher, pitcher, first base, second base, shortstop, third base, left field, center field and right field. The batting, or offensive, team bats one player at a time, in turn. Each team's half-inning ends when the three outs have been recorded. An out can occur for a given batter only when the batter has struck out or batted the ball into play, although a batter can remain at the plate if a base runner is tagged out, i.e, in a pick-off or if caught steeling. The player (i.e., the batter) can only advance legally to first base and be a base runner as a result of the last pitch thrown to him in a given turn at the plate, i.e., he can hit safely, be awarded a base on balls, be struck by a pitch, or strike out and reach first safely after a dropped or passed third strike. Any runners on base advance under these circumstances or are tagged or forced out. There are other ways a base runner can advance before a batter's turn comes to an end, for example, by stealing base, or on account of a wild pitch or a balk.

During a baseball game, there is considerable time taken during each half inning in which there is only limited action on the field. For example, for a given player's turn at bat, there can be six or more pitches thrown before the player hits the ball into play, strikes out, or walks. In addition, there is often a great deal of time used in pick off attempts and conferences in the infield, and in changing places between half-innings. A nine-inning game can typically last between two and three hours, and sometimes longer.

### BRIEF SUMMARY OF THE INVENTION

In accordance with an aspect of this invention, a film or video record is made of each player's turn at bat. The video record, which can be film, digital, or tape, is edited down to retain the last pitch thrown to each player, plus any resulting action for that pitch. This would record each safe base hit, each walk, strike out, sacrifice fly, ground out, etc. Of course, fielding would be recorded, i.e., each put-out, error, double-play, and throw-out. The resulting video record would be about 10 to 15 minutes, showing all the action of the game. Base running activity (i.e., activity that can also result in either an out or advancement of the runner) can also be retained, such as stolen bases and attempted steals, pickoffs,

**2**

rundowns, balks, and wild pitches. Some additional material (e.g., narrative) can be included to explain pitching changes, pinch runners, and other substitutions that may affect play.

### DETAILED DESCRIPTION OF THE INVENTION

In accordance with the invention, a film or video record is made of each player's turn at bat. Such a record is conventionally made as part of the original broadcast of most, if not all, professional, i.e., Major League Baseball games. The video record, which can be an analog record, such as film or videotape, or could be a digital record, is edited to retain the last pitch thrown to each player, plus any resulting action for that pitch as part of a consolidated record. Editing of either a complete analog or digital record of a pre-recorded baseball game is well within the skill in the art and requires no elaboration of the editing equipment or techniques. Editing of a digital record would be particularly easy and could be done using commercially available computers and off-the-shelf software. Such a reduced record would include each safe base hit, each walk, strike out, sacrifice fly, ground out, etc of every batter. Of course, the related fielding play associated with the action ensuring from the final pitch to a batter also would be retained as part of the recording e.g., each put-out, error, double-play, and throw-out. The resulting edited record of the baseball game would then be about 10 to 15 minutes, a considerable reduction from the standard 2-5 hours of a typical nine-inning professional baseball game. The edited record, however would show all of the action of the game that contributed directly to the outcome of the game. Base running activity (i.e., activity that can also result in either an out or advancement of the runner) should also generally be retained, such as stolen bases and failed attempted-steals, pickoffs, rundowns, balks, and wild pitches. If desired, some additional material (e.g., portions of an original soundtrack recorded by the announcers at the game or other added material) can be included in the edited record to explain pitching changes, pinch runners, and other substitutions that may affect play, as well as other aspects of the recorded action.

The completed (edited) version can be sold on a per-game basis, i.e., through a cable subscription arrangement, or delivered digitally over the Internet to subscribers, perhaps using a password and PIN assigned to the subscriber. The 10 to 15 minute video can also be used by professional scouts and others for purposes of player evaluation. The editing could take place immediately after each play, so that the recorded video could be released to its viewership immediately after the game. Each inning or half-inning can be packed as a unit, if desired. In this case, each pre-recorded inning, or half-inning could be supplied as the game is in progress. Thus, one could follow the game closely in time to when it is actually being played, while requiring only one-two minutes of attention to see all the action. This could increase interest in baseball, by making the game available, on a near-real-time basis, to fans some distance from the ball park, i.e., 75 miles or more. This could also permit satellite viewing of the game at remote locations, without requiring the full bandwidth that is needed for an unedited version or live telecast of the complete game.

The invention does not constitute merely a compilation of the highlights of a particular baseball game. Rather, the invention is directed to making a record of each and every outcome-determinative action that takes place during the complete game, while eliminating all of the action that ultimately does not impact on the outcome.

This procedure and the resulting action video can be used for other sports as well. In track and field, the last attempt or

US 7,628,716 B2

**3**

heat of each event could be recorded, e.g., the last pole-vault attempt for each athlete competing, and the last twenty meters of each race or heat. The invention would likewise apply in swimming and diving, or in figure skating. In horse racing, the final stretch and finish of each race would be recorded. This invention could also be adapted to baseball-related sports such as fast-pitch softball and cricket. The invention can be applied to net sports, e.g., capturing all game points in a tennis match, and capturing each score in volleyball. This system can also be adapted to show the important action in goal sports such as hockey, lacrosse, basketball, soccer, rugby, and football. The invention can also be used to feature target sports, i.e., to follow all the shots of a given player in golf or in billiards, or every roll in bowling.

The present invention has been described with reference to specific embodiments. However, this application is intended to cover those changes and substitutions that may be made by those skilled in the art without departing from the spirit and scope of the invention.

We claim:

**1**. A method of providing a subscription for viewing a recorded baseball game in which players from each team appear at bat, and attempt to place a pitched baseball into play and to reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method com-

**4**

prising: (1) recording each appearance-at-bat for every player and game action resulting from an appearance-at-bat to produce a game recording; (2) editing the game recording of each appearance-at-bat to produce an edited recording by deleting substantially all game action other than (i) game action from a final pitch thrown to each player, (ii) successful attempts of runners on base to advance to another base not associated with the game action resulting from the final pitch and (iii) unsuccessful attempts of the runners on base to advance to another base resulting in and out not associated with the game action resulting from the final pitch; (3) obtaining subscribers for viewing the edited recording and (4) playing or broadcasting the edited recording as a condensed recorded game for viewing by the subscribers.

**2**. The method of claim **1** wherein the edited recording for a nine-inning baseball game is about 15 minutes.

**3**. The method of claim **1** wherein said step of playing or broadcasting the edited recording for viewing is conducted over the Internet.

**4**. The method of claim **1** wherein said step of playing or broadcasting the edited recording for viewing is conducted by playing a videotape recording.

**5**. The method of claim **1** wherein the edited recording contains audio explaining any substitution of players.

* * * * *

Case 1:15-cv-00735-TJ0 Case 1:15-v-140735-T Documents: 1 Page 4 1 Filed 0 2/24 Page 15 149

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2003/0060311 A1**

Mockry et al.      (43) **Pub. Date:**     **Mar. 27, 2003**

(54) **METHOD OF RECORDING AND PLAYING BASEBALL GAME SHOWING EACH BATTER'S LAST PATCH**

(76) Inventors: **George Michael Mockry**, Cortez, CO (US); **Gregory Michael Mockry**, Massena, NY (JUS)

Correspondence Address:
**Bernhard P Molldrem Jr**
**333 East Onondage Street**
**Syracuse, NY 13202 (US)**

(21) Appl. No.:    **09/878,860**

(22) Filed:     **May 10, 2002**

Related U.S. Application Data

(60) Provisional application No. 60/211,208, filed on Jun. 13, 2000.

Publication Classification

(51) **Int. Cl.**$^7$ ............................ **A63B 71/02**; A63F 9/24
(52) **U.S. Cl.** ........................................... **473/468**; 463/42

(57)       **ABSTRACT**

A recorded complete baseball game is condensed into about fifteen minutes of action. All of the at-bat appearances of the players, in turn, are recorded, and then the recorded game is edited to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners to advance to another base and any other outs, such a runner as being picked off base. Then the recorded edited game is presented to viewers as a condensed game. The condensed game can be presented to subscribers over the Internet, or may be presented on film or as a video recording.

US 2003/0060311 A1                                        Mar. 27, 2003

1

## METHOD OF RECORDING AND PLAYING BASEBALL GAME SHOWING EACH BATTER'S LAST PATCH

[0001]   This invention relates to a method of condensing the action portions of a baseball game or other sporting event, by recording the game on film or video tape, and editing it to retain the action portions, i.e., the last pitch thrown to the batters for each turn at the plate.

[0002]   There are nine players in the field, i.e., on defense, at positions of catcher, pitcher, first base, second base, shortstop, third base, left field, center field and right field. The batting, or offensive, team bats one player at a time, in turn. Each team's half-inning ends when the three outs have been recorded. An out can occur for a given batter only when the batter has struck out or batted the ball into play, although a batter can remain at the plate if a base runner is tagged out, i.e., in a pick-off or if caught stealing. The player can only advance legally to first and be a base runner as a result of the last pitch thrown to him in a given turn at the plate, i.e., he can hit safely, be awarded a base on balls, be struck by a pitch, or strike out and reach first safely after a dropped or passed third strike. Any runners on base advance under these circumstances or are tagged or forced out. There are other ways a base runner can advance before a batter's turn comes to an end, for example, by stealing base, or on account of a wild pitch or a balk.

[0003]   During a baseball game, there is considerable time taken during each half inning in which there is only limited action on the field. For example, for a given player's turn at bat, there can be six or more pitches thrown before the player hits the ball into play, strikes out, or walks. In addition, there is often a great deal of time used in pick off attempts and conferences in the infield, and in changing places between half-innings. A nine-inning game can typically last between two and three hours, and sometimes longer.

[0004]   In accordance with an aspect of this invention, a film or video record is made of each player's turn at bat. The video record, which can be film, digital, or tape, is edited down to retain the last pitch thrown to each player, plus any resulting action for that pitch. This would record each safe base hit, each walk, strike out, sacrifice fly, ground out, etc. Of course, fielding would be recorded, i.e., each put-out, error, double-play, and throw-out. The resulting video record would be about 10 to 15 minutes, showing all the action of the game. Base running activity (i.e., activity that can also result in either an out or advancement of the runner) can also be retained, such as stolen bases and attempted steals, pickoffs, rundowns, balks, and wild pitches. Some additional material (e.g., narrative) can be included to explain pitching changes, pinch runners, and other substitutions that may affect play.

[0005]   The completed (edited) version can be sold on a per-game basis, i.e., through a cable subscription arrangement, or delivered digitally over the Internet to subscribers, perhaps using a password and PIN assigned to the subscriber. The 10 to 15 minute video can also be used by professional scouts and others for purposes of player evaluation. The editing could take place immediately after each play, so that the recorded video could be released to its viewership immediately after the game. Each inning or half-inning can be packaged as a unit, if desired. This could increase interest in baseball, by making the game available,

on a near-real-time basis, to fans some distance from the ball park, i.e., 75 miles or more. This could also permit satellite viewing of the game at remote locations, without requiring the full bandwidth that is needed for an unedited version or live telecast.

[0006]   This procedure and the resulting action video can be used for other sports as well. In track and field, the last attempt or heat of each event could be recorded, e.g., the last pole-vault attempt for each athlete competing, and the last twenty meters of each race or heat. The invention would likewise apply in swimming and diving, or in figure skating. In horse racing, the final stretch and finish of each race would be recorded. This invention could also be adapted to baseball-related sports such as fast-pitch softball and cricket. The invention can be applied to net sports, e.g., capturing all game points in a tennis match, and capturing each score in volleyball. This system can also be adapted to show the important action in goal sports such as hockey, lacrosse, basketball, soccer, rugby, and football. The invention can also be used to feature target sports, i.e., to follow all the shots of a given player in golf or in billiards, or every roll in bowling.

**1.** I claim the name "Baseball Quick" as our trademark. The name is an integral part of our invention and describes in 2 words how a fan can view a baseball game. "Baseball Quick" is a method of recording and editing a baseball game by showing only the last pitch to each batter and any subsequent action. Any action between the last pitch of any batter to the last pitch of another batter shall also be recorded. The result shall be a complete game of every player at bat in approximately 15 minutes.

**2.** I claim that this method of dispensing a baseball game can be used in the following medias. Television, Radio, Internet, Telephone, and Pagers.

**3.** I claim there are many ways "Baseball Quick" can be shown or heard. For example it can be dispensed, a) inning by inning while the game is in progress, b) 3rd inning, or 6th inning review while the game is in progress, or c) the whole game shown or heard after the game is over, d) all of the above can also be dispensed on the internet, telephone, pay per view or any hand held device. Finally, all these methods can be repeated at prime time slots or the next morning.

**4.** A method of recording and editing a baseball game in which players from each side appear at bat, in turn, and attempt to place a pitched baseball into play and reach base safely; with players failing to reach base safely being out and players on base attempting unsuccessfully to advance to another base being out; the method comprising:

recording the appearances-at-bat for each player, in turn, plus other action that ensues during or after the appearances-at-bat;

editing the recorded appearances-at-bat to leave only the last pitch thrown to each player, plus any action ensuing after that pitch and any attempts of runners on base to advance to another base; and

presenting the edited recorded game as a condensed recorded game showing important action portions of the game.

**5.** The method according to claim 4 wherein said editing includes omitting all pitches that do not result in either the

A117

2

player at bat placing the ball into play, producing an out, or the player at bat or another player on base advancing to another base.

6. The method according to claim 4 wherein the edited recorded game is about 15 minutes for a nine-inning game.

7. The method according to claim 4 wherein said edited recorded game comprises only a specific portion of the game.

8. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes delivering the recorded game to subscribers over the Internet.

9. The method according to claim 4 wherein said step of presenting the edited game as a condensed recorded game includes distributing the recorded game as a video recording.

10. The method according to claim 4 wherein the step of editing leaves in narrative material to explain substitution of players.

* * * * *

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 1st day of May, 2015, I caused this Non-Confidential Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Cynthia Rigsby
Kevin J. Malaney
Michelle A. Moran
FOLEY & LARDNER LLP
777 East Wisconsin Avenue, Suite 3800
Firstar Center
Milwaukee, Wisconsin  53202
(414) 297-5580

*Counsel for Appellee*

/s/ James M. Bollinger
*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*13,344*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>May 1, 2015                    </u>          <u>/s/ James M. Bollinger                    </u>
                                                          *Counsel for Appellant*